## UNITED STATES COURT OF INTERNATIONAL TRADE

AMSTED RAIL COMPANY, INC. and
ASF-K DE MEXICO S. DE R.L. DE C.V.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

**Court No. 23-00268**

## COMPLAINT

1.      Plaintiffs Amsted Rail Company, Inc. ("ARC") and its affiliated *maquiladora*
ASF-K de Mexico S. de R.L. de C.V. ("ASF-K") (collectively "Plaintiffs" or "Amsted"), by and
through their attorneys, hereby allege and state as follows:

## JURISDICTION

2.      Amsted brings this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and
(a)(2)(B)(i) to contest certain aspects of the final affirmative injury determination by the U.S.
International Trade Commission (the "Commission") on certain freight rail couplers and parts
thereof from Mexico, Case No. 731-TA-1583 (Final) (which, together with concurrent
antidumping and countervailing duty final injury investigations on certain freight rail couplers
and parts thereof from the People's Republic of China, constituted the "*2022-23 Investigations*").
*See Certain Freight Rail Couplers and Parts Thereof From Mexico*, 88 Fed. Reg. 77,612 (Int'l
Trade Comm'n Nov 13, 2023) ("*Final Mexico Determination*").

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c)
because this action is commenced pursuant to 19 U.S.C. § 1516a.

## PARTIES AND STANDING

4.      ARC is a U.S. importer of subject freight rail couplers ("FRCs").  ASF K is a

*maquiladora* affiliate of ARC that produces FRCs in Mexico.  Both ARC and ASF-K are

interested parties within the meaning of 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3).  ARC and

ASF-K also were parties to the *2022-23 Investigations* that led to the determination that is being

challenged herein.  Accordingly, ARC and ASF-K both have standing pursuant to 19 U.S.C. §

1516a(d) and 28 U.S.C. § 2631(c) to commence this action.

 5. Defendant is the U.S. International Trade Commission.

## TIMELINESS OF THE ACTION

 6. On November 13, 2023, the Commission published in the Federal Register the

*Final Mexico Determination*, 88 Fed. Reg. at 77, 612.

 7. As the *Final Mexico Determination* involves imports of FRCs from Mexico, a

free trade area country within the meaning of 19 U.S.C. § 1516a(f)(9)(A), the time limits for

commencing an action before this Court do not begin to run until the 31st day after publication

of the *Final Determination* in the Federal Register, 19 U.S.C. § 1516a(a)(5).  Thus, the

opportunity to file an appeal of the *Final Mexico Determination* in this Court begins to run on

December 14, 2023 (thirty-one days from November 13, 2023), and the last date to file is

Monday, January 15, 2024.

 8. Amsted timely filed a Notice of Intent to Commence Judicial Review with the

United States Secretary of the USMCA Secretariat on November 15, 2023.  Amsted timely filed

a Summons, ECF No. 1, on December 15, within thirty days of December 14, 2023, in

accordance with 19 U.S.C. § 1516a(a)(2)(A), 19 U.S.C. § 1516a(a)(5), 28 U.S.C. § 2636(c), and

Rules 3(a)(2) and 6(a) of the Rules of this Court.  Amsted timely files this complaint within 30

days of December 15, 2023.

US.361778003.01

## <u>STATEMENT OF FACTS</u>

### <u>The 2021-22 Investigations</u>

9.      On June 17, 2021, ARC engaged the law firm of [                              ] "to

provide legal services in connection with advice regarding the elevation and potential

prosecution of antidumping of imports of certain couplings and related rail products."

10.     ARC and [        ] formalized this engagement in letter expressly naming ARC

as the client.

11.     A [       ] partner, [                        ] ("Attorney"), executed the engagement

letter on the firm's behalf. On information and belief, the Attorney is a member of the Bar of this

Court, as well as being a member of the Bar of the District of Columbia.

12.     The engagement letter elaborated on the representation's "purpose":

> The purpose of this representation is to evaluate and pursue as
> appropriate a trade remedy investigation, specifically including any
> antidumping and/or countervailing duty proceeding filed on behalf
> of the domestic manufacturing industry, including any petition
> filed with the U.S. Department of Commerce and the U.S.
> International Trade Commission, and any subsequent litigation, as
> well as other litigation and lobbying services related to this
> investigation.

13.     The engagement letter contained an advance waiver of potential future conflicts.

By its terms, the advance waiver extends only to [        ] itself—not the Attorney or others. The

advance waiver also expressly excludes "matters that are substantially related to our work for

you":

> As a large firm with a diverse practice, we represent many other
> companies and individuals. It is possible that during the time that
> we are representing you, some of our present or future clients will
> have disputes or transactions with you, or undertake activities that
> may, directly or indirectly, conflict with your activities and
> interests. For example, we may represent other participants in your
> industry and competing industries—as well as their suppliers,

customers, and trade associations. Moreover, we maintain a multidisciplinary practice that includes, but is not limited to, the following practice areas: Appellate, Consumer Product Regulation, Corporate, Election Law & Government Ethics, Employment & Labor, Environment & Safety, Food Drug & Medical Device Law, Franchise, FTC Regulation, Government Contracts, Health Care, Insurance, Intellectual Property, International Trade, Litigation, Privacy & Cybersecurity, Public Policy, Telecom, Media & Technology (TMT), and White Collar Defense & Government Investigations, all of which are described on our firm's website. Notwithstanding our firm's representation of clients across a broad range of practice areas, you agree, except as to matters that are substantially related to our work for you, that we may continue to represent or may undertake in the future to represent existing or new clients in any matter, including litigation, even if the interests of such clients in those other matters are directly adverse to your own. For our part, upon becoming aware of the need, the firm agrees to take reasonable steps to establish and maintain an ethical "screen" designed to provide assurance that firm attorneys who have worked for you or continue to work for you will not, inadvertently or otherwise, share confidential information provided by you with others.

In a trade remedy investigation, we typical {sic} represent several members of the domestic industry that may have interests adverse to other members of any petitioning coalition with respect to future trade or commercial matters. As a result, the domestic producers could be adverse to each other in an antidumping investigation, trade investigation, or other matter. You agree that nothing contained in this representation, including the sharing of information and documents, shall be the basis of a claim of conflict of interest or disqualification against [                ]. Specifically, you agree to waive all current or future conflicts with [                ] with respect to antidumping, countervailing duty, or other trade investigations and will not seek disqualification of [              ] in regard to, or on the basis of, any antidumping, countervailing duty, or other trade remedy investigation.

4

14.      As explained in the accompanying Declaration of Professor Roy D. Simon, Jr.,

attached hereto as Exhibit A,[1] the supposed advance waiver of conflicts of interest is not a valid

waiver because, among other things, it is ambiguous, incomplete, and internally inconsistent.

15.      Through the Attorney, on September 29, 2021, the Coalition of Freight Rail

Coupler Producers ("Coalition" or "Petitioner") filed its petition with Commerce and the U.S.

International Trade Commission ("Commission"), commencing antidumping duty investigations

on FRCs from Mexico and China, and a countervailing duty investigation on FRCs from China

(the "*2021-22 Investigations*").

16.      At the time, the Coalition was composed of two constituent members: ARC and

M&T, both domestic producers of FRCs.

17.      The petition principally alleged that certain FRCs imported from China were

being subsidized by the Government of China within the meaning of section 701 of the Tariff

Act of 1930, *codified as amended at* 19 U.S.C. § 1671 ("Tariff Act"), and were being or were

likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act,

*codified as amended at* 19 U.S.C. § 1673, and these unfairly traded imports materially injured

the domestic industry producing FRCs.

18.      The period of investigation at Commerce for the 2021-22 antidumping duty

investigation was January 1, 2021 through June 30, 2021. *Freight Rail Coupler Systems and

Certain Components Thereof From the People's Republic of China*, 87 Fed. Reg. 14,511, 14,511

(Mar. 15, 2021) (preliminary antidumping determination). For the 2021-22 countervailing duty

investigation the period of investigation was January 1, 2020, through December 31, 2020.

---

[1] The Declaration attached as Exhibit A is a copy of a declaration that Plaintiffs originally
submitted in *Amsted Rail Co., Inc. v. U.S. Dep't of Commerce*, USCIT Case No. 22-00316,
which concerns the same disqualification issue alleged in this Complaint.

*Freight Rail Coupler Systems and Components Thereof from the People's Republic of China*, 87 Fed. Reg. 12,662, 12,662 (Mar. 7, 2022) (preliminary countervailing duty determination).

19.     On October 6, 2021, ARC, again through the Attorney, filed a letter in the *2021-22 Investigations* withdrawing from the petition. The letter explained that ARC would no longer participate as a petitioning party.

20.     Also on October 6, 2021, the Coalition amended its entry of appearance in the *2021-22 Investigations*, removing ARC from the list of Coalition members and adding the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW").

21.     On October 14, 2021, ARC's current counsel, the law firm of Faegre Drinker Biddle & Reath LLP ("Faegre"), entered an appearance in the 2021-22 injury investigations before the Commission.

22.     Until its withdrawal, ARC supervised and materially contributed to the Attorney's preparation for the *2021-22 Investigations*.

23.     ARC confided in the Attorney its legal strategy for prosecuting FRC-related trade investigations, competitive decision-making processes, and extensive business proprietary information relevant to establishing the scope of domestic like product, the domestic industry, and the conditions of competition.

24.     As one example, the Attorney, after review of certain trade data, contacted ARC for advice regarding the ultimate final wording of the scope language that the petition for the *2021-22 Investigations* should propose to cover. Specifically, in the course of preparing the petition for this predecessor matter, the Attorney could not reconcile trade data reflecting China-origin FRC imports, stating that the quantities of imports that he derived from the data seemed to

6

be too low. The Attorney contacted Jay Allan of ARC to seek his advice concerning the

seemingly low values. Mr. Allan explained that the low values were likely due to China-origin

FRCs entering Mexico complete or incomplete, and subsequently attached to Mexican-produced

rail cars to be imported into the United States without the reporting of the attached FRCs

entering into the United States in data collected by U.S. Customs and Border Protection

("CBP"). Mr. Allan further explained in detail how ARC and its maquila, ASF-K, do business

with OEM customers that produce rail cars in Mexico. Mr. Allan explained how ARC itself sells

to these OEMs with rail car production facilities in Mexico and how ARC's own FRCs produced

in Mexico are attached to rail cars in Mexico and then exported from Mexico. In other words,

Mr. Allan provided the Attorney with detailed, private information. Mr. Allan of ARC also

explained how FRCs attached onto rail cars could cross the border from Mexico into the United

States without CBP collecting data on the quantity of rail cars (and consequently FRCs) imported

because of special provisions under U.S. law allowing freight cars and certain "Instruments of

International Traffic" to be admitted to the United States without being declared in a formal

customs entry for consumption. As a result, substantial quantities of FRCs attached to rail cars

are imported into the United States that do not appear in U.S. government import statistics.

25.     Realizing the implications of this information relayed by Mr. Allan of ARC, the

Attorney's scope language expressly covered within the scope of investigation FRCs and parts

thereof that are joined to "non-subject parts" in the country of manufacture of the FRCs or a third

country, which would cover Chinese-manufactured FRCs attached to rail cars that are

manufactured in Mexico and then cross the border from Mexico into the United States,

undetected by the collection of import data.

US.361778003.01

26.     Although some of these FRCs are likely sourced from China and then sold to rail car producers in Mexico, a much larger quantity of these FRCs are sourced from ASF-K's own production facility in Mexico and sold to the same rail car producers in Mexico. However, because the petition for the *2021-22 Investigations* covered only FRCs from China, not FRCs from Mexico, ARC had no reason to worry that this expansion of the scope language would affect ASF-K's FRC production operations.  FRCs produced in Mexico, imported by ARC or attached to rail cars imported by OEM customers, would not be adversely impacted as the scope language did not purport to cover such FRCs produced in Mexico.

27.     Plaintiffs are prepared, if required to do so, to offer additional examples of client confidences that may be used against them in a trade investigation. Mr. Allan of ARC disclosed all of this confidential information, including via telephone calls, in the reasonable expectation and belief that the Attorney would preserve it within the confines of the attorney-client relationship.

28.     The Attorney's emails to ARC described themselves as "Attorney Client Communication – Privileged & Confidential," or variants of that description.

29.     The very information Mr. Allan provided to the Attorney was subsequently used against ARC in the *2022-23 Investigations*. The scope of the 2022-23 antidumping duty investigation on FRCs from Mexico (the "*Mexico Investigation*") included both FRCs imported directly from Mexico into the United States and FRCs attached to rail cars in Mexico that are then exported to the United States. This directly impacts ARC and ASF-K because a substantial amount of the FRCs produced in Mexico are covered by the scope of the *2022-23 Investigations*.

30.     In the *2022-23 Investigations*, Amsted took a position that was directly opposed to the scope of the investigation for its FRCs that are attached to rail cars in Mexico. ASF-K is

8

the producer of FRCs, but ARC is always the seller of such FRCs, whether ARC imports directly

from ASF-K in Mexico, or ARC sells to customers in Mexico, which customers, in turn, attached

the FRCs to rail cars in Mexico that are then exported to the United States and/or Canada.

Therefore, ARC is impacted by antidumping duty cash deposits currently being collected on the

FRCs that it imports from Mexico.  Specifically, ARC is directly impacted when importing

FRCs, and indirectly impacted when railcars are imported into the United States with FRCs

attached thereto.

31.    Moreover, the information that Mr. Allan supplied to the Attorney provided the

Attorney with an advantage in the *Mexico Investigation* before Commerce. Through discussions

with Mr. Allan, the Attorney was aware of ARC's sales structure. The information that Mr. Allan

of ARC provided to the Attorney was used by the Attorney in the *Mexico Investigation* directly

against ARC. Mr. Allan provided the Attorney with extremely confidential information

concerning its operations in Mexico and how it does business with OEMs in Mexico, which of

course was the focus of the *Mexico Investigation* before Commerce.  The Attorney formulated

arguments against Amsted (including ARC) throughout the *Mexico Investigation* based on the

information that Mr. Allan provided to the Attorney in connection with the *2021-22

Investigations*.

32.    Even after Faegre entered its appearance for ARC in the *2021-22 Investigations*,

the Attorney attempted to coach ARC into taking positions he would later use against ARC in the

*Mexico Investigation*. For instance, in March 2022, the Attorney told ARC it would be "very

helpful" if ARC took the position, "to the extent that it is factually correct," that "a significant

part of the decision to move production to Mexico was due to competition with low priced

imports from China."

US.361778003.01

33.     For [         ]'s legal services, ARC paid substantial attorneys' fees and costs. On information and belief, it shared these expenses equally with M&T.

34.     Between June 2021 and September 2021, ARC and the Attorney worked together extensively (via correspondence and telephone calls) to prepare the petition for the *2021-22 Investigations*. ARC and the Attorney discussed sensitive marketplace conditions and proprietary analysis of Plaintiffs' and competitors' products. Additionally, strategies for the development of the ultimate product scope definition were discussed. ARC provided key input into the petition filed in the *2021-22 Investigations*. After the petition was filed, the Attorney had access to and likely reviewed numerous documents submitted under the *2021-22 Investigations* that contained confidential information regarding Amsted's competition, distribution practices, pricing practices, operations, and sales figures, among other confidential information. As a result of all this, the Attorney became aware of specific categories of information relevant to ARC's position in the *2021-22 Investigations* and Amsted's position in the *Mexico Investigation*.

35.     On March 8, 2022, the Attorney entered his appearance on the Coalition's behalf to reflect that he had changed law firms, moving to [                              ] (the "Firm").

36.     A certified public accountant ("Accountant"), accompanied the Attorney in his move from [       ] to the Firm. As reflected on the petition's cover page, the Accountant was one of the Coalition's representatives in the *2021-22 Investigations*.

37.     The Commission scheduled the final phase of the *2021-22 Investigations* following notification of preliminary determinations by Commerce that imports of FRCs from China were subsidized within the meaning of section 703(b) of the Tariff Act, 19 U.S.C. § 1671b(b), and sold at less than fair value within the meaning of 733(b) of the Tariff Act, 19

US.361778003.01

U.S.C. § 1673b(b). Notice was given of the scheduling of the final phase and of a public hearing to be held.

38.     The Commission conducted its hearing on May 12, 2022. Representatives for the Coalition appeared at the hearing accompanied by counsel and submitted pre-hearing and post-hearing briefs, and final comments. Three respondent entities—Strato, Inc., Wabtec Corp., and TTX Company—participated in the final phase.

39.     The Commission announced its unanimous negative vote on June 14, 2022, thus terminating the *2021-22 Investigations* and denying the Coalition its requested relief.

40.     In early July 2022, the Commission issued its determinations and released its final report.

41.     Based on the record in the *2021-22 Investigations*' final phase, the Commission determined that an industry in the United States was not materially injured or threatened with material injury by reason of FRC imports found by Commerce to be sold in the United States at less than fair value and to be subsidized by the Government of China.

42.     One reason for the negative injury determination was that Chinese FRCs could not be considered a cause of the alleged injury because of significant non-subject FRC imports from Mexico.

## The Mexico Investigation

43.     Just days after certifying destruction of the confidential record from the *2021-22 Investigations*, on September 28, 2022, the Coalition filed a second petition commencing the *2022-23 Investigations*. The *2022-23 Investigations* were a reprise of the *2021-22 Investigations*. Both sets of investigations were and are quasi-adjudicative antidumping and countervailing duty investigations before the Commission and Commerce pursuant to the same body of statutory and

US.361778003.01

regulatory provisions. The petitioning party in each investigation was the Coalition, of which ARC is a former member. The FRCs covered by the investigations include E, F, and E/F couplers and E and F knuckles. ARC's confidential information concerning its FRCs was used in the *2021-22 Investigations*; much of that same business proprietary information ("BPI") was the focus of the *2022-23 Investigations*. The petitions in both alleged that FRCs are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act. In the *2021-22 Investigations*, the period of investigation ("POI") in Commerce's antidumping investigation of FRCs from China was January 1, 2020, through June 30, 2020, and the POI in the China countervailing duty investigation was January 1, 2020 through December 31, 2020. In the *2022-23 Investigations*, the POI in the Mexico antidumping investigation was July 1, 2021, through June 30, 2020.

44.     In both the 2021-22 and *2022-23 Investigations*, the Coalition's two members were M&T and USW.

45.     M&T is ARC's industry competitor.

46.     The USW represented unionized workers at ARC.

47.     The Coalition contended that the USW became a member "because of the impact of subject imports on USW workers," including purported job losses "in the domestic FRC industry."

48.     In the *2022-23 Investigations*, the Coalition hoped to "fix" the negative injury determination in the *2021-22 Investigations* by adding imports from Mexico to the *2022-23 Investigations*' scope.

49.     To do this, the Coalition painted a target on ARC. As asserted in the Coalition's petition, ARC "was formerly a major producer of FRCs in the United States, relocated

US.361778003.01

substantially all of its FRC production to Mexico and is now an importer of in-scope FRCs that are produced at its Mexican location." The Coalition further asserted that "{t}he AAR certified manufacturing plant in Mexico that manufactures FRC products is ASF-K de Mexico, S. de R. L. de C.V. Sahagun, which is owned by ASF-Keystone, a division of Amsted Industries' Amsted Rail Group." This is the same scenario that existed during the *2021-22 Investigations*, yet the Coalition, represented by the Attorney, did not include Mexican imports there.

50.     In the telling of the petition for the *2022-23 Investigations*, the "shift to production in Mexico by {ARC} has resulted in a significant market share decrease for domestic producers that chose not to abandon their U.S. employees and to continue their FRC production in the United States."

51.     ARC "relocated its production to Mexico," the Coalition posits in its petition, "to offer prices in the U.S. market for its imported FRCs from Mexico that are competitive with Chinese FRCs." The Coalition fails to mention, however, that ARC's initial relocation of its FRC production in Mexico in 2006 predated the petition for the *2022-23 Investigations*.

52.     The petition for the *2022-23 Investigations* also included the same expansive scope provision added in the *2021-22 Investigations* (described in ¶ 29 above), specifically including within the scope of investigation FRCs and parts thereof that are joined to "non-subject parts" in the country of manufacture of the FRCs or a third country.

53.     This expansive scope language in the petition for the *2022-23 Investigations*, however, applied not only to FRCs produced in China, but also to FRCs produced in *Mexico*, meaning that the expansive scope language covered within its sweep a substantial quantity of ARC's FRCs produced in Mexico, imported into the United States for sale, and also imported as attached to rail cars that subsequently cross the border into the United States.

US.361778003.01

54.     Immediately upon learning of the Attorney's participation in the *2022-23 Investigations* as the Coalition's lead counsel, ARC moved to protect itself from the Attorney's betrayal. It directed Faegre to send a letter to the Attorney detailing his ethical violation and requesting the Firm's withdrawal from further representation of the Coalition in the *2022-23 Investigations*. Faegre sent a letter to that effect on October 6, 2022.

55.     The Firm's general counsel responded by letter on October 11, 2022. Ignoring that ARC is the importer of record and would be harmed by the trade relief requested in the *2022-23 Investigations*, the Firm asserted that ARC actually "stands to benefit" if the *2022-23 Investigations* succeed. The Firm further asserted that [     ] negotiated a "robust advance waiver" in the June 2021 engagement letter. The advance waiver applies only to [     ] itself and, further, excludes "matters that are substantially related to our work for you."

56.     On October 11, 2022, ARC filed a letter with the Commission asking it to, among other things: disqualify the Firm from further participation as counsel for the Coalition in the *2022-23 Investigations*.

57.     One basis for these requests was the Attorney's violation of Rule 1.9(a) of the American Bar Association's ("ABA") Model Rules of Professional Conduct and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. Rule 1.9(a) provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

58.     The Commission has the power to disqualify lawyers from practicing in specific trade investigations in appropriate situations. In adjudicative proceedings under Section 337 of

14

the Tariff Act, the Commission's administrative law judges can and regularly do entertain rules

on motions to disqualify lawyers and law firms, including ruling on motions alleging violations

of the ABA Model Rules. They regularly invoke 19 C.F.R. § 201.15(a) as the legal basis for

their disqualification authority. Thereafter, the Commission can and does review its

administrative law judges' rulings in this regard.

59.     There is no rational reason the Commission can interpret and enforce the ABA

Model Rules in the context of adjudicative proceedings under section 337 but cannot do so in the

context of quasi-adjudicative antidumping and countervailing duty investigations.

### The Commission's Response To The Misconduct Allegations

60.     On October 13, 2022, the Commission's Acting Secretary, Katherine M. Hiner,

made a telephone call to Amsted's counsel at Faegre.

61.     Acting Secretary Hiner explained that the Commission would not act immediately

on the concerns expressed in ARC's and ASF-K's October 13 letter.

62.     Instead, she said, the Commission will respond to the ethical violations in the

ordinary course. She offered no timetable for the Commission's future response.

63.     On October 14, 2022, counsel for Plaintiffs provided notice via telephone to

Acting Secretary Hiner that Plaintiffs intended to file a motion for a temporary restraining order

concerning the subject-matter alleged herein.

### Prior Proceedings Before the U.S. Court of International Trade
### Concerning Misconduct Allegations

64.     On October 14, 2022, Plaintiffs filed suit in this Court for injunctive and

declaratory relief, pursuant to 28 U.S.C. § 1581(i), asking the Court (among other things) to

disqualify the Firm from further participation as counsel for Petitioner in the *2022-23*

US.361778003.01

*Investigations.  Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Ct. No. 22-cv-00307 (Oct. 14, 2023) (the "*ITC CIT Appeal*"), CM/ECF Docket Entry No. 14.

65.     On November 16, 2022, the Court in the *ITC CIT Appeal* dismissed Plaintiffs' complaint without prejudice to refiling under 28 U.S.C. 1581(c).  *ITC CIT Appeal*, Slip Op. 22-124, CM/ECF Docket Entry No. 88.  The CIT did not address the merits of Plaintiffs' claims, but instead held that the remedy available to Plaintiffs under 28 U.S.C. § 1581(c) is not manifestly inadequate, and therefore jurisdiction under 28 U.S.C. § 1581(i) was not available.  *ITC CIT Appeal*, Slip Op. 22-124, at 32-33.

66.     On December 20, 2022, Plaintiffs appealed to the U.S. Court of Appeal for the Federal Circuit ("CAFC") the CIT's opinion and final judgment in the *ITC CIT Appeal*.  *Notice of Appeal of Final Judgment* (Dec. 22, 203), *ITC CIT Appeal*, CM/ECF Docket Entry No. 101.

67.     On January 10, 2023, the CAFC docketed the appeal, styled as *Amsted Rail Company, Inc. v ITC*, No. 2023-1355 (the "*ITC CAFC Appeal*").  *See Notice of Docketing*, Case No. 23-1355 (Jan. 10, 2023), *ITC CAFC Appeal*, Doc. 1-1.

68.     On January 13, 2023, Plaintiffs and the other appellants in the *ITC CAFC Appeal* filed a motion asking the CAFC to set an expedited briefing schedule.  *See Appellants' Emergency Motion to Expedite* (Jan. 13,2023), *ITC CAFC Appeal*, Doc. 26-1.

69.     On the same date (January 13, 2023), Plaintiffs and the other appellants filed their opening brief in the *ITC CAFC Appeal*.  *See Plaintiffs-Appellants' Opening Brief* (Jan. 13, 2023), *ITC CAFC Appeal*, Doc. 27.

70.     On January 23, 2023, the CAFC denied Appellants' motion, but stated that the parties should not anticipate extensions of time, and the case would be placed on the next

16

available oral argument calendar after briefing is complete. *Order* (Jan. 23, 2023), *ITC CAFC Appeal*, Doc. 42.

71.     On February 24, 2023, the CIT in the *Prior DOC Appeal* entered an order staying the action pending final resolution of all appellate review proceedings in the *ITC CAFC Appeal*. *See Order* (Feb. 24, 2023) *Prior DOC Appeal*, CM/ECF Docket Entry No. 59.

72.     The parties in the *ITC CAFC Appeal* completed briefing on February 27, 2023. *See Plaintiffs-Appellants' Reply Brief* (Feb. 27, 2023), *ITC CAFC Appeal*, Doc. 48.

73.     On June 30, 2023, the CAFC having not yet calendared oral argument and the Commission's final injury investigation nearing completion, the Plaintiffs decided that the passage of time had essentially mooted their request for the Commission to disqualify the Attorney, the Accountant, and the Firm from the pending final injury investigation. Accordingly, after securing the consent of the other parties, Plaintiffs filed a Joint Stipulation of Voluntary Dismissal of the *ITC CAFC Appeal* on June 30, 2023. *Joint Stipulation of Voluntary Dismissal* (June 30, 2023), *ITC CAFC Appeal*, Doc. 89.

74.     The CAFC dismissed the *ITC CAFC Appeal* on July 5, 2023. *Order* (July 5, 2023), *ITC CAFC Appeal*, Doc. 90.

**Procedural History Relating to the Commission's Conduct of Investigation**

75.     On October 5, 2022, the Commission published notice of its institution of preliminary investigations regarding freight rail couplers from China and Mexico. *Certain Freight Rail Couplers and Parts Thereof From China and Mexico: Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 87 Fed. Reg. 60,143 (Int'l Trade Comm'n Oct. 5, 2022).

US.361778003.01

76.     On November 18, 2022, the Commission published notice of its preliminary

determination that there is a reasonable indication that an industry in the United States is

materially injured by reason of imports of certain freight rail couplers and parts thereof from

China and Mexico.  *Certain Freight Rail Couplers and Parts Thereof From China and Mexico*,

87 Fed. Reg. 69,340 (Int'l Trade Comm'n Nov. 18, 2022).  The public version of the Views of

the Commission is contained in *Certain Freight Rail Couplers and Parts Thereof from China

and Mexico*, Inv. Nos. 701-TA-682 and 731-TA-1592-1593 (Preliminary), USITC Pub. 5387

(Nov. 2022) ("*Preliminary Determination*").

77.     In the *Preliminary Determination*, the Commission excluded a domestic producer

from the definition of the domestic industry on the grounds that its primary interest appeared to

be in importation and not domestic production and that the firm's inclusion would obscure the

impact of injury due to subject imports.  *Id*. at 26-27.

78.     On May 3, 2023, Commerce published a preliminary antidumping duty

determination regarding FRCs from Mexico.  *Certain Freight Rail Couplers and Parts Thereof

From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value,

Preliminary Negative Determination of Critical Circumstances, Postponement of Final

Determination, and Extension of Provisional Measures*, 88 Fed. Reg. 27,864 (Dep't Commerce

May 3, 2023).  The provisional antidumping duty rate was 47.82 percent.  *Id*. at 27,865.  U.S.

Customs and Border Protection suspended liquidation of entries of subject merchandise entered,

or withdrawn from warehouse for consumption, on or after May 3, 2023, and required Amsted—

as importer of record—to deposit estimated antidumping duties upon entry.

79.     On March 9, 2023, the Commission commenced the final phase of these

investigations.  *See Certain Freight Rail Couplers and Parts Thereof From the People's*

US.361778003.01

*Republic of China and Mexico: Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 88 Fed. Reg. 16,031 (Int'l Trade Comm'n Mar. 15, 2023).

80.     On July 7, 2023, the Commission published notice that an industry in the United States is materially injured by reason of imports of certain freight rail couplers and parts thereof from China. *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China*, 88 Fed. Reg. 43,399 (Int'l Trade Comm'n July 7, 2023).  The vote was 3-1, with Chairman David S. Johanson dissenting, and Commissioner Randolph Y. Stayin not participating.  *Id.* at 43,399 n.3.  The Commission set forth both the majority and dissenting views in *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ("*China Views*").

81.     In the *China Views*, the majority (Commissioners Kearns, Schmidtlein, and Karpel) determined that the domestic industry is materially injured by reason of subject imports. *China Views*, at 3-60.  In the Dissenting Views, Chairman Johanson determined that the domestic industry is neither materially injured nor threatened with material injury by reason of subject imports.  *Id.* at 66-84.  In Separate Views, Chairman Johanson and Commissioner Karpel dissented from the majority's not to exclude one domestic producer from the definition of the domestic industry in these investigations.  *Id.* at 61-65.

82.     On September 21, 2023, Commerce published a final antidumping duty determination regarding FRCs from Mexico. *Certain Freight Rail Couplers and Parts Thereof From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 88 Fed. Reg. 65,153 (Dep't Commerce Sept. 21, 2023).

US.361778003.01

83.     On November 13, 2023, the Commission published notice that an industry in the United States is materially injured by reason of imports of certain freight rail couplers and parts thereof from Mexico.  *Final Mexico Determination*, at 77,612.  As with the final injury determination regarding imports of FRCs from China, the vote regarding imports of FRCs from Mexico was 3-1, with Chairman David S. Johanson dissenting.  *Id*. at 77,612 n.3. (Commissioner Stayin had resigned from the Commission prior to the *Final Mexico Determination*).  The Commission set forth both the majority and dissenting views in *Certain Freight Rail Couplers and Parts Thereof from Mexico*, Inv. Nos. 731-TA-1593 (Final), USITC Pub. 5470 (Nov. 2023) ("*Mexico Views*").

84.     In the *Mexico Views*, the majority (Commissioners Kearns, Schmidtlein, and Karpel) determined that the domestic industry is materially injured by reason of subject imports. *Mexico Views*, at 3-6.  In dissent, Chairman Johanson determined that the domestic industry is neither materially injured nor threatened with material injury by reason of subject imports.  *Id*. at 3 n.1.  In addition, Chairman Johanson and Commissioner Karpel dissented from the plurality opinion not to exclude one domestic producer from the definition of the domestic industry in these investigations.  *Id*. at 6 n.14.

## STATEMENT OF CLAIMS

### COUNT I

85.     The preceding paragraphs are incorporated herein by reference.

86.     The APA authorizes the Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

US.361778003.01

87.     The Attorney betrayed ARC. He did so for the cynical, self-interested purpose of trying to "undo" the Commission's negative injury determination in the *2021-22 Investigations* by including Mexico in the *2022-23 Investigations*. As explained in the accompanying Declaration of Professor Roy D. Simon, Jr., attached hereto as Exhibit A, the Attorney had a disqualifying conflict of interest.

88.     Amsted requested that the Commission disqualify the Attorney, the Accountant, and the Firm from further participation as counsel in the Investigation due to ethical violations, but the Commission provided no written response to Amsted's request.

89.     The Commission's failure to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the *2022-23 Investigations* is arbitrary, capricious, an abuse of discretion, and contrary to law, including because the Commission failed to explain its decision.

90.     "State ethics rules provide an important backdrop for the federal agency rules regulating lawyers who appear and practice before the agencies." George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963, 1972 (2016). Indeed, "lawyers who practice before federal agencies must comply with state ethics rules, typically based on the ABA Model Rules and applicable to all lawyers, as well as with the specific rules applicable to lawyers engaged in agency practice." *Id.*

91.     The Attorney's and the Accountant's representation of the Coalition in the Investigation was contrary to Rule 1.9(a) of the ABA Model Rules and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. In addition, even "before the Rules of Professional Conduct were adopted, the common law recognized that a lawyer could not undertake representation adverse to a former client in a matter substantially related to that in

21

which the lawyer previously had served the client." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (internal quotation marks omitted).

92.     The Firm's representation of the Coalition in the *Mexico Investigation* was contrary to Rule 1.10(a) of the ABA Model Rules and its analogue, Rule 1.10(b)(1) of the District of Columbia Rules of Professional Conduct: "{W}hen a lawyer becomes associated with a firm, the firm may not knowingly represent a person in a matter which is the same as, or substantially related to, a matter with respect to which the lawyer had previously represented a client whose interests are materially adverse to that person and about whom the lawyer has in fact acquired information protected by Rule 1.6 that is material to the matter."

93.     The Commission's decision not to act in the face of these serious allegations not only was the antithesis of reasoned decision-making, it was contrary to law and compromised the agency proceedings' integrity. "That agency considers itself without authority to forestall a conflict of interest other than to offer the plaintiffs a choice comparable to that of Thomas Hobson, to wit, agree that your former confidant assist your adversary in a substantially-related manner against you or withdraw your inside information so that your adversary's version of the data can be accepted as true. This is the kind of predicament a conflict of interest can cause. They are to be guarded against by all who are bound by the lawyers' rules of professional conduct, and, in those instances when resolve under the rules appears weak, courts must and will intervene to protect the practices agreed upon." *Makita Corp. v. United States*, 819 F. Supp. 1099, 1108 (Ct. Int'l Trade 1993).

94.     A claim of the Commission's "arbitrary and capricious refusal to disqualify" a conflicted attorney during a trade investigation may be "easily" framed as a challenge that the agency's final determinations were "'unsupported by substantial evidence on the record, or

22

otherwise not in accordance with law.'" *Amsted Rail Co. v. United States Int'l Trade Comm'n*, 600 F. Supp. 3d 1308, 1322 (Ct. Int'l Trade 2022) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "Plaintiffs may {}format their challenges to agency determinations not to investigate allegations of … ethical misconduct as part of a § 1581(c) challenge to a reviewable final determination by the Commission." *Amsted Rail Co. v. United States Int'l Trade Comm'n*, 607 F. Supp. 3d 1283, 1294 (Ct. Int'l Trade 2022). After all, "Plaintiffs are entitled to their day in court. Claims of misconduct should be addressed in the appropriate fora, and the Commission's determinations should be subject to appropriate judicial review." *Id.*

95.     Accordingly, the Court should set aside the Commission's refusal to disqualify the Attorney, the Accountant, and the Firm in the *Mexico Investigation*, and order the Commission to conduct a new injury investigation.  The Court should further order the Commission to disqualify the Attorney, the Accountant, and the Firm in any such investigation.

## COUNT II

96.     The preceding paragraphs are incorporated herein by reference.

97.     In defining the domestic industry in the *China Views*, a plurality of the Commission (*i.e.*, Commissioners Schmidtlein and Kearns) reversed the Commission's unanimous preliminary decision to exclude one domestic producer from the domestic industry for purposes of its material injury analysis and instead defined "a single domestic industry consisting of all U.S. producer{s} of FRCs." *China Views*, at 22.

98.     The plurality reasoned that "even if a U.S. producer's current primary interest is not in domestic production, that alone is not dispositive in the Commission's related party analysis when the record shows the related party is not shielded from subject import competition

23

and its exclusion from the industry would mask the effects of subject imports on the industry." *Id*. at 17.

99.     The plurality found both factors present here.  First, it found that the record did not indicate that the producer's "domestic production activities were shielded from competition with subject imports from China and Mexico during the POI, or otherwise benefited from \*\*\* subject imports from Mexico during the period." *Id*. at 22.  Second, contrary to what it found in its preliminary determination, the Commission concluded that "its exclusion from the domestic industry would mask declines in the industry's performance caused by subject import competition, including data relating to market share, employment, capacity utilization, and financial performance." *Id*.

100.     The plurality thus found "that appropriate circumstances do not exist to exclude" the firm "from the domestic industry as a related party." *Id*.

101.     In the *Mexico Views*, Commissioners Schmidtlein and Kearns stated that they "adopt the findings and analyses from our determinations and views in the leading investigations with respect to the issues of domestic like product, *domestic industry*, cumulation, conditions of competition, and material injury by reason of cumulated subject imports." *Mexico Views*, at 5-6. Chairman Johanson and Commissioner Karpel adopted their separate views from the leading investigation with respect to the definition of the domestic industry.  *Id*. at 6 n.14.

102.     The Commission's decision not to exclude one firm from the definition of the domestic industry, and the subsidiary findings and conclusions on which this decision rests, are unsupported by substantial evidence and otherwise not in accordance with law.

103.     Among other errors, the Commission:

a.     applied the wrong legal standard in defining the domestic industry;

US.361778003.01

b.     reversed its preliminary determination that one firm's primary interest is in importation and not domestic production given its ratio of imports to domestic production and its stated reasons for importation (lowering its costs and expanding sales for its largest customers) notwithstanding that no facts were introduced in the final phase investigation that detracted from the Commission's preliminary finding;

c.     reversed without adequate factual basis or explanation its preliminary determination that inclusion of the related party would skew the data for the domestic industry;

d.     improperly found that the firm was not shielded from competition with subject imports and did not benefit from subject imports from Mexico; and

e.     failed to properly consider the facts that: (i) this party did not move production to Mexico during the POI or due to subject import competition; (ii) its exclusion would not mask injury or distort the data; and (iii) the party's primary interest with respect to FRCs appears to lie in importation, which is consistent with its capacity utilization (and resulting performance and financial indicators) and its ratio of subject imports to domestic production.

**COUNT III**

104.     The preceding paragraphs are incorporated herein by reference.

105.     The Commission's decision that cumulated subject imports had significant adverse price effects during the POI, and the subsidiary findings on which this conclusion rests, are unsupported by substantial evidence and otherwise not in accordance with law.

106.     Among other errors, the Commission:

US.361778003.01

a.      erroneously concluded that underselling had significant adverse price effects;

b.      failed to recognize that despite underselling, subject imports lost market share to the domestic like product, not the other way around;

c.      improperly discounted the evidence of the domestic industry's improvement in 2022 because of the provisional duties imposed in the *2021-22 Investigations*;

d.      improperly focused on price and COGS-to-net-sales ratio trends from 2020 and 2021 while discounting trends between 2021 and 2022 because of the provisional duties imposed in the *2021-22 Investigations*;

e.      improperly discounted evidence that certain sales on the confidential record should not be treated as examples of lost sales or as evidence of injury or price suppression;

f.      failed to explain adequately its reliance on contemporaneous business documents provided by Petitioner that it previously rejected in the *2021-22 Investigations*;

g.      failed to recognize that the decline in the domestic industry's share of the replacement market was attributable to the industry's strategic decisions to prioritize its OEM customers and that subject imports were pulled into the market by demand considerations;

h.      failed to consider properly the impact of trends within the OEM channel on the domestic industry;

i.      failed to reconcile its reasoning with its determination in the *2021-22 Investigations*, where the Commission found that subject imports from China in 2020 and 2021 did not cause injury and discounted claims that FRC production shifted to Mexico due to competition with Chinese imports; and

US.361778003.01

j.  failed to properly consider record evidence showing that non-price factors such as availability and quality were more important than price in purchasing decisions.

## COUNT IV

107.  The preceding paragraphs are incorporated herein by reference.

108.  The Commission's decision that cumulated subject imports had an adverse impact on the domestic industry during the POI, and the subsidiary findings on which this conclusion rests, are unsupported by substantial evidence and otherwise not in accordance with law.

109.  Among errors, the Commission:

a.  failed to consider properly the fact that the domestic industry's condition improved during the POI by most measures of performance;

b.  improperly discounted the evidence of the domestic industry's improvement in 2022 because of the provisional duties in the *2021-22 Investigations*;

c.  improperly focused on trends within the replacement channel, failing to recognize the domestic industry's lack of capacity and lack of interest in this market;

d.  failed to reconcile its reasoning with its decision in the *2021-22 Investigations*, where the Commission found that subject imports from China in 2020 and 2021 did not cause injury; and

e.  failed to consider properly the impact of trends within the OEM channel on the domestic industry.

## COUNT V

110.  The preceding paragraphs are incorporated herein by reference.

111.  Although Commissioner Karpel defined the domestic industry to exclude one company that the Commission plurality had included as a member of the domestic industry,

US.361778003.01

Commissioner Karpel relied on the same basic factors as the Commission plurality in its price and impact analyses.

112.    The flaws in the Commission plurality analysis are also found in Commissioner Karpel's opinion.  In addition, Commissioner Karpel's exclusion of one domestic producer from the domestic industry changed the record in ways that undermined her ultimate finding of material injury.

113.    Among other errors, Commissioner Karpel improperly focused on trends within the replacement channel, failing to recognize that the domestic industry did not have the capacity or interest in serving this market due to its focus on the OEM market.

US.361778003.01

**DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment in its favor and against the Defendant:

(1) hold the Commission's *Final Mexico Determination* unsupported by substantial evidence and otherwise not in accordance with law;

(2) remand the *Final Mexico Determination* to the Commission for a redetermination consistent with the judgment and finding of this Court; and

(3)  provide such additional relief as the Court may deem just and proper in the circumstances.


Respectfully submitted,


/s/ Richard P. Ferrin
Douglas J. Heffner
Brian Perryman
Richard P. Ferrin
Carrie Bethea Connolly
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
Telephone: (202) 230-5803

*Counsel to Amsted*

December 15, 2023

US.361778003.01