## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| AMSTED RAIL COMPANY, INC. AND ASF-K DE MEXICO S. DE R.L. DE C.V., <br><br>     Plaintiffs, <br><br>  v. <br><br>UNITED STATES, <br><br>     Defendant, <br><br><br>  and <br><br>COALITION OF FREIGHT COUPLER PRODUCERS, <br>     Defendant-Intervenor. | Court No. 23-268 |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Memorandum in support of its Motion for Judgment on the Agency Record filed by Plaintiffs, Amsted Rail Company, Inc. and ASF-K de Mexico S. de R.L. de C.V., and all other papers and proceedings herein, it is hereby

ORDERED that such motion is GRANTED, and it is further

ORDERED that this case is remanded to the U.S. International Trade Commission, with instructions as detailed by this Court in its accompanying slip opinion.

SO ORDERED.


Date: _____, 20\_\_       _____
  New York, New York              Gary S. Katzmann, Judge

**PUBLIC VERSION**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| AMSTED RAIL COMPANY, INC. AND ASF-K DE MEXICO S. DE R.L. DE C.V.,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br><br>    and<br><br>COALITION OF FREIGHT COUPLER PRODUCERS,<br>        Defendant-Intervenor. | Court No. 23-268<br><br>**PUBLIC VERSION** |

**RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD
AND ACCOMPANYING MEMORANDUM**

Douglas J. Heffner
Brian Perryman
Richard P. Ferrin
Carolyn Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel for Plaintiffs*

Dated: September 6, 2024

PUBLIC VERSION

## TABLE OF CONTENTS

MOTION FOR JUDGMENT ON THE AGENCY RECORD ........................................... 1

STATEMENT PURSUANT TO RULE 56.2 .............................................................. 1

    A.    Administrative Determination Under Appeal. ........................................... 1

    B.    Reasons for Contesting the Administrative Determination. ....................... 1

    C.    Issues Presented and Summary of Argument. ........................................... 1

        1.    *Was the Commission's Determination to Include a Related Party Within the Domestic Industry Unlawful and Unsupported by Substantial Evidence?* ......................... 1

        2.    *Did the Commission's Failure to Reconcile Contradictory Conclusions Regarding the Same Evidence in FRC I and FRC II Yield a Determination Unsupported by Substantial Evidence?* ....................... 2

        3.    *Did the Commission Unlawfully Refuse to Investigate the Attorney's Conflict of Interest?* ....................... 3

STATEMENT OF FACTS ...................................................................................... 3

    A.    Facts Concerning Ethics Issue. ................................................................. 3

        1.    *FRC I* Investigations. ........................................................................... 3

        2.    *FRC II* Investigations. ......................................................................... 5

        3.    Proceedings at the U.S. Court of International Trade Regarding Ethics Issue. ...... 5

    B.    Procedural History Relating to the Commission's Injury Investigation. .................. 7

ARGUMENT ........................................................................................................ 9

I.    THE COMMISSION PLURALITY'S REFUSAL TO EXCLUDE [           ]
FROM THE DOMESTIC INDUSTRY WAS UNLAWFUL AND UNSUPPORTED BY
SUBSTANTIAL EVIDENCE. .................................................................................. 9

    A.    Standard of Review. ................................................................................. 9

    B.    The Text of Section 771(4)(A) of the Tariff Act, the Legislative History Thereof, and the Commission's Traditional Criteria Require Exclusion of Domestic Producers Whose Interests in Importation Causes Them to Act Against the Domestic Industry. ..... 12

    C.    Application of the Statute, the Legislative History, and the Commission's Traditional Criteria Required the Commission to Exclude [      ] from the Domestic Industry. ...................................................................................................... 14

    D.    The Commission Plurality's Decision Not to Exclude [      ] from the Domestic Industry Was Based on an Unlawful Interpretation of Section 771(4)(B) and Was Unsupported by Substantial Evidence. ....................................................................... 19

    E.    If the Commission Had Properly Applied the Related Parties Exception, the Result Would Have Been a Determination of No Material Injury by Reason of Subject Imports. .......................................................................................................... 25

**II.    THE COMMISSION'S CONTRADICTORY CONCLUSIONS REGARDING THE
SAME EVIDENCE IN *FRC I* AND *FRC II* RESULTED IN A DETERMINATION
UNSUPPORTED BY SUBSTANTIAL EVIDENCE**................................................................ 26

    **A.    The Commission's Analysis of the Effects of Provisional Measures in *FRC I* Is
Contrary With Its Analysis in *FRC I*.** .......................................................................... 27

    **B.    The Commission's Emphasis on the Replacement Channel in *FRC II* Contradicts
Its Findings in *FRC I*** ....................................................................................................... 32

**III.    THE COMMISSION'S REFUSAL TO DISQUALIFY [          ], THE
ATTORNEY, AND THE ACCOUNTANT RENDERS THE COMMISSION'S
DETERMINATION UNLAWFUL.** ............................................................................................ 34

    **A.    [          ], the Attorney, and the Accountant Represented the Coalition in a
Substantially Related Matter Against Amsted, a Former Client, Which Never Consented
to the Representation.** ....................................................................................................... 34

    **B.    The Attorney's Representation of M&T and the USW in a Substantially Related
Matter Adversely Against the Attorney's Former Client Amsted Violated the American
Bar Association's Model Rules of Professional Conduct and the District of Columbia
Rules of Professional Conduct.** ....................................................................................... 35

    **C.    The Commission's Refusal to Act Was Unlawful.** ............................................... 36

      **1.    The Attorney and the Accountant Had a Direct and Nonconsensual Conflict of
Interest.** ............................................................................................................................ 37

        **a.    Amsted Was a Former Client.** .......................................................................... 37

        **b.    Amsted Became Materially Adverse to the Coalition With Respect to *FRC II*..** 37

        **c.    The Investigations Were Substantially Related To Each Other.** ...................... 39

        **d.    Amsted Did Not Consent to the Conflict of Interest.** ......................................... 40

        **e.    Any Prior Joint Representation Does Not Eliminate the Conflict.** ...................... 40

      **2.    Amsted Was Harmed by Misuse of Its Confidential Information.** .......................... 41

      **3.    The Conflict of Interest Must Be Imputed to [          ] Generally** ...................... 42

      **4.    The Conflict Warranted Disqualification.** ............................................................. 42

      **5.    Because The Conflict Of Interest Tainted The Proceedings, The Court Must
Redress the Commission's Refusal to Disqualify** ........................................................ 44

      **6.    The Commission's Passing the Buck to Local Bar Authorities Leaves Amsted With
No Adequate Remedy.** .................................................................................................... 48

    **D.    Because of the Ethical Violations Committed by [          ], the Attorney, and the
Accountant, the Court Should Remand to the Commission With Instructions to
Terminate the Investigation.** .......................................................................................... 49

    **CONCLUSION AND PRAYER FOR RELIEF**................................................................ 50

**PUBLIC VERSION**

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861 (2004) ........................................ 13, 14

*Amsted Rail Co. v. United States Int'l Trade Comm'n*, 46 CIT ___, 600 F. Supp. 3d 1308 (2022) ............................................................................................................................ 3. 5, 49

*Amsted Rail Co. v. United States Int'l Trade Comm'n*, 46 CIT ___, 607 F. Supp. 3d 1283 (2022) ............................................................................................................................................ 6

*Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 39 CIT ___, 100 F. Supp. 3d 1314 (2015) ................................................................................................................... 13, 18, 19

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ........................................................................................................................... 11, 12

*Chevron U.S. A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ......... 10

*CVB, Inc. v. United States*, 675 F. Supp. 3d 1324 (2023) ................................................ 11, 31, 32

*Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F.3d 1280 (Fed. Cir. 2016) ..................................................................................... 36, 41, 42, 43, 49, 50

*Elkem Metals Co. v. United States*, 26 CIT 234, 239, 193 F. Supp. 2d 1314 (2002) ................. 46

*Empire Plow Co. Inc. v. United States*, 11 CIT 847, 675 F. Supp. 1349 (1987) .................. 14, 16

*EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459 (Fed. Cir. 1984) ............................................... 43

*FTC v. Exxon Corp.*, 636 F.2d 1336 (D.C. Cir. 1980) ............................................................... 41

*Gilead Sciences, Inc. v. Lee*, 778 F.3d 1341 (Fed. Cir. 2015) ................................................... 16

*Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117 (1926) ...................................... 46

*Herman v. Acheson*, 108 F. Supp. 723 (D.D.C. 1952) ............................................................... 46

*In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373 (Fed. Cir. 2010) ............................... 41

*Kearns v. Fred Lavery Porsche Audi Co.*, 745 F.2d 600 (Fed. Cir. 1984) ................................. 43

*Loper Bright Enters. V. Raimondo*, 144 S. Ct. 2244 (2024) ..................................... 10, 11, 16, 44

*Makita Corp. v. United States*, 17 CIT 240, 819 F. Supp. 1099 (1993) ............. 37, 39, 43, 44, 45

*Miller & Co. v. United States*, 824 F.2d 961 (Fed. Cir. 1987)....................................................45

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001).......10, 38, 39

*Polyhdoroff v. ICC*, 773 F.2d 372 (D.C. Cir. 1985) ...................................................................46

*Shanxi Hairui Trade Co., Ltd. v. United States*, 39 F.4th 1357 (Fed. Cir. 2022) ......................10

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ...........................................................................11

*Touchcom, Inc. v. Bereskin & Parr*, 299 F. App'x 953 (Fed. Cir. 2008) ............................37, 40

*Trone v. Smith*, 621 F.2d 994 (9th Cir. 1980) .............................................................................43

*USEC, Inc. v. United States*, 25 CIT 49, 132 F. Supp. 2d 1 (2001)............................................13

*W.L. Gore & Assocs. v. Int'l Med. Prosthetics Research Assocs.*, 745 F. 2d 1463 (Fed. Cir. 1984) ..........................................................................................................................43

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................................9, 44, 45

19 U.S.C. § 1677(4)(A) .................................................................................................................12

19 U.S.C. § 1677(4)(B).............................................................................................................1, 12

28 U.S.C. 1581(c) .......................................................................................................................5, 45

28 U.S.C. 1581(i) ........................................................................................................................5, 6

**Regulation**

19 C.F.R. § 201.15(a)..........................................................................................................45, 46, 47

**Legislative History**

S. Rep. No. 96-249, *reprinted in* 1979 U.S.C.C.A.N. 381 ...................................................13, 24

**Administrative Determinations**

*Certain Freight Rail Couplers and Parts Thereof From Mexico: Antidumping Duty Order*, 88 Fed. Reg. 78,308 (Dep't Commerce Nov. 15, 2023) .......................................................41

*Tungsten Ore Concentrates from the People's Republic of China*, USITC Inv. No. 731-TA-497 (Prelim.), USITC Pub. 2367 (Mar. 1991) ........................................................................17

**Other Court Proceedings**

Joint Stipulation of Voluntary Dismissal (June 30, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed. Cir. Ct. No. 23-1355, CM-ECF Docket Entry No. 89....................................................................................................6-7

Notice of Appeal (Dec. 22, 2022), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 101.......................6

Order (July 5, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed. Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 90 ....................................................7

Plaintiffs-Appellants' Reply Brief (Feb. 27, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 48..............................................................................................................6

Verified Complaint, *Amsted Rail Company, Inc. v. U.S. International Trade Commission* (Oct. 14, 2022), Ct. No. 22-cv-00307, CM/ECF Docket Entry No. 14 .....................................5

**Other Authorities**

ABA Comm. on Ethics & Pro. Responsibility, Formal Op. 497 (2021) ....................................38

*Certain Network Interfacce Cards & Access Points*, USITC Inv. No. 337-TA-455, Commission Op., 2001 WL 1646394 (Dec. 18, 2001) ........................................47

*Certain Personal Data & Mobile Commc'ns Devices & Related Software*, USITC Inv. No. 337-TA-710, Order No. 10, 2010 WL 2915587 (June 10, 2010) ..........................................47

D.C. R. Pro. Conduct 1.9(a).................................................................36, 41, 42

D.C. R. Pro. Conduct 1.10 ..............................................................................42

George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963 (2016) ............47

Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71 (2014)............................................................................................48

Model Rules of Pro. Conduct r. 1.9(a) (1983) .........................................................36

Model Rules of Pro. Conduct r. 1.10 (1983)............................................................42

**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiffs, Amsted Rail Company, Inc. and ASF-K de Mexico S. de R.L. de C.V. (collectively "Amsted"), respectfully move this Court to grant Amsted judgment on the agency record against Defendant, the United States (representing the U.S. International Trade Commission (the "Commission")), as detailed below in the Conclusion and Prayer for Relief.

**STATEMENT PURSUANT TO RULE 56.2.**

A.     **Administrative Determination Under Appeal.**

Amsted seeks review of the Commission's final determination in the antidumping and countervailing duty investigations of Freight Rail Couplers ("FRCs") from Mexico, which is unsupported by substantial evidence on the record and is otherwise not in accordance with law. *See* Notice of Determinations, PR209; Views, PR190, PR211, CR178, CR183.

B.     **Reasons for Contesting the Administrative Determination.**

The reasons for contesting the administrative determination are articulated in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

C.     **Issues Presented and Summary of Argument.**

1.     *Was the Commission's Determination to Include a Related Party Within the Domestic Industry Unlawful and Unsupported by Substantial Evidence?*

Yes.  Section 771(4)(B) of the Tariff Act (19 U.S.C. § 1677(4)(B)) permits the Commission to excluded related parties from the domestic industry in "appropriate circumstances."  In its preliminary determination, the Commission applied a five-part test that it consistently used in previous cases and made factual findings showing that all five prongs of the test were satisfied, concluding that "on balance appropriate circumstances exist to exclude [       ] from the domestic industry as a related party."  Confidential Preliminary Views, CR 96, at 27.  But in its final determination, after discovering that the data showed no injury by

reason of subject imports without including [      ] as part of the domestic industry, the Commission plurality did an about face. Suddenly, in contrast to its preliminary determination pointing to "[      ] use of subject imports to lower costs and expand sales," *id.* at 26, the Commission plurality claimed in its final determination that "there is no indication on the record that [      ] domestic production was shielded from competition with subject imports from Mexico" and that "there was direct competition between its imports and domestic production with respect to raw materials, use of production-related workers, and sales." Final Determination, at 19. In so doing, the Commission not only ignored its findings from the preliminary determination, but also transmogrified the related parties provision by effectively claiming that [      ] was injuring itself and that its financial data must be included in order to mask the health of the rest of the domestic industry. The Commission's conclusion in this regard is thus both unsupported by substantial evidence and not in accordance with law.

       **2.**    ***Did the Commission's Failure to Reconcile Contradictory Conclusions Regarding the Same Evidence in FRC I and FRC II Yield a Determination Unsupported by Substantial Evidence?***

       Yes. In the 2022-23 investigations ("*FRC II*"), the Commission determined that by almost every measure, the domestic industry's performance overall increased during the 2020-2022 POI. However, the Commission pointed to declines from 2020 to 2021 and discounted the rebound in 2022 based on the theory that the improvements in 2022 were due to imposition of provisional duties during the 2021-22 investigation of FRCs from China ("*FRC I*"). But in so doing, the Commission ignored a critical finding in its final determination in *FRC I*, in which it concluded that the domestic industry's health was tied disproportionately to demand for FRCs in the OEM market segment, which was in decline from 2019 to 2021 due to slumping railcar demand. Demand in the OEM market segment rose sharply in 2022. But rather than addressing this critical condition of competition and its findings in *FRC I* as an alternative explanation for

the sharp improvement in the industry's condition in 2022, the Commission brushed aside the improvement in the OEM channel and instead shifted its focus to the replacement market segment.

### 3. *Did the Commission Unlawfully Refuse to Investigate the Attorney's Conflict of Interest?*

Yes. The Commission refused to investigate a disabling conflict of interest by the Attorney. The Commission claimed that it had no authority to resolve conflicts of interest, although the Commission has done so in other proceedings based on its "inherent authority to control proceedings." The Commission's failure to consider the conflict-of-interest issue here taints these proceedings, and the Court should remedy that failure here by remanding and requiring the Commission to either dismiss the investigation or enter a final negative determination.

## STATEMENT OF FACTS

### A.    Facts Concerning Ethics Issue.

The facts underlying Count I of the Complaint in this action, concerning violation of conflict-of-interest ethical rules by [                    ] ("Attorney"), the law firm [

] ("[        ]") and [                    ] ("Accountant"), are recounted in detail in paragraphs 9-74 of the Complaint, and in related litigation previously before this Court. *See Amsted Rail Co. v. United States Int'l Trade Comm'n*, 46 CIT ___, 600 F. Supp. 3d 1308, 1314-18 (2022) ("*Amsted Rail I*"). Below we briefly recount some of the key facts.

### 1.    *FRC I* Investigations.

On June 17, 2021, Amsted engaged the law firm of [                        ] "to provide legal services in connection with advice regarding the elevation and potential prosecution of an antidumping petition concerning imports of certain couplings and related rail

products." Letter from Faegre Drinker to Katherine M. Hiner, Acting Secretary, U.S.

International Trade Commission re: *Certain Freight Rail Couplers and Parts Thereof from*

*China and Mexico*: Action Request to Disqualify Petitioner's Counsel (Oct. 14, 2022) ("Request

to Disqualify"), at 2, PR 36.

Through the Attorney, on September 29, 2021, the Coalition of Freight Rail Coupler

Producers ("Coalition" or "Petitioner") filed its petition with the U.S. Department of Commerce

("Commerce") and the U.S. International Trade Commission ("Commission"), commencing

antidumping duty investigations on Freight Rail Couplers ("FRCs") from China, and a

countervailing duty investigation on FRCs from China ("*FRC I*"). *Id.* at 3. At the time, the

Coalition was composed of two constituent members: Amsted and M&T, a domestic producer of

FRCs. *Id.*

On October 6, 2021, Amsted, again through the Attorney, filed a letter in *FRC I*

withdrawing from the petition. *Id.* at 3. Until its withdrawal, Amsted supervised and materially

contributed to the Attorney's preparation for *FRC II*. *Id.* On October 14, 2021, Amsted's current

counsel, the law firm of Faegre Drinker Biddle & Reath LLP ("Faegre"), entered an appearance

in *FRC I* before the Commission. *Id.*

On March 1, 2022, the Attorney entered his appearance on the Coalition's behalf to

reflect that he had changed law firms from [      ] to [          ]. *Id.* at 4.

A certified public accountant ("Accountant") accompanied the Attorney in his move from

[      ] to the Firm. As reflected on the petition's cover page, the Accountant was one of the

Coalition's representatives in *FRC I*. *Id.*

The Commission announced a unanimous negative determination in *FRC I* on June 14,

2022, thus terminating *FRC I* and denying the Coalition its requested relief. *Id.* at 5.

One reason for the negative injury determination in *FRC I* was that Chinese FRCs could not be considered a cause of the alleged injury because of significant non-subject FRC imports from Mexico. *Id.*

### 2. *FRC II* Investigations.

Just days after certifying destruction of the confidential record from *FRC I*, on September 28, 2022, the Coalition filed a second petition commencing the 2022-23 investigations ("*FRC II*"), this time naming imports from *Mexico* in addition to China. *Id.* at 5.

The petitioning party in each investigation was the Coalition, of which Amsted is a former member. *Id.* In the 2022-23 Investigations, the Coalition's two members were M&T and USW. *Id.* M&T is Amsted's industry competitor. The USW represented unionized workers at Amsted. *Id.* The Coalition contended that the USW became a member "because of the impact of subject imports on USW workers," including job losses "in the domestic FRC industry." *Id.*

### 3. Proceedings at the U.S. Court of International Trade Regarding Ethics Issue.

On October 14, 2022, Plaintiffs filed suit in this Court for injunctive and declaratory relief, pursuant to 28 U.S.C. § 1581(i), asking the Court to take the following several actions, including directing the Commission to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in *FRC II*. Verified Complaint, *Amsted Rail Company, Inc. v. U.S. International Trade Commission* (Oct. 14, 2022), Ct. No. 22-cv-00307 (the "*ITC CIT Appeal*"), CM/ECF Docket Entry No. 14.

On November 16, 2022, the Court in the *ITC CIT Appeal* dismissed Plaintiffs' complaint without prejudice to refiling under 28 U.S.C. 1581(c). *Amsted Rail I*, 600 F. Supp. 3d at 1330-31. The CIT did not address the merits of Plaintiffs' claims, but instead held that the remedy available to Plaintiffs under 28 U.S.C. § 1581(c) is not manifestly inadequate, and therefore

jurisdiction under 28 U.S.C. § 1581(i) was not available. *Amsted Rail I*, 600 F. Supp. at 1330.

Plaintiffs also moved unsuccessfully for an injunction pending appeal. *See Amsted Rail Co. v.*

*United States Int'l Trade Comm.*, 46 CIT ___, 607 F. Supp. 3d 1283, 1295 (2022) ("*Amsted Rail*

*II*"). Although it denied that motion on December 20, 2022, the CIT qualified that "Plaintiffs are

entitled to their day in court" and "the Commission's determinations should be subject to

appropriate judicial review." *Id.* at 1294. "Plaintiffs may reformat their challenges to agency

determinations not to investigate allegations of APO and ethical misconduct as part of a §

1585(c) challenge to a reviewable final determination by the Commission." *Id.* Amsted

subsequently appealed to the U.S. Court of Appeals for the Federal Circuit ("CAFC"). Notice of

Appeal (Dec. 22, 2022), *ITC CIT Appeal*, CM/ECF Docket Entry No. 101.

 The parties in the *ITC CAFC Appeal* completed briefing on February 27, 2023. *See*

Plaintiffs-Appellants' Reply Brief (Feb. 27, 2023), *Amsted Rail Company, Inc. v. U.S.*

*International Trade Commission*, Fed. Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 48.

 On June 30, 2023, the CAFC having not yet calendared oral argument and the

Commission's final injury investigation nearing completion, the Plaintiffs decided that the

passage of time had effectively mooted their request for the Commission to disqualify the

Attorney, the Accountant, and the Firm from the pending final injury investigation. Accordingly,

after securing the consent of the other parties, Plaintiffs filed a Joint Stipulation of Voluntary

Dismissal of the *ITC CAFC Appeal* on June 30, 2023. Joint Stipulation of Voluntary Dismissal

(June 30, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade Commission*, Fed. Cir.

Ct. No. 23-1355, CM/ECF Docket Entry No. 89. The CAFC dismissed the *ITC CAFC Appeal* on

July 5, 2023. Order (July 5, 2023), *Amsted Rail Company, Inc. v. U.S. International Trade*

*Commission*, Fed. Cir. Ct. No. 23-1355, CM/ECF Docket Entry No. 90.

**B.      Procedural History Relating to the Commission's Injury Investigation.**

On October 5, 2022, the Commission published notice of its institution of preliminary

investigations regarding FRC II.  *Certain Freight Rail Couplers and Parts Thereof From China*

*and Mexico: Institution of Antidumping and Countervailing Duty Investigations and Scheduling*

*of Preliminary Phase Investigations*, 87 Fed. Reg. 60,143 (Int'l Trade Comm'n Oct. 5, 2022).

On November 18, 2022, the Commission published notice of its preliminary

determination that there is a reasonable indication that an industry in the United States is

materially injured by reason of imports of certain freight rail couplers and parts thereof from

China and Mexico.  *Certain Freight Rail Couplers and Parts Thereof From China and Mexico*,

87 Fed. Reg. 69,340 (Int'l Trade Comm'n Nov. 18, 2022), PR 93.  In the same notice, the

Commission noticed commencement of its final phase investigations.  *Id.*  The public version of

the Views of the Commission is contained in *Certain Freight Rail Couplers and Parts Thereof*

*from China and Mexico*, Inv. Nos. 701-TA-682 and 731-TA-1592-1593 (Preliminary), USITC

Pub. 5387 (Nov. 2022), PR 95 ("Public Preliminary Views").  The confidential Views of the

Commission are contained in "Confidential Preliminary Views", CR 96.

In the *Preliminary Determination*, the Commission excluded [        ] from the

definition of the domestic industry on the grounds that its primary interest appeared to be in

importation and not domestic production and that the firm's inclusion would obscure the impact

of injury due to subject imports.  *Id.* at 25-26.

On July 7, 2023, the Commission published notice that an industry in the United States is

materially injured by reason of imports of certain freight rail couplers and parts thereof from

China.  *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China*,

88 Fed. Reg. 43,399 (Int'l Trade Comm'n July 7, 2023), PR 189.  The vote was 3-1, with

Chairman David S. Johanson dissenting, and Commissioner Randolph Y. Stayin not

participating. *Id*. at 43,399 n.3. The Commission set forth both the majority and dissenting views in *Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ("Public Final Views"), PR 190. The confidential version of the plurality that constituted the final Commission determination are contained in "Confidential Final Views", CR 178. In addition, separate views of Chairman David S. Johanson and Commissioner Amy A. Karpel on the Related Parties issue are contained in "Confidential Separate Views of Chairman David A. Johanson and Commissioner Any A. Karpel on Related Parties," CR 180. Finally, Chairman David S. Johanson issued a dissent, contained in "Confidential Dissenting Views of Chairman David S. Johanson" ("Confidential Dissenting Views") CR 179.

In the Final Views (both public and confidential versions), the majority (Commissioners Kearns, Schmidtlein, and Karpel) determined that the domestic industry is materially injured by reason of subject imports from China. Confidential Final Views at 3-64. Although the July 7, 2023 determination applied only to subject imports from China (because at that point Commerce had not yet issued its final antidumping determination regarding subject imports from Mexico), the Commission cumulated the volume and effects of subject imports from China and Mexico. *Id*. at 28. In the Confidential Dissenting Views, Chairman Johanson joined certain sections from the Confidential Final Views, including cumulation of imports from China and Mexico, *id*. at 3, but determined that the domestic industry is neither materially injured nor threatened with material injury by reason of cumulated subject imports from China. *Id*. at 1-22. In the Confidential Separate Views, Chairman Johanson and Commissioner Karpel dissented from the majority's not to exclude one domestic producer from the definition of the domestic industry in these investigations. *Id*. at 1-6.

Following a final affirmative determination by Commerce that subject imports from

Mexico were being dumped, on November 13, 2023, the Commission published notice that an

industry in the United States is materially injured by reason of imports of certain freight rail

couplers and parts thereof from Mexico. *Certain Freight Rail Couplers and Parts Thereof From*

*Mexico*, 88 Fed. Reg. 77,612 (Int'l Trade Comm'n Nov 13, 2023) ("Final Mexico

Determination"), PR 209.  As with the final injury determination regarding imports of FRCs

from China, the vote regarding imports of FRCs from Mexico was 3-1, with Chairman David S.

Johanson dissenting. *Id*. at 77,612 n.3.  (Commissioner Stayin had resigned from the

Commission prior to the Final Mexico Determination).  The Commission set forth the public

version of both the majority and dissenting views in *Certain Freight Rail Couplers and Parts*

*Thereof from Mexico*, Inv. Nos. 731-TA-1593 (Final), USITC Pub. 5470 (Nov. 2023) ("Public

Mexico Views"), PR 211.  The confidential version of the Mexico is contained in "Confidential

Mexico Views", CR 183.

**ARGUMENT**

**I.    THE COMMISSION PLURALITY'S REFUSAL TO EXCLUDE [          ]
       FROM THE DOMESTIC INDUSTRY WAS UNLAWFUL AND UNSUPPORTED
       BY SUBSTANTIAL EVIDENCE.**

   **A.    Standard of Review.**

Under the Tariff Act of 1930, as amended (the "Tariff Act"), this Court cannot affirm the

Commission's determination if it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The U.S. Court of

Appeals for the Federal Circuit had previously reviewed questions of statutory interpretation of

Title VII of the Tariff Act using the two-step *Chevron* analysis. *See Pesquera Mares Australes*

*Ltda. v. United States*, 266 F.3d 1372, 1380 (Fed. Cir. 2001) (explaining *Chevron U.S.A., Inc. v.*

*Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) and finding courts have

an "obligation to afford *Chevron* deference to {the agency's} interpretations of ambiguous statutory terms articulated in the course of {the agency's} antidumping determinations"). Under *Chevron*, the court determined "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842; *see also Shanxi Hairui Trade Co., Ltd. v. United States*, 39 F.4th 1357, 1360-61 (Fed. Cir. 2022) (quoting *Chevron*). "If the intent of Congress is clear," the court "must give effect to that intent." *Id*. (internal quotation marks omitted). "But if the statute is silent or ambiguous with respect to the specific issue," the court "then under *Chevron* Step Two…must defer to {the agency's} interpretation if its answer is based on a permissible construction of the statute." *Id*. (internal quotation marks omitted).

     *Chevron*, however, is no longer good law. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("*Chevron* is overruled"). In overruling *Chevron*, the U.S. Supreme Court has held that "agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id*. at 2261 (emphasis original). The Court in *Loper Bright* explained as follows:

> In an agency case as in any other, though, even if some judges might (or might not) consider the statute to be ambiguous, there is a best reading all the same—the reading the court would have reached if no agency were involved. It therefore makes no sense to speak of a "permissible" interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible.

*Id*. at 2266 (cleaned up). That is because "{t}he very point of the traditional tools of statutory construction—the tools courts use every day—is to resolve statutory ambiguities." *Id*. Unlike agencies, "{c}ourts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Id*. at 2268.

In *Loper Bright*, the Supreme Court stated that in exercising its independent judgment to interpret the statutes that agencies administer, "courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." *Id.* at 2262 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). As such, the agency's interpretation of the statute is not entitled to the degree of deference provided in *Chevron*; the weight that courts may give to the agency's interpretation would "'depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Loper Bright*, 144 S. Ct. at 2259 (quoting *Skidmore*, 323 U.S. at 140).

In reviewing the Commission's determination for substantial evidence, "{t}he Commission is obligated to draw from the evidence all inferences the evidence reasonably demands, not just those that are convenient." *CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1340 (2023), *appeal docketed*, no. 2024-1504 (Fed. Cir. Feb. 2, 2024).

> The Commission must fairly analyze the data…. The law charges the Commission with explaining how it views the evidence before it. When it changes methodologies in analyzing the data, the Commission must acknowledge and justify any inconsistent treatment.

*Id.* at 1340-41. "Although it is not the Court's domain to reweigh the evidence, it is the Court's domain to require that the Commission weigh *all* the evidence in the record—not just the evidence that supports its decision." *Id.* at 1342 (emphasis original).

Finally, when evaluating an agency's reasoning in applying the facts to the statute, courts must also consider whether the agency's reasoning is arbitrary and capricious. That is because "a reviewing court must apply both standards and that an agency's finding may be supported by substantial evidence, yet nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012).

11

**B.    The Text of Section 771(4)(A) of the Tariff Act, the Legislative History Thereof, and the Commission's Traditional Criteria Require Exclusion of Domestic Producers Whose Interests in Importation Causes Them to Act Against the Domestic Industry.**

The Tariff Act instructs the Commission to analyze injury to the "domestic industry," which is defined in Section 771(4)(A) of the Tariff Act as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." 19 U.S.C. § 1677(4)(A). However, Section 771(4)(B) of the Tariff Act, as amended by the Trade Agreements Act of 1979 ("TAA"), provides an exception allowing for exclusion of certain U.S. producers from the analysis of the "domestic industry," as follows:

> if a producer of a domestic like product and an exporter or importer of the subject merchandise are related parties, or if a producer of the domestic like product is also an importer of the subject merchandise, the producer may, in appropriate circumstances, be excluded from the industry.

19 U.S.C. § 1677(4)(B). Thus, the question of whether a U.S. producer should be excluded from the analysis of the domestic industry turns on two issues, both of which must be satisfied:

(1)    Is the U.S. producer related to the exporter or U.S. importer of the subject merchandise, or does the U.S. producer itself import the subject merchandise?

(2)    Do "appropriate circumstances" exist to exclude the U.S. producer?

Although the statute does not directly identify what constitutes "appropriate circumstances," the legislative history of the TAA gives the following guidance:

> The ITC is given discretion not to include within the domestic industry those domestic producers of the like product which are either related to exporters or importers of the imported product being investigated, or which import that product. Thus, for example, *where a U.S. producer is related to a foreign exporter and the foreign exporter directs his exports to the United States so as not to compete with his related U.S. producer, this should be a case where the ITC would not consider the related U.S. producer to be a part of the domestic industry.*

12

PUBLIC VERSION

S. Rep. No. 96-249, at 83 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 470 (emphasis added).

This Court has previously explained that "Congress enacted the provision so that domestic producers whose interests in the imports were strong enough to cause them to act against the domestic industry would be excluded from the ITC's consideration and investigation into material injury or threat thereof." *USEC, Inc. v. United States*, 25 CIT 49, 61, 132 F. Supp. 2d 1, 12 (2001), *aff'd*, 34 Fed. Appx. 725 (2002).

In several previous investigations, the Commission has identified five factors to decide whether "appropriate circumstances" exist to exclude a related party:

> (1) the percentage of domestic production attributable to the importing producer;
> (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV {less than fair value} sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market);
> (3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry;
> (4) the ratio or import shipments to U.S. production for the imported product; and
> (5) whether the primary interest of the importing producer lies in domestic production or importation.

Confidential Final Views, CR 178, at 14-15 n.54 (citing *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 39 CIT ___, 100 F. Supp. 3d 1314, 1326-31 (2015), *aff'd*, 879 F.3d 1377 (Fed. Cir. 2018)); *see also Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1865 (2004) (same). "The most significant factor considered by the Commission in making the 'appropriate circumstances' determination is whether the domestic producer accrued a substantial benefit from its importation of the subject merchandise." *Allied Mineral Prods.*, 28 CIT at 1864 (citing *Empire Plow Co. Inc. v. United States*, 11 CIT 847, 853, 675 F. Supp. 1349, 1353 (1987)).

In *Allied Mineral Products*, a case involving refined brown aluminum oxide ("RBAO") from China, the Commission applied the five-factor test to exclude a domestic producer (Great Lakes) from the definition of the domestic industry, finding that appropriate circumstances existed to do so in part because Great Lakes "accrued a substantial benefit from its importation of the subject merchandise." *Id*. On appeal, the plaintiff argued that the Commission placed "unlawful emphasis" on Great Lakes' financial results to support its "appropriate circumstances determination." *Id*. at 1865. This Court rejected the plaintiff's argument for various reasons, but the Court emphasized that the Commission's determination was not a results-oriented decision based on the effect of Great Lakes' financial results on the aggregate domestic industry data, but rather because those financial results "served to substantiate its finding that Great Lakes accrued a substantial benefit from its importation of the subject merchandise." *Id*. at 1866. The Court emphasized that "Great Lakes was importing the subject merchandise at lower prices than other domestic producers were paying for crude BAO {the input to produce RBAO}." *Id*. The record also indicates that "Great Lakes was using this cost advantage to increase sales volume by underpricing competing domestic RBAO producers" and as a result, "Great Lakes' importation of the subject merchandise gave it a competitive advantage in domestic RBAO production, which translated into improved financial results." *Id*.

C.  **Application of the Statute, the Legislative History, and the Commission's Traditional Criteria Required the Commission to Exclude [      ] from the Domestic Industry.**

In this investigation, all parties agree that [      ] "met the statutory definition of a related party because it imported subject merchandise and owned a Mexican producer and exporter of subject merchandise to the United States, [      ]." Confidential Final Views, CR 178, at 15.

14

Furthermore, "appropriate circumstances" existed to exclude [          ], based on both the

legislative history and the Commission's traditional five-factor test.  First, the foreign producer

in question – [          ] – directed its exports so as not to compete with Amsted's small domestic

production of FRCs.  The Final Staff Report states that "{i}n addition to directly importing the

subject merchandise, [

                              ]. [                                                ]."  Final Staff

Report (June 5, 2023), CR 163, at III-14.  The Final Staff Report notes that "Amsted Rail's

primary customers in the United States are [


                              ]."  *Id*. at III-14 n.12.

Undisputed in the administrative record are [          ]'s reasons for importing, which the

Final Staff Report summarized as follows:

[



                              ]

*Id*. at III-15, Table III-2.  In other words, [          ] orchestrates its production of FRCs in

Mexico and the United States so as to be complementary, so according to the legislative history

of Section 771(4)(B), this is a case where the Commission should *not* consider the related U.S.

producer ([          ]) to be a part of the domestic industry.

Under traditional methods of statutory construction, this should end the matter. *See Gilead Sciences, Inc. v. Lee*, 778 F.3d 1341, 1348 (Fed. Cir. 2015) ("In an effort to discern Congress' intent, this court looks to traditional tools of statutory construction. Beyond the statute's text, those tools include the statute's structure, canons of statutory construction, and legislative history") (cleaned up). As underscored recently by the U.S. Supreme Court in *Loper Bright Enterprises v. Raimondo*, "{c}ourts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." 144 S.Ct. 2244, 2268 (2024).

But even if the Court interprets the "appropriate circumstances" provision of section 771(4)(B) using the Commission's traditional five-factor test, the outcome should be the same. First, by the Commission's own account, [        ] accounted only for [      ] percent to [        ] percent of U.S. production of FRCs during the 2020-2022 POI. Confidential Final Views, CR 178, at 17. Thus, this is *not* a case where the domestic producer at issue "account{s} for a significant share of the domestic production and which exclusion would result in impairing the accuracy of the ITC determination." *Empire Plow Co. Inc. v. United States*, 11 CIT 847, 853, 675 F. Supp. 1349, 1354 (1987).

Second, in the preliminary determination, the Commission found that the reason [        ] imported from Mexico pointed toward exclusion, not inclusion, of [        ] in the domestic industry. The Commission stated as follows:

> [        ] primary interest appears to have been in the importation of subject merchandise, given that its ratio of subject imports to domestic production was [        ] high throughout the POI and its stated reasons for importing subject merchandise were lowering costs and expanding sales for its largest customers. [        ] also reported [
>
> ]. [                ] the petition concerning imports

> from Mexico. Moreover, [          ] use of subject imports to
> lower costs and expand sales suggests that inclusion of [          ]
> data may obscure the impact of dumped and subsidized imports on
> the domestic industry.

Confidential Preliminary Views, CR 96, at 26-27. Indeed, [          ] move to Mexico was

driven primarily by the need to be near its customers' railcar production sites. In other words, in

its preliminary determination, the Commission found that the reason that [          ] imported

FRCs from Mexico was to benefit from low costs and prices to its largest customers—which

were in or near Mexico—rather than a situation where the domestic producer is forced to buy

low-priced imports in order to compete in the U.S. market. *See Tungsten Ore Concentrates from*

*the People's Republic of China*, USITC Inv. No. 731-TA-497 (Prelim.), USITC Pub. 2367 (Mar.

1991), at 16, 23-24 (concluding that domestic producer's decision to import subject merchandise

was to survive in light of low-priced subject imports and therefore it was not appropriate to

exclude it as a related party). Nothing indicates that the reason for [          ] decision to import

FRCs from Mexico changed between the preliminary and final determination.

Third, the Commission concluded in the preliminary determination that the data for "the

rest of the industry" (*i.e.*, McConway and Torley, LLC ("M&T")) would be skewed by *including*

data for [          ], rather than by *excluding* it. As noted in the excerpt above from the

Preliminary Determination, the Commission found that "[          ] use of subject imports to

lower costs and expand sales suggests that *inclusion* of [          ] data may *obscure the impact*

*of dumped and subsidized imports on the domestic industry*." Confidential Preliminary Views, at

26-27 (emphasis added). The Commission plurality did not cite any change in the underlying

facts between the preliminary and final determinations that would undermine this conclusion. In

their separate views, two commissioners that dissented from the decision *not* to exclude

[          ] from the domestic industry disputed the plurality's finding that excluding [          ]

would "skew" the data, dryly noting that "the domestic industry that we are examining after exclusion of [     ] represents the sole domestic manufacturer that is claiming material injury by subject imports." Confidential Separate Views of Chairman David A. Johanson and Commissioner Amy A. Karpel on Related Parties, CR 180, at 4. In other words, it is simply logically incoherent to claim that removing [     ] from the domestic industry would somehow "mask" injury to the domestic industry when the remaining domestic producer— whose economic indicia standing alone shows greater health—is the only one that claimed the domestic industry was injured in the first place. As discussed further below, the Commission's decision regarding the question of whether the data would be more skewed by *including* or *excluding* [     ] data was not the result of neutral application of additional information uncovered during the final phase of the investigation. Instead, the determination was a policy decision of the Commission's plurality to reach whichever decision appeared to be more favorable to the petitioner.

Next, the fourth prong of the Commission's test—the ratio of import shipments to U.S. production for the imported product—suggests excluding [     ] from the domestic industry. In its Final Determination, the Commission reported that the ratio of [     ] subject imports to U.S. production "increased from [     ] percent in 2020 to [     ] percent in 2021, and then declined to [     ] percent in 2022." Confidential Final Views, CR 178, at 17. In situations where the domestic producer in question has a high ratio of imports to domestic production, the Commission has considered this a factor weighing in favor of excluding the producer from the domestic industry. *See Changzhou Trina Solar Energy Co., Ltd. v. U.S. Int'l Trade Comm'n*, 39 CIT ___, 100 F Supp. 3d 1314, 1330 (2015) (finding high ratio of imports to domestic production supported conclusion that producer's interests were primarily in importing

rather than domestic production), *aff'd*, 879 F.3d 1377 (Fed. Cir. 2018).  There is no indication in the final determination that the addition of full-year 2022 data changed the Commission's analysis of this factor between the preliminary and final determinations.

The fifth and final prong of the Commission's test of whether "appropriate circumstances" exist to exclude an importing producer—whether the "primary interest" of the importing producer lies in domestic production or importation—weighs in favor of excluding [        ].  In the preliminary investigation, the Commission stated that "[        ] primary interest appears to have been in the importation of subject merchandise, given that its ratio of subject imports to domestic production was [        ] high throughout the POI and its stated reasons for importing subject merchandise were lowering costs and expanding sales for its largest customers."  Confidential Preliminary Views, at 26.  Again, it is important that [        ] is located in Mexico because that is where most of its OEM customers are located.

> **D.    The Commission Plurality's Decision Not to Exclude [        ] from the Domestic Industry Was Based on an Unlawful Interpretation of Section 771(4)(B) and Was Unsupported by Substantial Evidence.**

As discussed in detail above, in its unanimous preliminary determination, the Commission defined the domestic industry as consisting of all U.S. producers of FRCs, with the exception of [        ].  Confidential Preliminary Views, at 27.  In the final determination, the Commission plurality came to the opposite conclusion.  But its *volte-face* was not driven by a change in the data following collection of additional information between the preliminary and final determinations.  Instead, the idea of inserting [        ] back into the aggregate data analysis for the domestic industry was entirely the product of thinking by a plurality of two commissioners.  It appears that the idea was developed in a question-and-answer exchange at the hearing between one of the commissioners and the petitioner:

PUBLIC VERSION

> COMMISSIONER KEARNS: …. I'd like to share my thinking as to how I could see injury due to subject imports in this case, and this is just one line of thinking, and it's obviously very simplified. But I'm hoping to get your responses to it, as well as respondents' thoughts this afternoon.
>
> First, it seems to me that we should define in the domestic industry to include the related party.  I know you all have argued to exclude it, but it seems to me we should include it because, as you have said also, excluding them would mask injury, and I know that's kind of the focus of your brief from pages 73 to 76.
>
> Also, just as a little side note, in addition to masking injury, going to the point where it talks about capacity, I think it might also mask capacity if we were to exclude the related party from our thinking in this case.

Revised and Corrected Commission Hearing Transcript (May 31, 2023), PR 160 ("Tr."),

at 70-71 (Commissioner Kearns).  Commissioner Kearns elaborated further in a later exchange

with the respondents:

> COMMISSIONER KEARNS: Our decision on whether to include or exclude a related party I think is supposed to be based on whether or not doing so – on or the other – would mask injury.
>
> And I know there's other ways of describing it but are more neutral, I would say, in their description.  And I do want to make clear before I give you a change {sic} to respond: I mean, to me, that does not mean we just find whatever numbers are most indicative of injury.
>
> There has to be some connection, right?  But it can go either way. So you can have a situation, for example, where, you know, because of imports a U.S. producer could be doing better – like, its profit margin – because it's able to focus on a niche product, you know.
>
> Or on the other hand, you could have a situation where it's doing worse because of imports because it's making a decision: we're going to get out of making this in the United States; we're going to make it in Mexico.
>
> In each of those different situations, you'd mask injury in a different way, but there is still some tie to the relationship between

the imports and the domestic production, so I did want to make
that clear.

*Id.* at 198-199 (Commissioner Kearns).

The problem with this reasoning is that it appears to discard the legislative history and the

Commission's five-factor test. Instead, the term "masking injury" is just a euphemism for saying

that the domestic producer should not be excluded from the domestic industry if its injury data

demonstrates that it is doing *worse* than other members of the domestic industry. Although

Commissioner Kearns appeared to disclaim that a "masking injury" test was simply to pick

whichever set of numbers look worse for the domestic industry, the "masking injury" test does in

fact do just that. He does not explain any set of circumstances in which the importing domestic

producer is doing worse than the rest of the industry, but would nevertheless still be excluded

under a "masking injury" test. In other words, the Commission's newly minted "mask injury"

test meant that the only factor from the traditional five-factor test that would matter is whether

excluding the data from the importing U.S. producer would "skew" or "distort" the data; the data

would be "skewed" or "distorted" only if excluding the data resulted in aggregate data showing

the domestic industry in better shape than including the data.

The Commission's determination reflects this non-neutral analysis. Despite

acknowledging [          ] position that "its subject imports from Mexico complement its

domestic production rather than compete with it," the Commission plurality declared that "the

record shows that [          ] domestic production was not shielded from competition with

subject imports during the POI and that its exclusion would skew the domestic industry data …."

Confidential Final Views, at 19.

According to the Commission plurality, "there is no indication on the record that

[          ] domestic production was shielded from competition with subject imports from

21

PUBLIC VERSION

Mexico." *Id*. That statement is unsupported by substantial evidence. The Commission ignored

an entire section from Amsted's Posthearing Brief and Answers to Commissioner Questions, in

which Amsted demonstrated that [          ] does not compete against [              ], but rather

complements [                ] production. In addition to pointing to the Commission's own

finding in the preliminary determination and testimony at the hearing all supporting the point that

[       ]'s production is set up to complement [               ] rather than compete against it,

Amsted point out that this "is precisely the type of situation in which the legislative history of the

TAA says that the U.S. producer should *not* be considered part of the domestic industry."

Amsted's Posthearing Brief and Answers to Commissioner Questions (May 26, 2023), CR 158,

at 4 (brief) and 47 (answers). Therefore, the Commission ignored the point that Amsted made in

its Posthearing Brief that [                 ] did *not* make a decision to import FRCs from

Mexico rather than produce in the United States in order to escape import competition. *See id*. at

4-5.

The Commission's broad-brush attempt to portray [                 ] facility in

competition with its [        ] operation in Mexico ignores the interrelationship between the two

facilities. As Amsted explained in written responses to commissioner questions:

> Amsted does not view its Granite City facility solely as an FRC
> facility. Instead, it views it as a casting facility for a suite of rail
> products that it sells as a bundle to its customers in North America.
> At the Granite City facility, in addition to freight rail couplers and
> knuckles, Amsted produces side frames, bolsters, yokes,
> articulated connectors and is, as Amsted witnesses testified at the
> hearing, expanding into transit product offerings. Amsted's goal is
> to maximize its production and sales of all of these products at its
> Granite City facility, while also optimizing production at its
> Mexican facility. The workers at its Mexican facility are not in
> competition with the workers at its Granite City facility for the
> production of FRCs. To the contrary, the goal is to produce a suite
> of products and maximize production at its Granite City and
> Mexican facilities in order to sell a bundle of rail products to its

22

> customers.  Although more FRCs may be produced in its Mexican
> facility, that production is complementary to the production of the
> other rail products that Amsted produces in its Granite City
> facility.

Amsted Posthearing Brief and Answers to Commissioner Questions (May 25, 2023), CR 158, at

28-29 (answers).  In fact, Amsted provided a table showing the *total* capacity of Granite City for

*all rail components* produced at the Granite City facility.  *Id.* at 29-30 (Table 5).  As Amsted

explained, "however, in a facility that is producing multiple rail components, it is the overall

capacity and capacity utilization figures that are important to Amsted."  *Id.*  Amsted also noted

the following:

> Moreover, overall production in two months, [
>                        ], actually exceeded capacity.  That is due to the fact
> that Amsted [
>                                            ].  Therefore, [
>                                            ].  Thus, [
>
>        ], meaning that it could not have produced any more FRCs
> or any other product.

*Id.* at 30.

    The Commission plurality also attempts to justify its decision by claiming that

"[        ] domestic operations also faced competition from low-priced subject imports from

China during the POI."  Confidential Final Views, at 20.  The Commission does not explain how

this is relevant to the Commission's five-factor test for determining whether "appropriate

circumstances" exist to exclude the importing domestic producer: none of those five factors calls

for the Commission to include the domestic producer if it competes with subject imports *other*

that those that it imported (or its affiliate imported).  Certainly it does not speak to the situation

described in the legislative history, where exclusion is appropriate "where a U.S. producer is

related to a foreign exporter and the foreign exporter directs his exports to the United States so as

not to compete with his related U.S. producer." S. Rep. No. 96-249, at 83 (1979), *reprinted in*

1979 U.S.C.C.A.N. at 470.

Next, the Commission attempts to justify its decision not to exclude [        ] because

"[        ] domestic FRC production operations do not appear to have benefited from its

[                                    ]." Confidential Final Views, at 21. This, of course, is just another

way the Commission plurality phrased its position that it is appropriate to exclude a domestic

producer only if the domestic producer is doing well and its inclusion in the aggregate data

would "mask injury." In any event, using the Commission's five-factor test, the relevant

question is whether the "U.S. producer" (or "the firm") benefits from the LTFV sales "or

whether the firm must import in order to enable it to continue production and compete in the

U.S. market." As noted above, the administrative record shows that [        ] made its

production decisions based on a suite of products—not just FRCs—and that its goal as a

company was to maximize production at *both* [                                ].

As such, it is clear that [        ] decision to import FRCs from Mexico was to achieve its

overall goals for production of that suite of products, which included profiting from its FRC

production in Mexico.

Finally, the Commission plurality again asserts that "[        ] exclusion from the

domestic industry would skew the data for the domestic industry." Confidential Final Views, at

23. Again, the Commission plurality interprets the term "skew" in a non-neutral manner. Under

the Commission plurality's reasoning, exclusion of [        ] from the domestic industry is

allowed if [        ] data shows health or improvement and its inclusion thereby weakens the

case for injury. But exclusion of [        ] is not allowed if [        ] data shows poor or

deteriorating results. This is especially perverse in this case, where the only company that is

claiming to be injured is petitioner M&T. If M&T's results alone do not show injury, if anything it would "skew" the data to lump in the data of [    ]—which opposes imposition of duties against imports from Mexico—in order to improve its injury case. In short, the inclusion of [    ] data "skews" the data for the rest of the domestic industry—M&T—by "masking" its non-injury.

> ### E. If the Commission Had Properly Applied the Related Parties Exception, the Result Would Have Been a Determination of No Material Injury by Reason of Subject Imports.

At the hearing, it was telling that Commissioner Kearns commented on his "thinking as to how I could see injury due to subject imports in this case …." Tr. at 71 (Commissioner Kearns). That is because unless the Commission did an about-face from the preliminary determination and inserted data from [    ] back into the domestic industry analysis, an affirmative injury determination would be unsupportable.

The data on the condition of the domestic industry, with [    ] excluded, is provided in Appendix C, Table C-2 of the Final Staff Report. The results are summarized in Commissioner Johanson's dissent, including an increase in the domestic industry's share of apparent U.S. consumption, an increase in the domestic industry's production over the POI, increased capacity and capacity utilization, increased domestic industry U.S. shipments, declining end-of-period inventories and ratio of end-of-period inventories to total shipments. Confidential Dissenting Views of Chairman David S. Johanson, CR 179, at 13-14. The dataset without [    ] shows improved employment indicators, including number of production and related workers, total hours worked and wages paid. *Id.* at 14. The domestic industry's financial performance—excluding [    ]—improved during the POI by virtually every measure, including a [    ] percent increase in net sales value, and improvement in the profit situation (whether examined in terms of gross, operating, or net income). *Id.* at 14-15.

In short, as Chairman Johanson concluded, analysis of the domestic industry without

[          ] data included "does not indicate that cumulated subject imports had a significant

impact on the domestic industry during the POI." *Id*. at 15.  The data—without distortions

caused by including [          ] results—show a "substantial improvement in performance" for

the domestic industry, corresponding with a significant upturn in the new railcar market," just as

the Commission predicted in *FRC I*. *Id*.  Indeed, analysis of the data without including [          ]

shows that "the domestic industry [

]. *Id*. at 16.

As a result, the Commission's decision to reverse its preliminary determination

decision—in which it removed Amsted from the domestic industry pursuant to Section 771(4)(B)

of the Tariff Act—in favor of a decision untethered from either the legislative history or the

Commission's traditional five-part test—is not harmless error.  It is an unlawful action that this

Court should reverse, with instructions on remand to re-evaluate its analysis of the impact on the

domestic industry *without* [          ].

## II.    THE COMMISSION'S CONTRADICTORY CONCLUSIONS REGARDING THE SAME EVIDENCE IN *FRC I* AND *FRC II* RESULTED IN A DETERMINATION UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

Even if the Court were to accept the Commission's decision to include [          ] within

the domestic industry, the data still do not support a finding that the domestic industry was

injured, by reason of subject imports or anything else.  Including [          ] in the domestic

industry data, the domestic industry's market share increased by [          ] percentage points.  Final

Staff Report, at C-3 (Table C-1).  U.S. producers' production quantity increased by [          ]

percent.  *Id*. at C-4 (Table C-1).  U.S. producers' shipments increased by [          ] percent.  *Id*.

U.S. producers' capacity utilization increased by [          ] percentage points.  *Id*.  The number of

U.S. production workers increased by [          ] percent.  *Id*.  U.S. production workers' hours

worked increased by [    ] percent. *Id.* U.S. producers' wages paid increased by [    ] percent. *Id.* The quantity of U.S. producers' net sales increased by [    ] percent. *Id.* The value of U.S. producers' net sales increased by [    ] percent. *Id.* The unit value of U.S. producers' net sales increased by [    ] percent. *Id.* U.S. producers turned from a gross [          ] to a gross [          ]. *Id.* U.S. producers [          ] operating [    ] from [          ] to [    ] and their net [    ] from [      ] to [    ]. *Id.*

Respondents explained that the domestic industry's sharply improved condition was attributable to the dramatic improvement in the railcar market in 2022. Amsted's Prehearing Brief, at 35-40. As the respondents maintained throughout the *FRC I* investigation and *FRC II*, the domestic industry—including M&T—is primarily focused on the OEM market, and as a result, its fortunes rise and fall with the new railcar market. *Id.* at 36. In its negative injury determination in *FRC I*, the Commission held that "{a}ny overall market share shift was affected by different demand trends for new railcars and maintenance of FRCs, as well as differing concentrations of shipments in these market segments by U.S. producers and importers." *FRC I* Views, PR 39 at 25. In *FRC II*, Amsted and the other respondents explained how that phenomenon played on during the 2019-2021 POI in *FRC I*:

> In *FRC I*, the POI covered a time of declining new railcar demand as North American freight railcar deliveries fell from 58,026 in 2019 to 29,280 in 2021, a decline of 49.5 percent. This drove the decline in overall FRCs demand and, given M&T's greater concentration in the OEM segment, adversely affected domestic industry performance during that period.

Amsted Prehearing Brief, at 36.

**A.    The Commission's Analysis of the Effects of Provisional Measures in *FRC I* Is Contrary With Its Analysis in *FRC I*.**

In its Prehearing Brief for *FRC II*, Amsted explained that railcar demand turned around in 2022:

> By contrast, the record evidence presented in the Prehearing Staff
> Report makes clear that this POI captured a significant recovery in
> the new railcar market, particularly in the second half of the POI.
> Freight railcar deliveries in North America increased from 33,417
> in 2020 to 40,735 in 2022, an increase of 21.9 percent (a strong
> contrast to the decline over the POI in *FRC I*). This sharp recovery
> was driven by the 39.1 percent increase between the 29,280
> deliveries in 2021 and the 40,735 deliveries in 2022, which—not
> coincidentally—coincides with M&T's sharp recovery in
> performance between 2021 and 2022.

*Id*. at 36-37.

But the Commission ignored in *FRC II* the explanation it had given in *FRC I* as the main

driver for the domestic industry's performance. The Commission stated that "{w}hile we

acknowledge that the domestic industry experienced overall improvements in its trade and

financial indicia, we also observe that its indicators declined 2020 to 2021 prior to provisional

duties in 2022. Although the domestic industry's production, sales, and shipments increased

over the POI, the improvements only occurred after the industry received trade relief."

Confidential Final Views, at 54 n.278. This contradicts, however, the finding elsewhere in the

plurality's opinion that "the withdrawal of subject imports from China after the imposition of

provisional duties *inured wholly to subject imports from Mexico*." *Id*. at 45 n.240 (emphasis

added). Commissioner Karpel made this very point in declining to join the Commission

plurality's excuse for ignoring the improvement in the industry in 2022. *Id*. at 55 n.281.

Commissioner Karpel noted that "it was [

      ] which principally contributed to [            ] relatively improved financial position in

2022." *Id*. The point that the imposition of provisional measures in *FRC I* resulted only in a

benefit to Mexico, which filled the void—a point that all four commissioners acknowledged—

indicates that provisional duties from *FRC I* did not explain the improvement of the domestic

industry in 2022. Instead, the domestic industry improved *despite* provisional duties "inur{ing}

28

wholly" to Mexico.  But that would not allow the Commission plurality to discount the improvements in 2022.

Furthermore, Chairman Johanson correctly noted that even if provisional measures from *FRC I* affected the health of the domestic industry in 2022, "improvements in the domestic industry's condition in 2022 were taking place regardless of the imposition of provisional measures in *FRC I*."  Confidential Dissenting Views of Chairman David S. Johanson, at 16 n.95. As a result, "{t}he transitional period in 2022 that resulted from M&T's unsuccessful petition in *FRC I* therefore does not justify not taking into consideration the significant improvement in the domestic industry's condition in 2022 in assessing whether the industry is currently materially injured by reason of subject imports." *Id.*

Moreover, a monthly analysis in the Final Staff Report of U.S. production and imports in 2022, by month and source, shows that U.S. production did not take off after the imposition of preliminary duties in *FRC I*, but rather *after* the Commission made its negative injury determination, when provisional duties were lifted.  The results of the monthly analysis are reproduced below from Figure IV-7 of the Final Staff Report:

[



]

Final Staff Report, at IV-21.

      In addition, if, as the Commission plurality claims, provisional duties explained the domestic industry's gain in market share in 2022, then the gain would have occurred in the replacement market, where most of the Chinese imports were sold.  Confidential Final Views, at 27.  But the administrative record does not confirm that hypothesis.  In fact, the domestic industry *lost* market share in the replacement market during the 2021-22 period, declining from [    ] percent in 2021 to [    ] percent in 2022.  Final Staff Report, at G-15 (Table G-12).  In

other words, provisional duties in *FRC I* do not explain away the change in the condition of the domestic industry in 2022.

Finally, the Commission plurality's focus on injury during the 2020-21 period ignores the fact that those are the years covered by the *FRC I* investigation, where the Commission had previously determined that subject imports from China were *not* injurious and did not cause any loss in the domestic industry's market share. *See* Investigation Nos. 701-TA-670 and 731-TA-1570 (Final): *Freight Rail Coupler Systems and Components from China—Views of the Commission* ("Confidential *FRC I* Views"), CR 42, at 34 (concluding that "subject imports did not gain significant market share at the expense of the domestic industry in either OEM or maintenance/replacement segment of the FRC market"); *id.* at 41 ("we do not find that the subject imports have had significant price effects on the domestic industry"); *id.* at 42 ("{a}lthough the domestic industry's output and financial performance declined considerably according to most measures during the POI, … we do not find a causal nexus between subject imports and such declines"). Although the Commission in *FRC I* noted an increase in market share by "non-subject imports" (*i.e.*, imports from Mexico) over the POI, the thrust of the opinion in *FRC I* does not suggest that the Commission's conclusions turned entirely (or even primarily) on the fact that imports from Mexico were treated as non-subject in that investigation. At a minimum, the Commission failed to "acknowledge and justify" its inconsistent treatment of the data from the 2020-21 period in *FRC I* versus *FRC II*. *See CVB, Inc. v. United States*, 675 F. Supp. 3d 1324, 1340-41 (2023), *appeal docketed*, no. 2024-1504 (Fed. Cir. Feb. 2, 2024).

In short, there is nothing but speculation—certainly not substantial evidence—to support the theory of the Commission plurality that improvements in the condition of the domestic industry in 2022 could be written off as due solely to imposition of provisional duties in *FRC I*,

justifying it to draw inferences from only those facts that are "convenient" to its conclusion. *CVB, Inc.*, 675 F. Supp. 3d at 1340. Accordingly, this Court should determine that the determination of the Commission plurality is unsupported by substantial evidence.

### B. The Commission's Emphasis on the Replacement Channel in *FRC II* Contradicts Its Findings in *FRC I*.

As noted above, including [     ] in the domestic industry data, the domestic industry's market share increased by [    ] percentage points over the POI. Final Staff Report, at C-3 (Table C-1). But the Commission's conclusion that the domestic industry *lost* market share is based on its argument that it lost market share in the *overall* market from 2020 to 2021, before provisional duties in *FRC I*, and that it lost market share from 2021 to 2022 in the *replacement* market segment. Confidential Final Views, at 45. Aside from the fact that the domestic industry's loss of market share in the replacement channel in 2021-22 contradicts the Commission's position that any improvement was due to provisional duties (see discussion above), it ignores the point that the Commission made in *FRC I* regarding the relationship between the OEM and replacement market channels.

In *FRC I*, the Commission explained that during the 2019-2021 POI for that investigation, "demand from the OEMs decreased to a greater extent than did demand in the maintenance/replacement segment of the market." Confidential *FRC I* Views, at 35. Because of the domestic industry's "dominant use of annual and long-term contracts" with OEMs, during the *FRC I* POI "domestic producers were not in a position to pivot as quickly to increase sales to the replacement market to avail themselves of the lesser decline in demand in that market." *Id.* at 36. As a result, the Commission in *FRC I* found that "domestic producers' greater reliance on OEM sales and complete FRC sales at the beginning of the POI relative to subject imports

contributed to domestic producers' [    ] percentage point market share loss to subject imports over the POI." *Id.*

The situation was reversed in 2022, which occurred after the end of the POI in *FRC I* and was the year for which the Commission plurality attempts to explain away inconvenient facts in *FRC II*. During the POR of *FRC II*, new railcar builds increased by 39.0 percent from 2021 to 2022, and the domestic industry's market share in the OEM channel increased from [    ] in 2021 percent to [    ] percent in 2022. Final Staff Report, at II-12 and G-11 (Table G-9). This is exactly the result predicted by the Commission in *FRC I*.

In justifying its new focus on the replacement market segment, the Commission in *FRC II* admits that "the industry made gains in the OEM market in 2022 that offset volume losses in the replacement market," but insists that "the replacement market is larger than the OEM market and represents a more steady source of demand and income for the domestic industry." Confidential Final Determination, at 45. But this argument ignores the Commission's finding in *FRC I* and extended by the dissent of Chairman Johanson in *FRC II* that:

> On this record, any loss of share in the replacement channel by the domestic industry was attributable to the industry's strategic decisions as to how to deploy its capacity. The industry prioritized its OEM customers, capturing the entirety of the increasing demand in the OEM channel and resulting in the industry increasing its share of the overall market significantly.

Confidential Dissenting Views, at 9.[1]

---

[1] As noted above, in the Confidential Dissenting Views, Chairman Johanson excluded [    ] from its analysis of the domestic industry, leaving [    ] as the sole focus. But [    ] experience is most salient with respect to the OEM market, given that most of [    ] OEM sales consisted of FRC's shipped from [    ] to OEMs located in Mexico, rather than sales to railcar builders in the United States.

Thus, to justify an affirmative determination in *FRC II*, the Commission plurality not only ignored its findings in *FRC I* with respect the period of time where provisional measures from *FRC I* were in effect, but also ignored the findings in *FRC I* with respect to the relationship between the OEM and replacement market segments.

III.    **THE COMMISSION'S REFUSAL TO DISQUALIFY [          ], THE ATTORNEY, AND THE ACCOUNTANT RENDERS THE COMMISSION'S DETERMINATION UNLAWFUL.**

A.    **[          ], the Attorney, and the Accountant Represented the Coalition in a Substantially Related Matter Against Amsted, a Former Client, Which Never Consented to the Representation.**

The Attorney and [     ] represented the Coalition in both *FRC I* and *FRC II*. Between June 2021 and September 2021, the Attorney represented Amsted and the Coalition (including Amsted, which at that time was a member of the Coalition) in preparing the petition for *FRC II*. Statement of Facts § A.1.  The Attorney continued to represent Amsted and the Coalition in the filing of the petition on September 29, 2021, and in the initial days following the filing of the petition.  *Id*.  As a client, Amsted confided in the Attorney its legal strategy for prosecuting antidumping and countervailing duty investigations against FRCs from China.  Complaint ¶¶ 23-27.  These confidences included Amsted's decision-making processes, as well as extensive business proprietary information relevant to establishing the scope of the petition and certain key factors critical to establishing that the domestic FRC was being materially injured by reason of subject imports from China.  The injury factors for which Amsted supplied business confidential information to the Attorney included information regarding the domestic like product, the domestic industry, and the conditions of competition.

In entering into an attorney-client relationship between Amsted on the one hand and [     ] and the Attorney on the other hand, on June 17, 2021, the parties executed an engagement agreement that purported to contain an advance waiver of potential future conflicts.

34

Complaint ¶12. By its terms, the advance waiver extended only to [      ] itself—not the Attorney or others. Complaint ¶ 13. The advance waiver also expressly excluded "matters that are substantially related to {[      ]} work for {Amsted}." *Id.*

Amsted withdrew its support for the 2021 petition shortly after it was filed and dropped out as a member of the Coalition. Statement of Facts § A.1. But even after Amsted withdrew its support for the petition and Faegre entered its appearance for Amsted in *FRC I*, the Attorney (who had by then moved to a new law firm, [      ]) attempted to coach Amsted into taking positions he would later use against Amsted in the Mexico investigation. Complaint ¶ 32.

Ultimately, *FRC I* resulted in a negative final injury determination by the Commission issued in early July 2022, which resulted in termination of the investigations without imposition of either antidumping or countervailing duties against FRCs from China.

Yet after the ink was barely dry on the ITC's final negative injury determination, the Attorney betrayed Amsted by filing a new petition on September 28, 2022. Statement of Facts § A.2. The new petition was targeted not only at China, but also at *Amsted's own imports from Mexico*. Complaint ¶ 43. The attorney did so for the cynical, self-interested purpose of trying to "undo" the Commission's negative injury determination in *FRC I* by including Mexico in the new investigations. Complaint ¶ 87.

In short, the Attorney represented a current client—M&T and the USW as members of the reconstituted Coalition—in a substantially related matter against a materially adverse former client—Amsted—which never consented to the representation.

**B.    The Attorney's Representation of M&T and the USW in a Substantially Related Matter Adversely Against the Attorney's Former Client Amsted**

**Violated the American Bar Association's Model Rules of Professional
Conduct and the District of Columbia Rules of Professional Conduct.**

The Attorney represented current clients—the reconstituted Coalition and its members

M&T and the USW—in a substantially related matter against a materially adverse former

client—Amsted—which never consented to the representation. This violates Rule 1.9(a) of the

American Bar Association ("ABA") Model Rules of Professional Conduct and its analogue, Rule

1.9(a) of the District of Columbia Rules of Professional Conduct. Rule 1.9(a) governs lawyers'

duties to former clients. It provides as follows:

> A lawyer who has formerly represented a client in a matter shall
> not thereafter represent another person in the same or a
> substantially related matter in which that person's interests are
> materially adverse to the interests of the former client unless the
> former client gives informed consent, confirmed in writing.

Model Rules of Pro. Conduct r. 1.9(a) (1983); D.C. R. Pro. Conduct 1.9(a).

**C.    The Commission's Refusal to Act Was Unlawful.**

"Because motions to disqualify counsel are substantive motions affecting the rights of the

parties, courts in the Federal Circuit apply standards developed under federal law." *Dynamic 3D

Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.)*, 837 F. 3d 1280, 1284 (Fed. Cir.

2016) (internal quotation marks omitted).  Two "sets of rules govern the grant of the motion to

disqualify counsel in this case"—"the ABA Model Rules of Professional Conduct, the legal

profession's national ethical rules," and the District of Columbia Rules of Professional

Responsibility, "the state-specific adoption of the ABA Model Rules." *Id.*

Applying those rules, this is not a close case.  The Attorney violated his ethical duties

under Rule 1.9(a) of the ABA Model Rules and its analogue, Rule 1.9(a) of the District of

Columbia Rules.  This is equally true with respect to the Accountant, the Coalition's certified

public accountant in both sets of investigations.  "Where nonlawyers have had access to

confidential information and subsequently change firms, courts have held them to the same

standards of Rule 1.9." *Makita Corp. v. United States*, 17 CIT 240, 246, 819 F. Supp. 1099,

1104 (1993).

### 1.   The Attorney and the Accountant Had a Direct and Nonconsensual Conflict of Interest.

"Rule 1.9(a) requires disqualification if four criteria are met: (1) the moving party and

opposing counsel had a prior attorney-client relationship, (2) the interests of the opposing

counsel's present client are adverse to the movant, (3) the matters involved in the present

underlying lawsuit are substantially related to the matters for which the opposing counsel

previously represented the moving party, and (4) the moving party does not consent."

*Touchcom, Inc. v. Bereskin & Parr*, 299 F. App'x 953, 954 (Fed. Cir. 2008). Each of these

criteria is met here.

#### a.   Amsted Was a Former Client.

Amsted and the Attorney had a prior attorney-client relationship, as reflected in the June

2021 engagement letter and otherwise demonstrated by their course of conduct, including

sending and receiving e-mails designated as attorney-client privileged communications. That the

Coalition, and not Amsted itself, filed the petition in *FRC I* is immaterial. The relationship ran

directly between Amsted and the Attorney.

#### b.   Amsted Became Materially Adverse to the Coalition With Respect to *FRC II*.

In *FRC II*, Amsted's interests were materially adverse to the Coalition's interests. The

Coalition turned from Amsted's ally in *FRC I* to its foe in *FRC II*. The Attorney sided with one

client against the other.

During the Commission's proceedings and the earlier lawsuit before this Court, the

Coalition argued that it was not materially adverse to Amsted in *FRC II*. Relying on an ethics

opinion from the ABA's Committee on Ethics and Professional Responsibility, the Coalition

contended that material adversity does not include situations where representation is merely

harmful to another entity's economic or financial interests "without some specific tangible direct

harm." ABA Comm. on Ethics & Pro. Responsibility, Formal Op. 497, at 3 (2021). In this vein,

the Coalition contended that if it prevailed in *FRC II*, the fact that Amsted would be required to

pay duties on imports from ASF-K's FRC products is insufficient to create material adversity

between the Coalition and Amsted.

The Coalition misinterpreted the ethics opinion on which it relied. True, in a general

context, that a lawyer's representation of a current client might cause a former client economic

harm might not, by itself, constitute material adversity. For instances, "a lawyer does not have a

Rule 1.9 conflict solely because the lawyer previously represented a competitor of a current

client whose economic interests are adverse to the current client." *Id.* at 3. Where, however, the

representation would cause economic harm *in a specific legal proceeding in which the former

client is adverse to the current client on substantially related matters*, it constitutes material

adversity. As the same ethics opinion makes clear, suing a former client on a substantially

related matter—being on the opposite side of the "v."—"is a classic example of representing

interests that are directly adverse and therefore 'materially adverse' to the interests of a former

client." *Id.* at 4.

Strictly speaking, there is no "v." in antidumping investigations, but that is a matter of

form, not substance. Antidumping investigations are quasi-judicial in nature. *See Pesquera

Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1381-82 (Fed. Cir. 2001) ("The

antidumping proceedings conducted by Commerce may of course be fairly characterized as

'relatively formal administrative procedures' that adjudicate parties' rights."). Those who

support a petition with the Commission are comparable to plaintiffs; those who oppose it are comparable to defendants. Some preliminary and all final decisions may be appealed to this Court, where a "v." clearly exists. It exists in *this* action. The ethics opinion on which the Coalition relies explains that material adverseness "requires a conflict as to the legal rights and duties of the clients," Formal Op. 497, at 3, and the Federal Circuit has held that antidumping investigations "adjudicate parties' rights." *Pesquera Mares*, 266 F.3d at 1381.

The material adversity is just common sense. The *Makita* court had no difficulty grasping the intuitive point that eluded the Coalition. *Makita* itself involved an antidumping investigation. The petitioner there was found to be materially adverse to an interested party. *See* 819 F. Supp. at 1105 (attorney's representation of petitioner in antidumping investigation involving the attorney's former client was 'against its interests'). This Court should likewise find that the Coalition and Amsted were materially adverse to each other in the 2022-23 investigations.

### c. The Investigations Were Substantially Related To Each Other.

Next, *FRC I* was substantially related to *FRC II*. "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Model Rules of Pro. Conduct r. 1.9 (1983), cmt. 3.

There is no serious question as to whether *FRC I* and *FRC II* were substantially related. They were. *FRC II* was a reprise of *FRC I*. Both sets of investigations were quasi-judicial antidumping investigations before the Commission and Commerce pursuant to the same body of statutory and regulatory provisions. The petitioning party in each investigation was the Coalition, of which Amsted was a former member. The FRCs covered by both investigations include E, F, and E/F couplers and E and F knuckles. Amsted's BPI concerning its FRCs was

used in *FRC I*; much of that same BPI was the focus of *FRC II*. The petitions in both *FRC I* and *FRC II* commonly allege that FRCs are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act. In *FRC I*, on Amsted's behalf, the Attorney and the Accountant faulted Chinese imports. In *FRC II*, on the Coalition's behalf, they faulted Chinese imports and additionally faulted imports from Mexico after Amsted allegedly shifted its U.S. production to Mexico. The periods of investigation also substantially overlap. And, in both sets of investigations, the Coalition demanded similar forms of trade relief.

### d.    Amsted Did Not Consent to the Conflict of Interest.

Amsted never consented to [        ]'s, the Attorney's, or the Accountant's representation in *FRC II*. Although the terms and conditions of the June 2021 engagement letter included an advance waiver of potential future conflicts, by its terms that waiver covered only [    ]—not [        ], the Attorney, or the Accountant—and expressly excluded "matters that are substantially related to our work for you." *FRC I* was, of course, substantially related to *FRC II*.

### e.    Any Prior Joint Representation Does Not Eliminate the Conflict.

Confusing privilege issues with conflict issues, the Coalition argued to the Commission (and before this Court in the prior case) that the Attorney's representation of M&T and Amsted as members of the Coalition's prior iteration was a "joint representation" of the two industry competitors. The most this argument might purchase is that, if Amsted shared communications with M&T within the joint representation, then those communications are not now *privileged*.

Any jointness of the representation, however, does not eliminate the conflict of interest. "Rule 1.9 of the Model Rules was designed not only to protect client confidences, but to establish broader standards of attorney loyalty." *Touchcom*, 299 F. App'x at 956 (internal

quotation marks omitted). *See also Dynamic 3D*, 837 F.3d at 1286 ("the obligation to protect a client's confidential information exists as part of the larger duty of loyalty owed to clients"). The comments to Rule 1.9(a) explicitly contradict the Coalition's "joint representation" theory: "Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or substantially related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent." Model Rules of Pro. Conduct r. 1.9, cmt. 1. That is precisely what occurred here, albeit without informed consent.

### 2.    Amsted Was Harmed by Misuse of Its Confidential Information.

Amsted was materially harmed by misuse of the Attorney's and the Accountant's intimate knowledge of Amsted's legal strategy for prosecuting FRC-related trade investigations, decision-making processes, and extensive FRC-related BPI. Specifically, Amsted, as the importer of record, was harmed by the 48.10 percent dumping margin that Commerce imposed in its antidumping duty order, which resulted from the Coalition's misuse of confidential information that Amsted gave to the Attorney while he was preparing the petition for *FRC I*. *See Certain Freight Rail Couplers and Parts Thereof From Mexico: Antidumping Duty Order*, 88 Fed. Reg. 78,308 (Dep't Commerce Nov. 15, 2023) (finding 48.10 percent dumping margin).

"It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.'" *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980)).

Disqualification has been mandated on less egregious facts. In *Makita*, for instance, earlier section 337 proceedings were held to be "substantially related" to later section 731 proceedings for purposes of applying Rule 1.9(a) where "the latter would appear to be necessarily related to plaintiffs' business practices and data, which were at the core of {the

conflicted attorney's} former confidential involvement." 819 F. Supp. at 1106. On this basis, the *Makita* court enjoined Commerce from allowing the conflicted attorney "any access to the ITA's investigations of Makita Corporation *et alia* at the behest of petitioner." *Id.* at 1108. Although in this action Amsted does not contest the Commission's decision in the 2022-23 investigations to allow the Attorney access to information released under the administrative protective order, the same reasoning certainly supports Amsted's request for this Court to order the Commission to rescind its final affirmative injury determination.

### 3.   The Conflict of Interest Must Be Imputed to [           ] Generally.

The Attorney and the Accountant are operating under a disabling conflict of interest. This conflict is not solely their problem—it is also [           ]'s problem. The conflict of interest is imputed to [           ] at large under Rule 1.10 of the ABA Model Rules and the District of Columbia Rules. Rule 1.10(a) provides that "{w}hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9," unless certain exceptions not applicable here allow otherwise. Model Rules of Pro. Conduct r. 1.10 (1983); D.C. R. Pro. Conduct 1.10.

Imputation makes particular sense because the Attorney was the Coalition's lead counsel. In that capacity, his ethical violation surely tainted every aspect of [           ]'s representation. His conflict must be imputed to [           ] as a whole. *See Dynamic 3D*, 837 F.3d at 1289 (imputing conflict of interest to corporate legal department for Rule 1.9 violation absent affirmative showing that attorney's knowledge of confidential information shall not be imputed to other counsel).

### 4.   The Conflict Warranted Disqualification.

Ethical violations do not automatically mandate disqualification—there must be a showing that the unethical conduct tainted the proceeding. This is because "there are important

societal rights implicated by attorney disqualification, such as the right of a party to counsel of its choice and an attorney's right to freely practice his or her profession." *Id.* at 1286.

"However, there is an overriding countervailing concern suffusing the ethical rules: a client's entitlement to an attorney's adherence to her duty of loyalty, encompassing a duty of confidentiality." *Id.* "'That professional commitment is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter. Both the fact and the appearance of total professional commitment are endangered by adverse representation in related cases. From this standpoint it matters not whether confidences were in fact imparted to the lawyer by the client. *The substantial relationship between the two representations is itself sufficient to disqualify.*'" *Makita*, 17 CIT at 249, 819 F. Supp. at 1107 (quoting *Trone v. Smith*, 621 F.2d 994, 998-99 (9th Cir. 1980)) (emphasis added); *Kearns v. Fred Lavery Porsche Audi Co.*, 745 F.2d 600, 603 (Fed. Cir. 1984) ("a 'substantial relationship' *requires* the attorney's disqualification") (emphasis added); *W.L. Gore & Assocs. v. Int'l Med. Prosthetics Research Assocs.*, 745 F.2d 1463, 1466 (Fed. Cir. 1984) (that maters were substantially related "establishes *prima facie* the case for disqualification").

Amsted's "countervailing concern" about disloyalty and breach of confidentiality is "overriding" as against the Coalition's choice of counsel and the Attorney's and the Accountant's professional self-interests. *See Dynamic 3D*, 837 F.3d at 1286. Because client confidences passed to them in the course of *FRC I*, "that would plainly be ground for disqualification in the circumstances here." *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1461 (Fed. Cir. 1984). Here, the Coalition exploited confidential information of Amsted to which the Attorney and the Accountant became privy in the course of their representation of Amsted in *FRC I*.

**5.    Because The Conflict Of Interest Tainted The Proceedings, The Court Must Redress the Commission's Refusal to Disqualify.**

Section 516A of the Tariff Act states that this Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i). The U.S. Supreme Court recently held that "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Moreover, "courts need not and under the APO may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* Plaintiffs submit that the new standard for review of the Commission's interpretation of its obligations and authority under the Tariff Act is the same as the new standard of review of agency action under the APA, namely that this Court must evaluate the Commission's obligations and authority under the Tariff Act without deference to the Commission's own interpretation.

Here, the Commission improperly consigned Plaintiffs to a direct, ongoing, and nonconsensual conflict of interest in the 2022-23 investigations. The resulting taint to the proceeding demands redress, whether or not the Commission was willing or able to act. Instead, the Court must act independently:

> That {the trade} agency considers itself without authority to
> forestall a conflict of interest other than to offer the plaintiffs a
> choice comparable to that of Thomas Hobson, to wit, agree that
> your former confidant assist your adversary in a substantially-
> related manner against you or withdraw your inside information so
> that your adversary's version of the data can be accepted as true.
> This is the kind of predicament a conflict of interest can cause.
> They are to be guarded against by all who are bound by the
> lawyers' rules of professional conduct, and, in those instances
> when resolve under the rules appears weak, courts must and will
> intervene to protect the practices agreed upon.

*Makita*, 819. F. Supp. at 1108. Tolerating the conflict is contrary to the Rules of Professional

Conduct. Tolerating the Coalition's unfair advantage also is unreasoned and an abuse of agency

discretion. "Under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a, the procedural correctness of a

countervailing duty determination, as well as the merits, are subject to judicial review." *Miller &*

*Co. v. United States*, 824 F.2d 961, 964 (Fed. Cir. 1987).

      Regardless, the Commission's actions were, in fact, contrary to law. It erred by refusing

even to consider the ethical charges against [      ], the Attorney, and the Accountant. This

was done on the premise that 19 C.F.R. § 201.15(a)—which authorizes the Commission to, for

"good cause shown," "suspend{} or bar{}" an attorney "from practicing before the

Commission"—because "{t}he Commission does not adjudicate alleged violations of the Rules

of Professional Conduct of a state Bar, nor does it determine whether conduct has violated the

Model Rules of Professional Conduct of the American Bar association, such as those described

in your request." According to the Commission, "{s}uch a determination falls under the purview

of the relevant state bar association." Letter from Katherine M. Hiner, Acting Secretary to the

Commission, to Douglas J. Heffner, re: Request to Disqualify Petitioner's Counsel: *Certain*

*Freight Rail Couplers and Parts Thereof from China and Mexico*, Inv. Nos. 701-TA-682 and

731-TA-1592-1593 (Oct. 21, 2022) ("Response to Disqualification Request"), PR 53.

      In its Post-Conference Brief in the preliminary investigation, Amsted argued that the

Commission should dismiss the petition because of the egregious ethical violations, in order to

preserve the integrity of the Commission's proceedings. Post-Conference Brief of Amsted Rail

Company, Inc. and ASF-K de Mexico S. de R.L. de C.V. (Oct. 24, 2022), PR 57, at 1-6. In its

Prehearing Brief in the final investigation, Amsted reiterated its position that the Commission

should disqualify petitioner's counsel and dismiss the petition on the same grounds,

incorporating by reference Amsted's earlier submissions regarding the ethical issue and the remedies that they believe the Commission should apply to this ethical breach. Amsted Prehearing Brief (May 12, 2023), PR 134, at 59.

"Whether agency or court, any institution engaging in the adjudicative process must have the power to police the professionals who practice before it." *Polyhdoroff v. ICC*, 773 F.2d 372, 375 (D.C. Cir. 1985). This principle is no less true in the context of an agency engaged in quasi-adjudicative processes. *See Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117, 121 (1926) (in light of "the quasi-judicial nature of its duties," an agency may require representatives to "be persons whose qualities as lawyers or accountants will secure proper service to their clients and to help the {agency} in the discharge of its important duties"); *Herman v. Acheson*, 108 F. Supp. 723, 725 (D.D.C. 1952), *aff'd sub nom. Herman v. Dulles*, 205 F.2d 715 (D.C. Cir. 1953). The Commission's antidumping and countervailing duty injury investigations are quasi-adjudicative in nature. *Elkem Metals Co. v. United States*, 26 CIT 234, 239, 193 F. Supp. 2d 1314, 1320 (2002).

Petitioners in antidumping and countervailing duty injury investigations, therefore, do not enjoy an absolute right to counsel of their original choosing where that counsel's conflict of interest threatens the investigations' integrity. Here, the Attorney's, the Accountant's, and [        ]'s failures to meet their ethical duties created the intolerable situation in which they used a former's client's secrets to advantage a current client and disadvantage the former client. The Commission can and should act to remedy this blatant conflict of interest. Following an opportunity to present his or her views, an attorney may "for good cause shown" be suspended or barred from practicing before the Commission or have imposed on him such lesser sanctions as the Commission deems appropriate. 19 C.F.R. § 201.15(a). In its Post-Conference Brief, Amsted

PUBLIC VERSION

demonstrated that such "good cause" includes violations of the Rules of Professional Responsibility.  Post-Conference Brief of Amsted Rail Company, Inc. and ASF-K de Mexico S. de R.L. de C.V. (Oct. 24, 2022), PR 57, at 20-21.  "State ethics rules provide an important backdrop for the federal agency rules regulating lawyers who appear and practice before the agencies." George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963, 1972 (2016). "Lawyers who practice before federal agencies must comply with state ethics rules, typically based on the ABA Model Rules and applicable to all lawyers, as well as with the specific rules applicable to lawyers engaged in agency practice." *Id.*

In adjudicative proceedings under section 337 of the Tariff Act, the Commission's administrative law judges can and regularly do entertain and rule on motions to disqualify lawyers and law firms, including ruling on motions alleging violations of the ABA Model Rules. They invoke 19 C.F.R. § 201.15(a) as the legal basis for their disqualification authority.  *See, e.g., id.* (disqualifying law firm based on violation of Rule 1.7); *Certain Personal Data & Mobile Commc'ns Devices & Related Software*, USITC Inv. No. 337-TA-710, Order No. 10, 2010 WL 2915587 (June 10, 2010) (disqualifying law firm based on violation of Rule 1.9).  Thereafter, the Commission can and does review its administrative law judges' rulings in this regard.  *See, e.g., Certain Laser Abraded Denim Garments*, USITC Inv. No. 337-TA-930, Commission Op., 2016 WL 11603662 (May 16, 2016) (stating the Commission "could initiate further proceedings to resolve the disqualification issue," which implicated Rules 1.0 and 1.7, but electing not to do so because the issue was moot); *Certain Network Interface Cards & Access Points*, USITC Inv. No. 337-TA-455, Commission Op., 2001 WL 1646394 (Dec. 18, 2001) (affirming denial of law firm disqualification based on alleged violation of Rule 1.7).

There is no rational reason the Commission can interpret and enforce Rule 1.9(a) in the context of a Section 337 proceeding but not a Title VII proceeding. The Commission's decision to bury its head in the sand in the face of serious allegations is the antithesis of reasoned decision-making.

### 6.    The Commission's Passing the Buck to Local Bar Authorities Leaves Amsted With No Adequate Remedy.

In its October 21, 2022 letter, the Commission declares that "such a determination falls within the purview of the relevant state bar association." Response to Disqualification Request, PR 53.

This approach is misguided, because a discipline-only approach leaves Amsted without an adequate remedy:

> Perhaps more importantly, discipline on the merits pales in comparison to the disqualification remedy; discipline will not cure the violation in the same way that disqualification could. Disqualification stops (*i.e.*, enjoins) the conflict. Discipline, however, effectively permits the conflict to continue for months or years as the disciplinary investigation ensues (assuming it ensues), and even after the investigation and potential subsequent prosecution conclude, discipline (or a malpractice action) almost never involves an injunction against a specific representation. To be sure, if the disciplinary sanction is disbarment or suspension, all representations are effectively enjoined. Such a substantial sanction for first-time (or even second-time) conflicts of interest is rare, however. When other, more common sanctions are imposed (*e.g.*, reprimand, admonishment, or censure), this "remedy" is not much of a remedy for continuing-violation cases; it does not retroactively protect the confidential information or restore the lawyer's loyalty to the client, for example.

Keith Swisher, *The Practice and Theory of Lawyer Disqualification*, 27 Geo. J. Legal Ethics 71, 115 (2014). "Because disqualification is a unique and effective remedy, discipline cannot fully replace disqualification." *Id.* at 116. In other words, it simply will not do for the Commission to

pass the buck to the Bar authorities, because it provides no actual *remedy* to compensate Amsted

for these ethical violations.

Moreover, in Amsted's 2022 interlocutory attempt to appeal the Commission's refusal to

evaluate the same ethics issue, this Court dismissed the case on jurisdictional grounds as

essentially premature, but in so doing assured Amsted if it waits until the end of the investigation

and appeals under Section 1581(c) jurisdiction, the Court possesses "the power to remedy

violations of professional ethics with disqualification, sanctions, or other relief." *Amsted Rail*

*Co., Inc. v. U.S. Int'l Trade Comm'n*, 46 CIT ___, 600 F. Supp. 3d 1308, 1329 (2022). Despite

the Commission's attempt to evade its own responsibility to police attorneys practicing before

the agency, this Court has plenary power to remedy ethical violations, and based on this court

case, it can do so by overturning the Commission's final determination and terminate the

investigation.  That appears to be within the Court's power, since the Court insisted that

interlocutory relief under Section 1581(i) jurisdiction was not "manifestly inadequate" and this

appears to be the only remedy left for Plaintiffs.

### D.  Because of the Ethical Violations Committed by [          ], the Attorney, and the Accountant, the Court Should Remand to the Commission With Instructions to Terminate the Investigation.

All of the conflict of interest violations described herein are intolerable and tainted the

Commission's investigation. In refusing to make a determination whether [          ], the

Attorney, and the Accountant violated their ethical responsibilities, the Commission abrogated

its responsibility to maintain the integrity of its proceeding. As a result, this Court should order

disqualification of [          ], the Attorney, and the Accountant from this investigation. But

merely ordering a redo of the investigation without their participation is not sufficient. As the

Federal Circuit has explained, "continuing a case after disqualification without dismissal would

greatly prejudice a party because the case would be tried on a record developed primarily

through the fruits of the disqualified attorney's unethical labor." *Dynamic 3D*, 837 F.3d at 1291

(citations omitted). Here, "forcing {Plaintiffs} to break new ground with a fresh complaint and

clean docket rather than to continue drawing from a poisoned well" would abate "the improper

use of {Plaintiffs'} confidential information in preparing the original {petition}." *Id.* (affirming

dismissal of case based on attorney disqualification). All aspects of the proceedings were

contaminated by the Attorney's actions, from the preparation of the petition to the determination

of the product scope. *See id.* ("Dynamic 3D's pleadings were drafted by lawyers presumed to

possess Schlumberger's confidential information and that the significant prejudice that

Schlumberger would face, if the case were to continue, outweighed the harsh result of dismissal.

We do not dispute the court's conclusion. All aspects of the case were contaminated by

Rutherford's actions, from the purchase of the '319 patent, to preparation for suit against

Schlumberger, to the actual filing of the suit.").

     As a result, the only way that the Court can address the taint to these proceedings is for it

to remand the Commission's final determination with instructions either to dismiss the

investigation entirely, or to enter a negative determination.

**CONCLUSION AND PRAYER FOR RELIEF**

     For the above reasons, the Court should enter judgment in Plaintiffs' favor and hold that

the Commission's determination is not in accordance with law with respect to the ethics issue.

For the reasons stated above with respect to the ethics issue, the Court should remand with

instructions either to dismiss the investigation entirely, or to enter a negative determination.

     If the Court determines not to grant judgment in Plaintiffs' favor with respect to the

ethics issue, then the Court should nevertheless enter judgment in Plaintiffs' favor and hold that

the Commission's determination is unsupported by substantial evidence and is not in accordance

with law with respect to the related parties issue and regarding the consistency of the

**PUBLIC VERSION**

Commission's findings between *FRC I* and *FRC II*.  The Court should then remand the Commission's determination consistent with the judgment and finding of this Court.

Finally, the Court should provide such additional relief as the Court may deem just and proper in the circumstances.

<div style="margin-left: 40%;">

Respectfully submitted,


*/s/ Richard P. Ferrin*
Douglas J. Heffner
Brian Perryman
Richard P. Ferrin
Carrie Bethea Connolly
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
Telephone: (202) 230-5803

*Counsel to Plaintiffs*

</div>

September 6, 2024

PUBLIC VERSION

**Certification of Compliance with Standard Chamber Procedures Rule 2(b)(1)(a)**

The undersigned hereby certifies that the foregoing brief contains 15,456 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitation of 15,500 for primary briefs as set forth in Standard Chamber Procedures Rule 2(B)(1)(a), as modified by this Court's Order dated September 6, 2024.

<div align="right">

/s/ Richard P. Ferrin

Douglas J. Heffner

Brian Perryman

Richard P. Ferrin

**FAEGRE DRINKER BIDDLE & REATH LLP**

1500 K Street, N.W.

Washington, DC 20005

(202) 230-5803

*Counsel to Plaintiffs*

</div>