*NONCONFIDENTIAL VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN

Court No. 23-00268

**AMSTED RAIL COMPANY, INC. AND ASF-K DE MEXICO S. DE R.L. DE C.V.,**

*Plaintiffs,*

**v.**

**UNITED STATES,**

*Defendant,*

**and**

**COALITION OF FREIGHT COUPLER PRODUCERS,**

*Defendant-Intervenors.*

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

GARRETT L. PETERSON
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone: (202) 205-3241
Facsimile: (202) 205-3111
garrett.peterson@usitc.gov

MICHAEL K. HALDENSTEIN
Attorney-Advisor
Office of the General Counsel
Telephone: (202) 205-3041
michael.haldenstein@usitc.gov
**DATED:  February 6, 2025**

DOMINIC L. BIANCHI
General Counsel
Telephone:  (202) 205-3061
dominic.bianchi@usitc.gov

ANDREA C. CASSON
Assistant General Counsel for Litigation
Telephone: (202) 205-3105
andrea.casson@usitc.gov

JANE C. DEMPSEY
Attorney-Advisor
Office of General Counsel
Telephone: (202) 205-3142
jane.dempsey@usitc.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................................v

I.    STATEMENT PURSUANT TO RULE 56.2.............................................................1

    A.    Administrative Determinations Sought to be Reviewed.................................1

    B.    Questions Presented .......................................................................................2

        1.    Was the Commission's decision not to exclude Amsted
             from the domestic industry supported by substantial
             evidence and in accordance with law? ..........................................2

        2.    Was the Commission's finding that subject imports had a
             significant impact on the domestic industry supported by
             substantial evidence and in accordance with law?...........................4

        3.    Was the Commission's decision not to disqualify the
             Attorney and Firm supported by substantial evidence and in
             accordance with law?......................................................................6

II.   STATEMENT OF FACTS .......................................................................................6

    A.    Procedural History.........................................................................................6

    B.    The FRC II Investigations..............................................................................8

        1.    Domestic Like Product ..................................................................8

        2.    Domestic Industry..........................................................................8

        3.    Cumulation...................................................................................10

        4.    Conditions of Competition...........................................................11

        5.    Volume .........................................................................................12

        6.    Price Effects ................................................................................13

        7.    Impact ..........................................................................................14

III.  STANDARD OF REVIEW.....................................................................................15

**TABLE OF CONTENTS (cont'd)**

IV.    **ARGUMENT** ...................................................................................................**16**

    A.    **The Commission's Inclusion of Amsted in the Domestic Industry Definition Is Supported by Substantial Evidence and in Accordance with Law** ...............................................**16**

        1.    The Commission's Related Parties Analysis Was Consistent with Its Statutory Authority .........................................**16**

        2.    The Commission's Determination Not to Exclude Amsted from the Effects of Subject Imports Is Supported by Substantial Evidence .........................................................**19**

        3.    Plaintiffs' Challenges to the Commission's Findings Are Unavailing .............................................................**21**

    B.    **The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance with Law** ...............................................**29**

        1.    The Commission's Impact Analysis Should Be Sustained.......................**29**

        2.    The Commission's Decision to Attribute the Domestic Industry's Improved Performance in 2022 to the *FRC I* Provisional Duties Was Supported by Substantial Evidence ....................**31**

        3.    The Commission's *FRC II* Determinations Are Not Undermined By Or Inconsistent with its *FRC I* Determinations .........................................................**35**

    C.    **The Commission's Decision Not to Disqualify the Attorney and his Firm is Supported by Substantial Evidence and Otherwise in Accordance with Law** ...............................................**37**

        1.    Background ...............................................................**37**

            a.    *FRC I* Investigations .............................................**37**

            b.    *FRC II* Investigations .............................................**37**

        2.    Good Cause Did Not Exist to Disqualify the Attorney from Representing the Coalition During the *FRC II* Investigations .........................................................**39**

        3.    The Reasonableness of the Commission's Decision Not to Disqualify Does Not Depend on Amsted's Ability to Obtain a Remedy in the Face of Its Own Inaction ................................**43**

## TABLE OF CONTENTS (cont'd)

4.  The Court Should Not Entertain Amsted's Request for the Court to Address the Alleged Conflict of Interest......................................44

5.  In Any Event, Amsted is Not Entitled to Its Requested Relief........................................................................................................46

V.  **CONCLUSION** ..............................................................................................**47**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                       **Page(s)**

*Algoma Steel Corp. v. United States*,
    865 F.2d 240 (Fed. Cir. 1989) .................................................................................39

*Allied Mineral Prods., Inc. v. United States*,
    28 CIT 1861 (2004) ..................................................................................... *passim*

*Altx, Inc. v. Am. Extruded Prod. Corp.*,
    370 F.3d 1108 (Fed. Cir. 2004) .............................................................................45

*Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*,
    600 F. Supp. 3d 1308 (Ct. Int'l Trade 2022) ..............................................7, 40, 47

*Ass'n of Am. Sch. Paper Suppliers v. United States*,
    34 CIT 31, 683 F. Supp. 2d 1317 (2010) ...............................................................45

*Beker Indus. Corp. v. United States*,
    7 CIT 313 (1984) ....................................................................................................46

*Budd Co. v. United States*,
    1 CIT 67, 507 F. Supp. 997 (1980) ........................................................................42

*Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*,
    100 F. Supp. 3d 1314 (Ct. Int'l. Trade 2015) .......................................................18

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .........................................................................................15, 33

*Elkem Metals Co. v. United States*,
    26 CIT 234, 193 F. Supp. 2d 1314 (2002) .......................................................44, 47

*Empire Plow Co. v. United States*,
    11 CIT 847 (1987) .............................................................................................17, 19

*NLRB v. Food Store Emps. Union*,
    417 U.S. 1 (1973) .............................................................................................46, 47

*Geo Specialty Chem., Inc. v. Husisian*,
    951 F. Supp. 2d 32 (D.D.C. 2013) ........................................................................44

*Goldsmith v. U.S. Bd. of Tax Appeals*,
    270 U.S. 117 (1926) ...............................................................................................42

*Grupo Industrial Camesa v. United States*,
    85 F.3d 1577 (Fed. Cir. 1996) ...............................................................................33

v

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                            **Page(s)**

*Herman v. Acheson*,
   108 F. Supp. 723 (D.D.C. 1952) ............................................................................42

*Imperial Sugar Co. v. United States,*.
   181 F. Supp. 3d 1284 (Ct. Int'l Trade 2016) ........................................................15

*INS v. Ventura*,
   537 U.S. 12 (2002) ................................................................................................46

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n*,
   253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017),
   *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019) .............................................................15

*Koyo Seiko Co., Ltd. v. United States*,
   13 CIT 461, 715 F. Supp. 1097 (1989) .............................................................43, 47

*LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*,
   38 CIT 1562, 26 F. Supp. 3d 1345 (2014) .................................................... *passim*

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) .....................................................................................15, 16, 39

*Makita Corp. v. United States*,
   17 CIT 240, 819 F. Supp. 1099 (1993) .............................................................39, 40

*Metallverken Nederland B.V. v. United States*,
   13 CIT 1013, 728 F. Supp. 730 (1989) ................................................................33

*Metro. Area EMS Auth. v. Sec'y of Veterans Affs.*,
   122 F.4th 1339, 1345 (Fed Cir. 2024) ..................................................................16

*N.M. Garlic Growers Coal. v. United States*,
   352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ......................................................45

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ........................................................................15, 46

*Polyhdoroff v. ICC*,
   773 F.2d 372 (D.C. Cir. 1985) .............................................................................42

*Royal Brush Mfg., Inc. v. United States*,
   75 F.4th 1250 (Fed. Cir. 2023) .........................................................................41, 45

*Sandvik AB v. United States*,
   13 CIT 738 (1989), *aff'd without opinion*, 904 F.2d 46 (Fed. Cir. 1990) ..............17

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                **Page(s)**

*Shakeproof Indus. Prods. Div. of Ill. Toll Works, Inc. v. United States*,
    104 F.3d 1309 (Fed. Cir. 1997)..............................................................................41

*Siemens Energy, Inc. v. United States*,
    806 F.3d 1367 (Fed. Cir. 2015)..............................................................................33

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)..................................................................................................16

*Sweet Harvest Foods v. United States*,
    669 F. Supp. 3d 1346 (Ct. Int'l Trade 2023) .........................................................33

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998)................................................................................16

*Torrington Co. v. United States*,
    16 CIT 220, 790 F. Supp. 1161 (1992), *aff'd without opinion*, 991 F.2d 809
    (Fed. Cir. 1993)..............................................................................................17, 18

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996)................................................................................15

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)................................................................................................15

*USEC Inc. v. United States*,
    25 CIT 49, 132 F. Supp. 2d 1 (2001) ..............................................................18, 19

*Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*,
    217 F. Supp. 3d 1363 (Ct. Int'l Trade 2017) .........................................................15

**USITC Adminstrative Decisions**

*Gas-Powered Pressure Washers from Vietnam*,
    Inv. Nos. 731-TA-1598 (Final), USITC Pub. 5465 (Oct. 2023)............................27

*Portable Elec. Typewriters from Singapore*,
    Inv. No. 731-TA-515 (Final), USITC Pub. No. 2681 (Sept. 1993)........................27

*Softwood Lumber Products from Canada*,
    Inv. Nos. 701-TA-566. 731-TA-1342 (Final), USITC Pub. 4749 (Dec. 2017).....18

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Statutes**                                                                              **Page(s)**

5 U.S.C. § 554 ................................................................................................42

19 U.S.C. § 1337 ............................................................................................40

19 U.S.C. § 1516 ............................................................................................46

19 U.S.C. § 1516a ..........................................................................................40

19 U.S.C. § 1516a(b) ......................................................................................45

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................15

19 U.S.C. § 1516a(b)(2) ............................................................................40, 45

19 U.S.C. § 1671d(b)(1) .................................................................................41

19 U.S.C. § 1673d(b)(1) .................................................................................41

19 U.S.C. § 1677(4) ..........................................................................................2

19 U.S.C. § 1677(4)(b)(i) ...............................................................................18

19 U.S.C. § 1677(4)(A) ..................................................................................26

19 U.S.C. § 1677(4)(B) ..................................................................................16

28 U.S.C. § 1581(c) ........................................................................................40

28 U.S.C. § 2639(a)(1) ...................................................................................15

**Regulatory Authorities**

19 C.F.R. § 201.15(a) ..........................................................................39, 43, 45

**Legislative Materials**

Statement of Administrative Action accompanying the Uruguay Round
    Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) ....................................... *passim*

S. Rep. No. 96-249 (1979) ........................................................................17, 46

Defendant U.S. International Trade Commission opposes the motion for judgement upon the agency record filed by Amsted Rail Company. Inc. ("Amsted") and ASF-K de Mexico S. de R.L. de C.V. ("ASF-K") (collectively "Plaintiffs"). The Commission's affirmative determination regarding *Certain Freight Rail Couplers and Parts Thereof from Mexico*, Inv. No. 731-TA-1593 is supported by substantial evidence and otherwise fully in accordance with law. We respectfully request this Court to affirm the determination.

I.    **STATEMENT PURSUANT TO RULE 56.2**

A.    **Administrative Determination Sought to be Reviewed**

Plaintiffs seek review of the Commission's final affirmative antidumping duty determination in *Certain Freight Rail Couplers and Parts Thereof from Mexico*, Inv. No. 731-TA-1593 (CR183) ("Trailing Views") (available publicly in USITC Pub. 5470 (Nov. 2023) (PR211)).[1] Notice of the Commission's determination was published at 88 Fed. Reg. 77,612 (Nov. 13, 2023) (PR209).

---

[1] Although the petition in this investigation was filed on the same day as the petitions concerning imports of certain freight rail couplers and parts thereof ("FRCs") from China, Nos. 701-TA-682 and 731-TA-1592, the investigation schedules for imports of FRCs from China and Mexico became staggered when the U.S. Department of Commerce ("Commerce") did not postpone its final determinations for the AD and CVD China investigations, but did postpone its final determination for the Mexico AD investigation. Trailing Views at 3-4. Consequently, the Commission made staggered determinations, with the investigations concerning FRCs from China being "leading investigations" and the investigation concerning FRCs from Mexico being a "trailing investigation." The Plaintiffs in this case have appealed the Commission's determination in the trailing investigation, and the Chinese respondents have separately appealed the Commission's determinations concerning the affirmative orders on Chinese imports. *Wabtec Corp. v. United States*, Consol. Court No. 23-157.

Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record. The Commission's determination concerning FRCs from Mexico adopted the findings and analyses from its determinations and views in the leading investigations with respect to the issues of domestic like product, domestic industry, cumulation, conditions of competition, and material injury by reason of cumulated subject imports. Trailing Views at 6-7. Accordingly, the citations in this brief concerning the

### B.    Questions Presented

1.    **Was the Commission's decision not to exclude Amsted[2] from the domestic industry supported by substantial evidence and in accordance with law?**

Yes.  The statute defines the domestic industry as the industry as a whole and provides that the Commission "may," in appropriate circumstances, exclude a domestic producer as a related party.  19 U.S.C. § 1677(4).  Congress has explained that the reason for excluding related parties from the domestic industry under this provision is "to reduce any distortion in industry data caused by the inclusion in the domestic industry of a related producer who is being shielded from the effects of the subject imports."  Statement of Administrative Action for the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 at 858 (1994) ("SAA").  Plaintiffs have not presented a contrary view of the purpose of the related parties provision.  *See, e.g.*, PlBr. at 12-13 (ECF 47).  Applying the primary factors it has consistently used to address related parties questions, as well as other considerations relevant to this investigation, the Commission reasonably found that Amsted was not shielded from the effects of competition with subject imports and that its exclusion would have masked injury to the domestic industry.  Views at 19-22.

Contrary to Plaintiffs' view, PlBr. at 15-16, 21-23, the Commission considered statements made by Amsted representatives about Amsted's domestically produced FRCs not competing

---

Commission's analyses and findings for its imports of FRCs from Mexico determination are to the leading investigations' confidential Views ("*FRC II*" and "Views") at CR178 and Staff Report ("SR") at CR163.

[2] Because the discussion of related party in the Commission's Staff Report and Views derived from confidential questionnaires responses, the identity of the related party, Amsted, was redacted in the Report and Views, and consequently in the briefs to this Court in *Wabtec Corp. v. United States*, Consol. Court No. 23-157.  Amsted has since indicated its consent to make public its identity as the related party.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

with subject imports from Mexico.  Views at 17-19.  These statements, however, were at odds with other data-specific record information that showed direct competition between Amsted's domestically produced FRCs and subject imports from Mexico.  Specifically, the record showed that Amsted's domestically produced FRCs were competing with subject imports from Mexico across multiple sub-products of FRCs; this competition, in turn, caused declines in the performance of Amsted's domestic operations, including market share loss to subject imports from Mexico from 2020 to 2021.  Views at 19-23.  Consequently, the Commission reasonably declined to exclude Amsted from the domestic industry on the basis of the statements made by its representatives.

Furthermore, the primary factors did not indicate to the Commission that appropriate circumstances existed to exclude Amsted from the domestic industry.  The data collected in the final phase of the investigation showed that Amsted had a high ratio of imports to domestic production during the 2020-2022 period of investigation ("POI") (factor four) and the record was mixed regarding its primary interest (factor five), with Amsted changing its position during the investigation on where its primary interest lie.  Views at 17.  Amsted, however, doubled its share of total U.S. production over the POI (factor one) and it was not shielded from the effects of, nor benefitted from (factor two), subject imports.  Views at 18-23.  "To the contrary, Amsted's domestic operations suffered [ █████ ] trade and financial performance as subject imports from Mexico increased."  Views at 22.  Consequently, Amsted's exclusion from the domestic industry would have distorted the domestic industry's data (factor three), including market shares, employment figures, capacity utilization rates, and financial performance.  Views at 23.

Also contrary to Plaintiffs' view, PlBr. at 24-35, for purpose of the related party analysis, the Commission was not required to, and properly did not consider whether the remainder of the

domestic industry was or was not injured by reason of the subject imports. Finally, Plaintiffs are mistaken in claiming that the Commission cannot consider whether Amsted competed with subject imports from China as part of its analysis. PlBr. at 23-24. This consideration was informative in understanding Amsted's performance during the POI and the potential distorting effect of its inclusion in the domestic industry, a concern addressed in the third primary factor.

> **2.** **Was the Commission's finding that subject imports had a significant impact on the domestic industry supported by substantial evidence and in accordance with law?**

Yes. The domestic industry suffered declines in its production, sales, shipments, and revenues from 2020 to 2021 while subject imports were capturing market share through significant underselling and preventing the domestic industry from increasing prices that otherwise would have occurred. Views at 53-54. Although the domestic industry's performance subsequently increased by most measures from 2021 to 2022, this improvement coincided with, and was accounted for by, the *FRC I* provisional duties. Views at 54-55.

Plaintiffs make several unavailing attempts to undermine the evidence indicating that the *FRC I* provisional duties played a role in the domestic industry's improved performance in 2022. PlBr. at 27. Contrary to Plaintiffs' claims, the record showed that the *FRC I* provisional duties reduced the presence of subject imports from China in the overall market in 2022, as well as influenced the level of participation of subject imports from Mexico in the two market segments. Views at 40, 44-45; SR at Tables G-9 & G-12. And as the Commission explained, the statute permits it to presume that changes in the volume of imports was related to provisional duties and reduce the weight accorded to the affected data. Views at 44 n.236 (citing SAA at 854). Furthermore, Plaintiffs' claim during the administrative proceedings (and again on appeal) was based on the incorrect belief that the domestic industry's performance was solely driven by the

original equipment ("OEM") market.  PlBr. at 27.  The domestic industry shipped domestically produced FRCs to both the replacement market and OEM market, with the majority of its U.S. shipments going to the replacement market in 2020 and 2021.  Views at 37.

Contrary to Plaintiffs' view, PlBr. 27-28, the Commission did not find that all the U.S. shipments of subject imports from China that withdrew from the market inured wholly to subject imports from Mexico.  Rather, the Commission found that subject imports from China that withdrew from the <u>replacement market</u> inured wholly to subject imports from Mexico, Views at 45 n.240, which were lower-priced than domestically produced FRCs and increased their presence in that market segment to the detriment of their market presence in the OEM market. The domestic industry was, therefore, able to increase its shipments, and the prices of those shipments, in the OEM market due to the reduced presence of subject imports from China. Views at 43-45.

Plaintiffs' attempts to undermine the Commission's *FRC II* findings using findings from the Commissions Views in *Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570 (Final) (CR42) ("*FRC I*" and "*FRC I Views*") (available publicly in USITC Pub. 5331 (July 2022) (PR39)), PlBr. at 31-34, are also unavailing.  As the Commission explained, there were several differences between *FRC I* and *FRC II*, including the subject merchandise, domestic like product definition, and subject countries, that would result in different volume, price, and impact analyses.  *Certain Freight Rail Couplers and Parts Thereof from China and Mexico*, Inv. Nos. 701-TA-682 and 731-TA-1592-1593 (Prelim.) at 39-40 & n.167 (CR96) ("Prelim. Views") (available publicly as USITC Pub. 5387 (Nov. 2022) (PR95)); *see also* Views at 58.  In addition, the domestic industry's market positions at the beginning of the POIs in the two investigations were "reversed" (*i.e.*, Plaintiffs' description, PlBr. at 33),

5

which made the Commission's *FRC I* market share loss finding inapplicable to the industry's market share loss in *FRC II*.

### 3. Was the Commission's decision not to disqualify the Attorney and Firm supported by substantial evidence and in accordance with law?

Yes. The record does not contain a conclusive determination of a conflict of interest, let alone one that required the Commission to disqualify the Attorney and Firm. Consequently, the Commission's determination that good cause did not exist to disqualify the Attorney and Firm is supported by substantial evidence and otherwise in accordance with law. Plaintiffs' contrary arguments center around their misunderstanding that the Commission is required by statute, regulation, and practice in antidumping and countervailing duty investigations to adjudicate conflict of interest claims. No such requirement or practice exists, and Plaintiffs fail to demonstrate otherwise.

## II.    STATEMENT OF FACTS

### A.    Procedural History

*FRC I Investigations*. On September 29, 2021, the Coalition of Freight Coupler Producers (the "Coalition") filed petitions concerning imports of freight rail coupler systems and certain components thereof from China. *FRC I* Views at 3. The scope of these investigations included knuckles, coupler bodies, coupler yokes, and follower blocks. *FRC I* Views at 7-8. In July 2022, the Commission determined that an industry in the United States was not materially injured or threatened with material injury by reason of imports of the subject merchandise from China that were found by Commerce to be sold in the United States at less than fair value ("LTFV") and subsidized by the government of China. *FRC I* Views at 3.

*FRC II Investigations*. On September 28, 2022, the Coalition filed petitions concerning imports of FRCs from China and Mexico. Views at 3. The scope of these investigations

included knuckles and coupler bodies, but not coupler yokes or follower blocks, making it

narrower than the scope of the *FRC I* investigations.  Views at 7-9 & n.21.  In July 2023, the

Commission determined that an industry in the United States was materially injured by reason of

LTFV and subsidized FRCs from China, Views at 3, and in November 2023, applying the same

analysis, determined that an industry in the United States was materially injured by reason of

LTFV FRCs from Mexico.  Trailing Views at 3.[3]

     *Prior Proceedings at the Court of International Trade and U.S. Court of Appeals for the*

*Federal Circuit*.  On October 14, 2022, while the preliminary phase of the Commission's *FRC II*

investigations was ongoing, Amsted, Wabtec, Strato, and another U.S. importer, TTX,

commenced an action in this Court seeking declaratory and injunctive relief to block the

Commission from disclosing business proprietary information ("BPI") to the Attorney and Firm

and disqualify the Attorney and Firm from representing the Coalition based upon an alleged

conflict of interest.  *Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*, Ct. Int'l Trade No. 22-307,

Verified Compl. (ECF 14).

     On November 15, 2022, following briefing and oral argument, the Court dismissed the

case for lack of subject matter jurisdiction.  *Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*,

600 F. Supp. 3d 1308, 1318 (Ct. Int'l Trade 2022).

     Amsted, Strato, and TTX subsequently appealed the Court's dismissal decision to the

U.S. Court of Appeals for the Federal Circuit.  After the parties completed briefing, Amsted filed

a Joint Stipulation of Voluntary Dismissal, and the Federal Circuit dismissed the appeal on July

5, 2023.  *Amsted Rail Co., Inc. v. U.S. Int'l Trade Comm'n*, Fed. Cir. No. 23-1355 (ECF 90).

---

[3] Then-Chairman Johanson dissented in both the leading and trailing investigations, and reached
negative final determinations.  *See* Dissenting Views (CR179); Trailing Views at 3 n.1.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### B.    The *FRC II* Investigations

#### 1.    Domestic Like Product

The Commission found that the record supported defining all in-scope FRCs as a single domestic like product.  Views at 10-13.  Consequently, and in the absence of any contrary argument, the Commission defined a single domestic like product, coextensive with the scope. Views at 13-14.

#### 2.    Domestic Industry

The records of the preliminary and final phases of the subject investigation established that Amsted was a related party due to its importation of subject merchandise and ownership of [ ███ ], a subject producer and exporter of subject merchandise in Mexico.  Prelim. Views at 24; Views at 15-16.

In the preliminary phase of the investigation, notwithstanding Amsted's insistence that its primary interest was in domestic production, the Commission found that, based on information available in the preliminary record, appropriate circumstances existed to exclude it from the domestic industry.[4]  Prelim. Views at 25-27.

Additional evidence and argument on the related parties issue was presented during the final phase of the investigations.  Based on its review of the updated and complete record, the Commission found that appropriate circumstances did not exist to exclude Amsted from the domestic industry.[5]  Views at 17-23.  The Commission explained that Amsted's share of U.S.

---

[4] Amsted was not a related party in *FRC I* because Mexico was not a subject country.

[5] Then-Chairman Johanson and Commissioner Karpel dissented from the majority finding on related parties.  They found appropriate circumstances to exclude Amsted from the domestic industry as a related party, and conducted their injury analyses in relation to a domestic industry consisting of solely M&T.  *See* Separate Views on Related Parties (CR180); Trailing Views at 7 n.14.  Then-Chairman Johanson went on to reach negative determinations (CR179; Trailing

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

production of FRCs during the POI doubled from [ ████ ] percent to [ ████ ] percent during the

POI, and Amsted reported capital expenditures totaling $[ ██████ ].  Views at 17.  Its ratio of

subject imports to domestic production was again [ ████ ] but declined overall.  Views at 17-18.

While Amsted, toward the end of the investigation, reversed its earlier position to state that its

primary interest was in importation, the Commission explained that Amsted's primary interest

was not dispositive in its related party analysis.  Views at 17-18.

   The record indicated that Amsted's domestic production was not shielded from

competition with subject imports during the POI.  Views at 19-21 & 23.  Amsted's U.S.

shipments of domestically produced FRCs and U.S. shipments of subject imports from Mexico

had an inverse relationship across multiple pricing products during the POI, with overall U.S.

shipments of Amsted's domestically produced FRCs decreasing by [ ████ ] percent and U.S.

shipments of subject imports from Mexico increasing by [ ████ ] percent.  Views at 20.  The

average unit values ("AUVs") of subject imports from Mexico for coupler fit/assembly and

coupler bodies (sub-products of subject imports) were consistently [ ████ ] than the AUVs of

Amsted's domestically produced coupler fit/assembly and coupler bodies.  Views at 20.  Amsted

[ ██████████████████████████████████████████ ] that could have

been used to produce FRCs at its facility in the United States.  Views at 19.  Amsted also lost

market share to subject imports from China in the replacement market from 2020 to 2021 before

the *FRC I* provisional duties were in place.  Views at 20-21.  Thus, the record showed that

Amsted was not shielded from competition with imports from either subject country.

---

Views at 3 n.1), while Commissioner Karpel joined the majority in reaching affirmative
determinations.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The Commission also found that Amsted's domestic FRC production operations did not benefit from its imports of FRCs from Mexico. Views at 21-22. Rather, the record indicated that Amsted's exclusion from the domestic industry would mask declines in the domestic industry's market share, financial performance, and employment, as well as the domestic industry's available capacity. Views at 23. Amsted's U.S. shipments and market share declined overall during the POI, with it notably losing market share to subject imports from Mexico from 2020 to 2021. Views at 22. Its operating income-to-net sales ratio and COGS-to-net-sales ratio worsened over the POI, with its COGS-to-net-sales ratio reaching [ ███ ] percent in 2022. Views at 22. Increasing subject imports from Mexico also coincided with a reduction in Amsted's production related workers from 2020 to 2021. Views at 23. Finally, Amsted's capacity utilization was [ ███████ ] throughout the POI, reaching a high of [ ███ ] percent in 2022, which was [ █████████ ] than the only other domestic producer. Views at 21-22.

### 3.    Cumulation

The Commission explained that the statutory threshold for cumulation was satisfied because the petitions with respect to both subject countries were filed on the same day, September 28, 2022, and none of the statutory exceptions to cumulation applied. Views at 26. It then found that there was a reasonable overlap of competition between the domestic like product and imports from each subject country and between imports from each subject country. Views at 26-28. Consequently, the Commission cumulated subject imports from China and Mexico for purposes of its material injury analysis.[6] Views at 28.

---

[6] Plaintiffs have not appealed the Commission's cumulation finding.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### 4.    Conditions of Competition

The Commission considered the pertinent conditions of competition in its analysis.  First, the Commission found that demand for FRCs was driven by the production of new freight railcars (OEM market), as well as the replacement of FRCs on freight railcars already in service (replacement market).  Views at 31-32.  The parties generally agreed that U.S. demand for new freight railcars follows an eight-to-ten-year business cycle, whereas U.S. demand for replacement FRCs is steadier and less tied to the business cycle since it is driven by the average useful life of FRCs.  Views at 32.  Apparent U.S. consumption declined from [          ] pounds in 2020 to [          ] pounds in 2021, and then increased to [          ] pounds in 2022.  Views at 32.

The Commission found that the U.S. market was exclusively supplied by the domestic industry and subject imports from China and Mexico.  Views at 33.  The domestic industry's share of apparent U.S. consumption decreased from [     ] percent in 2020 to [     ] percent in 2021, and then increased to [     ] percent in 2022.  Views at 33.  Its practical FRCs capacity decreased from [          ] pounds in 2020 to [          ] pounds in 2021, and then increased to [          ] pounds in 2022.  Views at 33.  Its capacity utilization decreased from [     ] percent in 2020 to [     ] percent in 2021, and then increased to [     ] percent in 2022.  Views at 33.

Subject imports' share of apparent U.S. consumption increased from [     ] percent in 2020 to [     ] percent in 2021, and then decreased to [     ] percent in 2022.  Views at 34.

The Commission found a moderately high to high degree of substitutability between domestically produced FRCs and subject imports, and that price was an important factor in purchasing decisions for FRCs.  Views at 35-36.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Domestically produced FRCs were sold in the OEM and replacement markets, with the majority of domestic producers' U.S. shipments going to the replacement market in 2020 and 2021 and to the OEM market in 2022. Views at 37. The domestic industry's share of the OEM market increased from [ █ ] percent in 2020 to [ █ ] percent in 2021 and [ █ ] percent in 2022, while its share of the replacement market decreased from [ █ ] percent in 2020 to [ █ ] percent in 2021 and [ █ ] percent in 2022. Views at 37 n.192. Subject imports were also sold in both market segments. Views at 37. Subject imports from Mexico had a larger presence than subject imports from China in the OEM market but were predominantly and increasingly sold to the replacement market during the POI. Views at 37. As a whole, more subject imports were sold in the replacement market than in the OEM market, and subject imports' presence in the replacement market increased over the POI. Views at 37.

The parties generally agreed that the *FRC I* provisional duties reduced the presence of subject imports from China in the U.S. market for some time in 2022. Views at 40. The *FRC I* and *FRC II* investigations had overlapping POIs, and the subject imports from China in the *FRC II* investigations had been included in the scope of the *FRC I* investigations. Views at 39-40. Thus, after Commerce issued affirmative preliminary determinations in the *FRC I* investigations in March 2022, the subject imports from China in the *FRC II* investigations were subject to provisional duties until July 2022. Views at 39-40.

### 5. Volume

The Commission found that the volume of subject imports was significant in absolute terms and relative to both consumption and production in the United States.[7] Views at 41.

---

[7] Plaintiffs have not appealed the Commission's volume finding.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

6.      **Price Effects**

The Commission found that subject imports caused significant adverse price effects to the domestic industry by significantly underselling and suppressing domestic like product prices. Views at 42-49.

The quarterly pricing data collected by the Commission showed that subject imports pervasively undersold the domestic like product during the POI. Views at 42-43. It also showed that while subject imports from Mexico undersold the domestic like product throughout the POI, the underselling by subject imports from China was less prevalent in 2022 than in 2020 and 2021. Views at 43.

The Commission explained that the significant underselling by subject imports resulted in the domestic industry losing market share to subject imports.[8] Views at 44. In the overall market, the domestic industry lost [ ▮ ] percentage points of market share to subject imports from 2020 to 2021. Views at 44. Although the domestic industry did gain overall market share in 2022, the Commission afforded less weight to that data because the *FRC I* provisional duties significantly reduced U.S. shipments of subject imports in the overall market that year. Views at 45 n.240. In the replacement market, the domestic industry lost [ ▮ ] percentage points of market share to subject imports over the POI. Views at 45. U.S. shipments of subject imports from China declined in the replacement market in 2022 as a result of the *FRC I* provisional duties but those shipments wholly inured to subject imports from Mexico, so the Commission determined not to discount the replacement market shares for 2022. Views at 45 n.240. The Commission acknowledged that the domestic industry made gains in the OEM market in 2022

---

[8] The domestic industry did not lose market share to subject imports in the OEM market during the POI. SR at Table G-9.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

that offset volume losses in the replacement market, but it observed that the replacement market is "larger than the OEM market and represents a more steady source of demand and income for the domestic industry." Views at 45.[9]

The Commission observed that the domestic industry's COGS-to-net-sales ratio was high and increased from 2020 to 2021, and it found that subject imports prevented price increases that would have otherwise occurred to a significant degree during that period. Views at 47-48. The Commission afforded less weight to the domestic industry's improved, although still high, COGS-to-net-sales ratio in 2022 because it was largely driven by increased sales values that coincided with the *FRC I* provisional duties on FRCs from China. Views at 47 n.249.

### 7.    Impact

The Commission observed that domestic industry began the POI in a weakened condition that worsened from 2020 to 2021. Views at 50. While cumulated subject imports were capturing market share through significant underselling and preventing the domestic industry from increasing prices that otherwise would have occurred in 2020 and 2021, the domestic industry suffered declines in its production, sales, shipments, and revenues. Views at 53-54. The domestic industry's performance increased by most measures from 2021 to 2022, but the improvement coincided with the *FRC I* provisional duties that caused subject imports from China to recede from the U.S. market and oversell the domestic like product. Views at 54. The domestic industry as a whole, [███████████████████████████], remained unprofitable in 2022, even with an [████] percent increase in apparent U.S. consumption that

---

[9] The Commission examined the available data on price trends but made no conclusion as to whether subject imports depressed the domestic like product prices. Views at 46-47.

year.  Views at 54.  The domestic industry also lost market share in the replacement market in each year of the POI.  Views at 54.

## III.    STANDARD OF REVIEW

Under the Tariff Act of 1930, as amended, this Court reviews the Commission's final determinations by assessing whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quotation omitted).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1347 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 217 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2017); *Imperial Sugar Co. v. United States*, 181 F. Supp. 3d 1284, 1294 (Ct. Int'l Trade 2016).  Under the substantial evidence standard, the reviewing courts defer to the Commission's reasoned fact-finding and analysis in injury investigations.  *See, e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006); *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996).

Regarding statutory interpretation, the Supreme Court has stated that "courts use every tool at their disposal to determine the best reading of the statute and resolve {any} ambiguity."  *Loper Bright Enters v. Raimondo*, 603 U.S. 369, 400 (2024).  Beyond the statute's text, the tools

of statutory construction to ascertain Congress's purpose and intent include the statute's

legislative history, the statute's structure, and the canons of statutory construction. *Timex V.I.,*

*Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998); *see also Metro. Area EMS Auth. v. Sec'y*

*of Veterans Affs.*, 122 F.4th 1339, 1345 (Fed Cir. 2024) (a post-*Loper Bright* decision where the

court recognized the employment of the traditional tools of statutory construction, including "the

statute's structure, canons of statutory construction, and legislative history" when considering

statutory construction) (citing *Timex,* 157 F.3d at 882). Furthermore, the Supreme Court

continues to recognize that courts should be informed by agencies' expertise, interpretation, and

experience with statutes that Congress entrusted them to administer. *Loper Bright*, 603 U.S. at

402, 144 S. Ct. at 2263, 2267 (citing, *e.g.*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40

(1944)).

IV.    **Argument**

    A.    **The Commission's Inclusion of Amsted in the Domestic Industry Definition Is Supported by Substantial Evidence and in Accordance with Law**

        1.    **The Commission's Related Parties Analysis Was Consistent with Its Statutory Authority**

Under the statute, the Commission is given the discretion to exclude from the domestic

industry producers of the like product that import subject merchandise or are related to exporters

or importers of subject merchandise, but it may only exclude such producers if it determines that

"appropriate circumstances" exist. *See* 19 U.S.C. § 1677(4)(B). In adding section 1677(4)(B) to

the Trade Agreements Act of 1979, Congress provided an example of a circumstance that would

warrant exclusion:

> {W}here a U.S. producer is related to a foreign exporter and the
> foreign exporter directs his exports to the United States *so as not to*
> *compete* with his related U.S producer, this should be a case where

the ITC would not consider the related U.S. producer to be a part of the domestic industry.

S. Rep. No. 96-249 at 83 (1979) (emphasis added). *See Empire Plow Co. v. United States*, 11 CIT 847, 852-53, 675 F. Supp. 1348, 1353-54 (1987) ("{T}he {U.S. Senate report for the Trade Agreements Act of 1979} displays an intent to exclude from the industry headcount domestic producers which, due to a relationship with the foreign producer, benefit from the foreign exporter" and "{t}he ITC is also concerned about excluding companies which account for a significant share of the domestic production and which exclusion would result in impairing the accuracy of the ITC determination").

In amending the statute during the implementation of the URAA, Congress endorsed the approach that had been (and continues to be) utilized by the Commission, *viz*, "to reduce any distortion in industry data caused by the inclusion in the domestic industry of *a related producer who is being shielded from the effects of the subject imports*." SAA at 858 (emphasis added). *See, e.g.*, *LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*, 38 CIT 1562, 1567-70, 26 F. Supp. 3d 1338, 1345-47 (2014) (the Commission reasonably found that appropriate circumstances did not exist to exclude Electrolux from the domestic industry where Electrolux was not shielded from subject import competition and its exclusion would distort the data).

As the courts have explained, exclusion is within the Commission's discretion and based on the record. *See Torrington Co. v. United States*, 16 CIT 220, 224-25, 790 F. Supp. 1161, 1168 (1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993); *Sandvik AB v. United States*, 13 CIT 738, 747-49, 721 F. Supp. 1322, 1331-32 (1989), *aff'd without opinion*, 904 F.2d 46 (Fed. Cir. 1990); *Empire Plow*, 11 CIT at 851-52, 675 F. Supp. at 1352. To this end, the Commission has traditionally looked at five primary factors: (1) the percentage of domestic production attributable to the importing producer; (2) the reason the U.S. producer has decided to import the

17

product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market); (3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry; (4) the ratio of import shipments to U.S. production for the imported product; and (5) whether the primary interest of the importing producer lies in domestic production or importation.  *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 100 F. Supp. 3d 1314, 1328-29 (Ct. Int'l. Trade 2015); *see also Torrington*, 16 CIT at 224-25, 790 F. Supp. at 1168.  As the Commission's appropriate circumstances analysis is specific to the facts of each case, its determination may be based on some or all of these enumerated factors or even non-enumerated factors.  *See Allied Mineral Prods., Inc. v. United States*, 28 CIT 1861, 1865-67 (2004) (acknowledging the Commission's primary factors and finding it within the Commission's direction under section 1677(4)(b)(i) to consider other factors as well); *see e.g.*, *Softwood Lumber Products from Canada*, Inv. Nos. 701-TA-566 & 731-TA-1342 (Final), USITC Pub. 4749 at 18-19 (Dec. 2017) (the Commission examined production trends and level of capital investment).

While not challenging the discretionary authority given to the Commission, Plaintiffs suggest that the primary purpose of the related parties provision to be the exclusion of domestic producers whose interest in importation causes them to "act against the domestic industry."  PlBr. at 12-13 (citing *USEC, Inc. v. United States*, 25 CIT 49, 132 F. Supp. 2d 1 (2001)).  The quotation, however, is only a snippet of the court's discussion of the related parties provision in *USEC*, as the court also specifically recognized that "the provision's purpose is to exclude from the industry headcount domestic producers substantially benefitting from their relationships with foreign exporters."  *See USEC, Inc.*, 25 CIT at 61, 132 F. Supp. 2d at 12.  Indeed, the court in

18

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

*USEC* was citing *Empire Plow*, which in turn viewed Congress' intent as focusing on exclusion of a domestic producer that benefitted where a related foreign producer's exports were directed to the United States in a manner that did not compete with the related domestic producer. *See Empire Plow,* 11 CIT at 852, 675 F. Supp. at 1353. Accordingly, Plaintiffs' narrow view of the purpose of the related parties provision is not a comprehensive or accurate representation of the legislative history or case law that has interpreted the legislative history.

In sum, the legislative history and caselaw both indicate that exclusion of a related party from the definition of the domestic industry is appropriate when the related party's trade and financial data do not reflect competition with subject imports because the related party is shielded from competition with subject imports or benefitting from the imports. In such instances, that party's inclusion in the domestic industry can mask the injury from subject imports.

**2.    The Commission's Determination Not to Exclude Amsted from the Effects of Subject Imports Is Supported by Substantial Evidence**

The record showed that Amsted's domestically produced FRCs were not shielded from competition with its imports from Mexico, notwithstanding that the latter far outweighed its domestic production. Views at 19. Rather, the record evinced direct competition between those products. For example, when Amsted could have used raw materials located in the United States for the production of FRCs in the United States, those raw materials [                           ]. Views at 19. Amsted then imported these products into the United States where they competed for sales with, and [                                        ]. Views at 20-21 & n.92. This resulted in Amsted's [                                ] being increasingly substituted for its domestically produced FRCs during the POI, as evidenced by the corollary [            ]

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

█████ ] in U.S. shipments of coupler bodies and knuckles produced in Mexico as Amsted's U.S. shipments of domestically produced coupler bodies and knuckles [ █████████ █████ ].  Views at 19-20.

The record also supports the Commission's finding that Amsted competed with, and was not shielded from the effects of, subject imports from China.  Particularly, Amsted's domestically produced FRCs [ ████████████████ ] in the replacement market in 2021.  Views at 20-21.  This competition was further corroborated by Amsted's reported [ ███ █████ ] to subject imports from China and testimony from the head of the UAW during the *FRC I* conference that Amsted informed its U.S. workers in October 2021 that FRC production shifted to Mexico due to competition from subject imports from China.  Views at 21.

Additionally, rather than benefitting from its [ ██████████ ], the record indicated that Amsted's domestic FRC operations performance suffered as the volume of [ █████ █████ ] subject imports from Mexico increased in the U.S. market.  Views at 21-22.  Its capacity utilization figures were [ █████████ ] throughout the POI, and even when its capacity utilization increased in 2022, it was [ ████████████ ] than the other domestic producer's utilization.  Views at 21-22.  Amsted's sales and market share declined and its operating-income-to-net-sales and COGS-to-net-sales ratios both worsened over the POI.  Views at 22.  An amended supply agreement in 2022 that Amsted had with [ █████ ] served as further evidence that Amsted's U.S. operations did not benefit from subject imports from Mexico, as the majority of the knuckles ordered under that agreement were supplied with subject imports from Mexico.  Views at 22.

Given its competition with subject imports, Amsted's exclusion from the domestic industry would have skewed the domestic industry data, as it was one of two domestic producers,

and it doubled its share of total U.S. production over the POI, reaching [   ] percent in 2022.

Views at 23.  Particularly, Amsted's exclusion would have skewed the domestic industry's

capacity utilization figures, market shares, financial data, and employment figures, which

declined when subject imports increased from 2020 to 2021.  Views at 23.

     In sum, substantial evidence supports the Commission's conclusion that the record did

not indicate that Amsted's domestic production activities were shielded from competition with

subject imports from China and Mexico, or that Amsted otherwise benefitted from its

importation of subject imports from Mexico.  Views at 23.  To the contrary, Amsted's domestic

production suffered substantially when the company decided to increasingly replace domestically

produced product with imports from Mexico.  Accordingly, the Commission's decision not to

exclude Amsted from the domestic industry was a reasonable exercise of its discretion, much like

the Commission's related parties analysis upheld in *LG Elecs.*, 38 CIT at 1569, 26 F. Supp. 3d at

1346 (finding a similar analysis to be reasonable and sustaining the Commission's finding that

"excluding Electrolux would distort the data because it would mask declines in domestic

capacity and employment during the POI").

### 3.    Plaintiffs' Challenges to the Commission's Findings Are Unavailing

     In Plaintiffs' view, the Commission ignored evidence demonstrating that Amsted's

imported FRCs from Mexico were not competing with its domestically produced FRCs in the

U.S. market.  PlBr. at 21-23.  They specifically point to statements made by Amsted

representatives concerning the initial purchase of the production facility in Mexico having

nothing to do with import competition and Amsted's imports of FRCs from Mexico

complimenting its FRCs production in the United States.  PlBr. at 22-23; Amsted's Posthearing

Br. at 2-6 and Answers to Commissioners' Questions at 28-30, 46-58 (CR158).  Contrary to

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Plaintiffs' view, the Commission considered this information in its related parties analysis, *see* Views at 18-19, but those statements were contradicted by other data-specific record information.

As discussed above, Amsted's [ ▮▮▮▮▮▮▮▮▮▮▮▮ ] were increasingly substituted for its domestically produced FRCs during the POI, with Amsted's U.S. shipments of domestically produced FRCs declining by [ ▮▮▮ ] percent and U.S. shipments of subject imports increasing by [ ▮▮ ] percent over the POI. Views at 19-20. The performance of Amsted's domestic FRC operations also declined as the volume of [ ▮▮▮▮ ] subject imports from Mexico increased in the U.S. market. Views at 21-22. Its capacity utilization figures were [ ▮▮▮▮ ] throughout the POI, and even when its capacity utilization increased in 2022, it was [ ▮▮▮▮▮ ] than the other domestic producer's capacity utilization. Views at 21-22. Amsted's sales and market share declined during the POI, with it specifically losing market share to subject imports from Mexico from 2020 to 2021. Views at 22. A reduction in Amsted's production related workers, which declined from [ ▮▮ ] in 2020 to [ ▮ ] in 2021, coincided with its market share loss to the increasing volume of subject imports from Mexico. Views at 23. Its operating-income-to-net-sales and COGS-to-net-sales ratios also worsened over the POI. Views at 22. Tellingly, even Plaintiffs appear to recognize that Amsted competed with and was injured by subject imports by stating that "unless the Commission did an about-face from the preliminary determination and inserted data from {Amsted} back into the domestic industry analysis, and affirmative injury determination would be unsupportable." PlBr. at 25.

Given the above, the Commission reasonably declined to exclude Amsted from the domestic industry based on Amsted's statements that subject imports from Mexico were not

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

competing with its domestically produced FRCs.  Such an approach would have the Commission ignore record information that contradicted Amsted's statements and other evidence reflecting the effects of subject imports, including those from China, on Amsted's operations.

Further, Plaintiffs' reliance on *Allied Mineral* illustrates the flaws in Plaintiffs' argument that Amsted benefited from its imports of FRCs from Mexico.  In *Allied Mineral*, as Plaintiffs note, both brown aluminum oxide ("BAO") and refined brown aluminum oxide ("RBAO") were in-scope, and the related party gained a cost advantage by importing dumped BAO that it used to produce RBAO.  The firm's superior financial results for the production of RBAO confirmed the benefit it was receiving by importing dumped RBAO.  PlBr. at 14 (citing *Allied Mineral Prods.*, 28 CIT at 1864-66).  These facts are not analogous to those in this investigation.  While Plaintiffs argue that Amsted's [███████████████████████████ ], they do not, and lack a basis for doing so with the record information, claim that Amsted's [███████████████████ ████████████████████ ].

In arguing that application of the Commission's primary factors should have led to Amsted's exclusion from the domestic industry, Plaintiffs primarily rely on findings from the Commission's preliminary determinations.  PlBr. at 16-19.  Of particular significance, both the petitioners and respondents changed their stances between the two investigation phases as to whether appropriate circumstances existed to exclude Amsted.  Views at 15-17.

In fact, during the preliminary phase of the investigation through the hearing in the final phase of the investigation, Amsted claimed that, based on its capital expenditures, its primary interest was in **domestic production**, and that its exclusion would skew the domestic industry data.  Views at 17 n.74.  This included testimony at the Commission hearing on May 18, 2023, where Amsted's Vice President, responding directly to questioning from the Commissioners,

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

unequivocally stated that it was a major U.S. producer with a "primary interest" in domestic

production. Hearing Tr. at 162-63 (PR160). Then, near the end of the investigations, in its

posthearing brief, Amsted reversed course and argued, based on the relative size of its FRC

production to its production of other products, that its primary interest was actually in

importation. Views at 18; Amsted's Posthearing Br. at 2-6 and Answers to Commissioners'

Questions at 28-30, 46-58 (CR158).

    Simply put, Plaintiffs fail to account for the additional arguments and data that were

added to the record during the final phase of the investigation, which covered several additional

quarters and included more detailed breakouts of the information. For example, Amsted's share

of total production in the final phase of the investigations reached a level that was [ ███ ] the

size of its share of production during the preliminary phase of the investigations. The

Commission also considered more detailed information in the final phase of the investigation,

such as U.S. shipment breakouts by product type and source. *See* Views at 20.

    Regarding the Commission's consideration of its primary factors in the final phase of the

investigation, Amsted was one of two domestic producers and doubled its share of total U.S.

production over the POI, reaching [ ███ ] percent in 2022 (factor one). Views at 19, 23. Its

ratio of imports of FRCs to domestic production was [ ███ ] throughout the POI, but it declined

overall (factor four). Views at 17-18. The record was mixed regarding whether Amsted's

primary interest (factor five) was in importation or domestic production – including a last-minute

change in stance by the very company involved. Views at 17-18. The Commission explained

that even if a U.S. producer's current primary interest lies in importation, that factor alone is not

dispositive in the Commission's related parties analysis. Views at 18. Amsted's stated reason

for purchasing the facility in Mexico was to serve large rail customers that had moved

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

production to Mexico, and its stated reason for importing FRCs from Mexico was to [ ███

█████████ ], with its operations in the two countries complementing each other.

Views at 18.  The record, however, indicated that Amsted's domestically produced FRCs were

competing with subject imports from Mexico, as well as with subject imports from China, and

that its domestic operations did not benefit from subject imports from Mexico (factor two), all of

which is detailed above.  Views, at 19-22.  Since Amsted was not shielded from the effects of,

nor benefitted from, subject imports and had an increasing share of total domestic production

during the POI, Amsted's exclusion would have distorted the domestic industry data (factor

three).  Views at 23.  Specifically, the Commission found that Amsted's exclusion would have

distorted the domestic industry's market shares, employment figures, capacity utilization rates,

and financial performance.  Views at 23.

      Plaintiffs imply that the Commission viewed Amsted's share of total domestic production

during the POI to be insignificant.  PlBr. at 16.  The Commission made no such finding when

noting that Amsted's domestic production doubled from [ ███ ] percent to [ ███ ] percent over

the POI.  Views at 17.  Rather, the Commission found that Amsted's share of the total domestic

production of FRCs during the POI were significant enough to distort the domestic industry's

data if it was excluded from the domestic industry.  Views at 23.

      Here, the Commission found that Amsted did not benefit from subject imports from

Mexico, which it found informative in determining whether Amsted's inclusion in the domestic

industry would distort the data.  Views at 21-23.  Contrary to Plaintiffs' suggestion, PlBr. at 24,

there was no legal obligation for the Commission to then determine whether Amsted imported

subject merchandise to remain competitive in the U.S. market.

Relying on a question-and-answer discussion between Commissioner Kearns and counsel for the petitioners and respondents, Plaintiffs claim that the Commission developed a new "non-neutral" analysis for determining whether appropriate circumstances existed to exclude Amsted, for which the Commission simply looked at whether the inclusion or exclusion of Amsted made the domestic industry data look worse. PlBr. at 21. In the dialogue referenced by Plaintiffs, Commissioner Kearns simply explained again that the purpose of the related parties provision was to exclude domestic producers that masked injury to the domestic industry, with the added clarity that the Commission's analysis "does not . . . just find whatever numbers are most indicative of injury." Hearing Tr. at 198 (PR160). Contrary to Plaintiffs' insinuation, this dialogue did not indicate an outcome-determinative approach; rather, Commissioner Kearns was simply describing Congress' intent regarding the related parties provision, as discussed above in section A.1. As Congress intended, the Commission's analysis considered whether Amsted's domestic operations were shielded from the effects of, or benefitted from, subject imports. The Commission found they were not, and in fact that Amsted was harmed by subject imports. Having made this finding, the Commission reasonably determined that Amsted's exclusion would have masked injury to the domestic industry.

In arguing that Amsted's inclusion would skew the domestic industry data, Plaintiffs point to the effect Amsted's data would have on the other domestic producer's data. This argument runs afoul of the statutory purpose to assess whether dumped or subsidized imports are causing material injury to the domestic industry, defined as "producers as a whole of a domestic like product." 19 U.S.C. § 1677(4)(A). This statutory definition means that the starting point in the Commission's analysis is that all domestic producers are included in the domestic industry. Thus, absent appropriate circumstances to exclude a producer, it is to be included in the

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

definition of the domestic industry. Nothing in the statute supports Plaintiffs' claim that the Commission is obligated to exclude a firm because it performed [ ██████ ] than other members of the industry and could mask "noninjury."[10] To the contrary, as the Commission found here and in other cases, the exclusion of a related party not shielded from the effects of subject imports can mask the effects of those imports on the domestic industry. Views at 23; *Aluminum Lithographic Printing Plates from China and Japan,* Inv. Nos. 701-TA-694 and 731-TA-1641-1642 (Final), USITC Pub. 5559 at 11-12 (Nov. 2024); *Gas-Powered Pressure Washers from Vietnam*, Inv. Nos. 731-TA-1598 (Final), USITC Pub. 5465 at 16-19 (Oct. 2023); *Portable Elec. Typewriters from Singapore*, Inv. No. 731-TA-515 (Final), USITC Pub. 2681 at 10 (Sept. 1993). This Court has also recognized that excluding a related party not shielded from the effects of competition with subject imports can distort the industry data. *See LG Elecs.*, 38 CIT at 1569 n.9, 26 F. Supp. 3d at 1346 n.9 (distorting the industry data can mean excluding a domestic producer that competed with subject imports, as well as including a domestic producer that was shielded from the effects of subject imports).

The Commission's consideration of Amsted's performance indicators is also consistent with its approach in other cases that have been affirmed by this Court as reasonable. In *Allied Mineral,* the Commission found that the related party's performance confirmed it was receiving a benefit. "{T}he Commission considered Great Lakes' financial results as just one of numerous factors contributing to its conclusion that Great Lakes substantially benefitted from its importation of the subject merchandise. Accordingly, the Commission did not place unlawful emphasis on Great Lakes' financial results in making its 'appropriate circumstances'

---

[10] Moreover, the premise of Plaintiffs' claim is questionable, given that Commissioner Karpel, who determined to exclude Amsted from the domestic industry, joined the majority in reaching an affirmative determination.

27

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

determination." *Allied Mineral Prods.*, 28 CIT at 1865-66.  Similarly in *LG Electronics*, the

Court found reasonable the Commission's finding "that the increasing ratio of imports combined

with increased operating losses was evidence that Electrolux did not receive a benefit from

subject imports." *LG Elecs.,* 38 CIT at 1568 n.8, 26 F. Supp. 3d at 1345-46 & n.8.  Thus, the

Commission reasonably considered Amsted's [ ███████████ ] in finding its FRC production

operations did not benefit from the imports.

Plaintiffs also take issue with the Commission's consideration of competition between

Amsted and Chinese products.  PlBr. at 23-24.  Whether or not the five primary factors

specifically encompass such an analysis, it cannot be gainsaid that the Commission has the

discretion to consider competition between a related producer's domestic operations and non-

affiliated subject imports, particularly whereas here, such a consideration is relevant to the

inquiry.  As described in detail above, the Commission's related parties analysis seeks to discern

whether a related party has been shielded from the effects of subject imports.  Indeed, the

Commission has the discretion to determine whether appropriate circumstances exist to exclude a

related party, which allowed it to establish the primary factors, and continues to give it the

flexibility to consider other factors as well.  *Allied Mineral Prods.*, 28 CIT at 1865-67.  And as

discussed above, the competition between Amsted's domestically produced FRCs and subject

imports from China provided additional insight into whether Amsted's inclusion in the domestic

industry would distort the domestic industry data.

Moreover, this consideration is informative for addressing the third primary factor –

concerning the potential distorting effect of the related party's inclusion in the domestic industry.

Here, the Commission found that Amsted was not shielded from the effects of subject imports

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

from China, which further indicated that Amsted's inclusion in the domestic industry would not skew the industry data.

**B.    The Commission's Impact Finding Is Supported by Substantial Evidence and in Accordance with Law**

**1.    The Commission's Impact Analysis Should Be Sustained**

The Commission reasonably found that subject imports had a significant adverse impact on the domestic industry.  Views at 54.  As the Commission explained, the domestic industry began the POI in a weakened condition that worsened from 2020 to 2021, and then improved by most measures in 2022 after the *FRC I* provisional duties were imposed, although it continued to experience financial losses.  Views at 50.  The Commission observed that the domestic industry's declining production, sales, shipments, and revenues from 2020 to 2021 exceeded the decline in apparent U.S. consumption and corresponded with subject import underselling, market share gains, and price suppression.  Views at 54.  Then, the domestic industry's improved performance from 2021 to 2022 corresponded with the *FRC I* provisional duties, and the industry still reported operating and net losses and continued to lose market share to subject imports in the replacement market in 2022.  Views at 54.

The Commission rejected respondents' argument that the domestic industry was not injured because its production, capacity utilization, shipments, and profitability all improved over the POI.  Views at 54 n.278.  It explained that those improvements occurred only after the imposition of the *FRC I* provisional duties and that prior to those duties, all the indicators cited by Plaintiffs declined.  Views at 54 n.278.

Respondents argued that any [ ███ ] of market share in the replacement market segment by the domestic industry was attributable to the industry's decision to [ ████████████

████ ], but the record did not support this argument.  Views at 55.  The domestic industry made

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

[ ▮▮▮▮▮ ] in the replacement market in 2020 and 2021 and [ ▮▮ ] market share to subject imports during that period.  Views at 55.

The Commission was unpersuaded by respondents' argument that the domestic industry did not have the available production capacity to increase sales during the POI.  Views at 55. Both domestic producers reported [ ▮▮▮▮▮▮▮▮▮ ] during the POI.  Views at 55.  And even when there was a [ ▮▮▮▮ ] increase in the domestic industry's production and shipments in 2022, both U.S. producers' capacity utilization rates remained below [ ▮ ] percent for the most part, with only [ ▮▮ ] surpassing that figure in [ ▮ ] of the [ ▮ ] months that year.  Views at 55-56.

The Commission disagreed with respondents that a contract dispute that resulted in [ ▮▮ ] no longer supplying [ ▮▮▮▮ ] proved that [ ▮▮▮ ] was operating at [ ▮▮▮ ] during the POI.  Views at 56 n.289.  The evidence supported the Commission's finding that the dispute concerned price increases, not capacity.  As the Commission also noted, the dispute occurred in July 2021, before the alleged domestic industry capacity constraints in 2022. Views at 56 n.289.

Addressing respondents' contention that a substantial portion of the FRC market was unavailable to the domestic industry because purchasers required FRCs with Bedloe technology, the Commission noted that the majority of subject imports during the POI were non-Bedloe FRCs.  Views at 57.  And while certain [ ▮▮ ] purchasers, such as [ ▮▮ ], preferred FRCs with Bedloe technology, most responding purchasers did not view the technology as important. Views at 57.  [ ▮▮ ] also increased its purchases of non-Bedloe FRCs during the POI when the *FRC I* provisional duties reduced the availability of Bedloe FRCs.  Views at 57-58.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Finally, the Commission examined the trends in apparent U.S. consumption and nonsubject imports and found that neither could explain the domestic industry's performance during the POI. Views at 54-55, 58. Specifically, it found that the increase in apparent U.S. consumption from 2021 to 2022 could not fully explain the domestic industry's improved performance in 2022 because the domestic industry's U.S. shipments, bolstered by the *FRC I* provisional duties, increased by far more than apparent U.S. consumption over that period. Views at 54-55, 58.

### 2. The Commission's Decision to Attribute the Domestic Industry's Improved Performance in 2022 to the *FRC I* Provisional Duties Was Supported by Substantial Evidence

In Plaintiffs' view, the Commission's discounting of the domestic industry's improved performance in 2022 based on the *FRC I* provisional duties is unsupported by substantial evidence. PlBr. at 27-28. As the Commission explained, however, the statute permits it to presume that changes in the volume of imports was related to provisional duties and reduce the weight accorded to the affected data. Views at 44 n.236 (citing SAA at 854).

The parties agreed that subject imports from China reduced their presence in the U.S. market for some time in 2022, Views at 40, and the record data that showed U.S. shipments of subject imports from China decreased in both market segments from 2021 to 2022, with the largest decline, at [      ] pounds, occurring in the [            ]. SR at Tables G-9 & G-12. U.S. shipments of subject imports from Mexico also declined in the OEM market from 2021 to 2022, decreasing by [      ] pounds, but increased by [        ] pounds in the replacement market during that period. SR at Tables G-9 & G-12. These changes coincided with the imposition of the *FRC I* provisional duties in 2022.

There was also no sufficient evidence rebutting the Commission's presumption by establishing that the change was related to factors other than the provisional duties. *See* SAA at 854. The respondents did not offer an explanation of the increased prices of subject imports from China in 2022 or the changes in the volumes of subject imports that year. Accordingly, the Court's consideration of Plaintiffs argument in this appeal would require it to reweigh the evidence, which it should decline to do. *See, e.g.*, *LG Elecs.*, 38 CIT at 1578-81, 26 F. Supp. 3d at 1353-55 (the Court declined to consider whether the decline in imports, which the Commission found was attributable to filing of the petitions, was a part of a larger trend because it would require it to reweigh the Commission's determination).

Accordingly, the Commission properly considered the domestic industry's improved performance in 2022 in the context of the *FRC I* provisional duties, including its market share gain in the overall market from 2021 to 2022. Views at 44-45 & n.240.

Plaintiffs' claim is also based on the incorrect assumption that the domestic industry's performance is solely driven by the OEM market, with the domestic industry's improved performance in 2022 being attributable to increased consumption in the OEM market that year. PlBr. at 27. The domestic industry shipped domestically produced FRCs to both the OEM and replacement markets during the POI. Views at 37. Indeed, the majority of the domestic industry's U.S. shipments were to the replacement market in 2020 and 2021. Views at 37. Given this, the larger size of the replacement market compared to the OEM market, and the more stable demand trends in the replacement market, the Commission found that the replacement market represented a steadier source of demand and income for the domestic industry. Views at 45. The Commission also considered whether the increase in apparent U.S. consumption in 2022 explained the domestic industry's improved performance that year, but it found that the domestic

industry's U.S. shipments increased by far more than apparent U.S. consumption in 2022.  Views at 54-55.  Moreover, the domestic industry remained unprofitable in 2022.  Views at 54.[11]

In arguing that the domestic industry did not benefit from the *FRC I* provisional duties, PlBr. at 27-28, Plaintiffs overlook that the Commission actually found, as supported by substantial evidence on the record, that the subject imports from China that withdrew from the replacement market inured wholly to subject imports from Mexico.  Views at 44-45 & n.240.  Moreover, the *FRC I* provisional duties reduced the presence and increased the prices of subject imports from China in 2022.  Views at 43-45.  Given this, and the fact that lower-priced subject imports from Mexico completely replaced the subject imports from China in the largest and steadiest segment of the market (the replacement market), Views at 45 & n.240, the domestic industry was able to increase its shipments, and the prices of those shipments, to the OEM market.  Views at 45, 47, & 55.

Plaintiffs argue that the data should have shown domestic industry market share gains in the replacement market if they benefited from the *FRC I* provisional duties, given that subject

---

[11] Plaintiffs also argue that then-Chairman Johanson's dissenting opinion took the correct view of the impact of the *FRC I* provisional duties on the domestic industry.  PlBr. at 29.  Plaintiffs' reliance on then-Chairman Johanson's separate views in support of its challenge to the Commission's determination arguments is misplaced.  That the dissenting Commissioner may have weighed the evidence differently, does not provide grounds to overrule the Commission's determination.  Indeed, "{a}lthough individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'"  *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) (citing *Consolo*, 383 U.S. at 619-20); *Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1346, 1362-63 (Ct. Int'l Trade 2023).  Accordingly, Plaintiffs argument is simply another way of asking the Court to reweigh evidence. *See Metallverken Nederland B.V. v. United States*, 13 CIT 1013, 1017, 728 F. Supp. 730, 734 (1989) ("In asking the Court to negate a commissioner's determination based upon the findings of dissenting commissioners, plaintiffs are, in essence, asking the Court to reweigh the evidence.").

imports from China were more concentrated in that market segment. PlBr. at 30-31. The record shows, and the Commission explained, that any benefit that accrued to the domestic producer were in the OEM market. As discussed above, U.S. shipments of subject imports from China declined in both the OEM and replacement markets from 2021 to 2022, with the largest decline occurring in the replacement market where the withdrawal of imports from China inured wholly to subject imports from Mexico. The increased presence of subject imports from Mexico in the replacement market corresponded with their decreased presence in the OEM market. Thus, lower-priced subject imports from Mexico – which were not subject to *FRC I* provisional duties – took advantage of the gap left by the exiting imports from China in that market and prevented the domestic industry from gaining any share of that market in 2022. Views at 43 & 45 n.240. Although the domestic industry did not directly pick up a significant portion of the sales left behind by the withdrawn subject imports from China, the *FRC I* provisional duties reduced the presence of subject imports in the OEM market, where the domestic industry was able to increase its sales and gain market share.

Plaintiffs also point to the spike in the domestic industry's production figures after the *FRC I* provisional duties were removed to claim that the domestic industry's improvement in 2022 was not caused by the *FRC I* provisional duties. PlBr. at 29-30. The Commission took all factors, including production data into account in reaching its conclusion, and it found that the domestic industry's declining performance coincided with a significant volume of lower-priced subject imports that adversely affected domestic like product prices. Views at 50-54. Moreover, it is undisputed that the *FRC I* provisional duties reduced the sales and increased the prices of subject imports from China in 2022, which according to record information, remained the case even after the duties were lifted. SR at Tables V-3-7, IV-10, C-1 & Fig. IV-7. This allowed the

domestic industry to increase its prices and U.S. shipments throughout the remainder of 2022. SR at Tables V-3-7.

>  **3.    The Commission's *FRC II* Determinations Are Not Undermined By or Inconsistent with Its *FRC I* Determinations**

Plaintiffs attempt to poke holes in the Commission's *FRC II* determinations using the Commission's *FRC I* determinations.  In Plaintiffs' view, the "thrust" of the Commission's *FRC I* determinations was not driven by the presence of nonsubject imports (imports from Mexico), which were subject imports in *FRC II*.  PlBr. at 31.  Plaintiffs extend this to mean that there was nothing distinguishing *FRC II* from *FRC I* to argue that the negative *FRC I* determinations precluded affirmative *FRC II* determinations, at least with respect to subject imports from China in 2020 and 2021.  PlBr. at 31.

Plaintiffs, however, fail to acknowledge that there were significant differences between the *FRC I* and *FRC II* investigations.  Indeed, as the Commission explained in its *FRC II* preliminary determinations, the *FRC I* and *FRC II* investigations were based on different petitions and "involved different scopes, different domestic like product and domestic industry definitions, and different subject countries than the {*FRC II*} investigations . . ., and these differences will also result in different volume, price, and impact analyses{.}"  Prelim. Views at 39-40 & n.167; *see also* Views at 25-26 n.114.  Moreover, contrary to Plaintiffs' view, the Commission observed a strong connection between the domestic industry's performance and imports from Mexico in *FRC I*.  In *FRC I*, nonsubject imports (*i.e.*, imports from Mexico) accounted for the majority of the market share lost by the domestic industry; were lower-priced than the subject imports (from China) and the domestic like product; and had a stronger correlation than subject imports to domestic like product price declines.  *FRC I* Views at 35 n.133 & 38.  Indeed, the inclusion of FRC imports from Mexico as subject imports in the *FRC II*

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

led to different pricing data in the two investigations, which showed pervasive underselling by subject imports in *FRC II* compared to majority overselling by subject imports in *FRC I*. *FRC I* Views at 29; Views at 42-43, 58 n.299.

According to Plaintiffs, the Commission, in *FRC I*, found that the domestic industry's performance was driven by the OEM market, which they allege undermines the Commission's findings that the domestic industry lost market share in the replacement market to subject imports and was otherwise adversely impacted by subject imports. PlBr. at 32-34. In *FRC I*, the Commission found that the domestic industry's long-term contracts primarily positioned it in the OEM market at the beginning of that POI. This in turn limited the industry's ability to quickly shift sales to the replacement market when demand declined to a greater extent in the OEM market later in the POI. *FRC I* Views at 35-36. Notably, this *FRC I* finding was not applicable in *FRC II*, as the two investigations had very different market conditions – which Plaintiffs themselves describe as "reversed" situations. PlBr. at 33. Thus, while the domestic industry's long-term contracts may have explained market share losses in the market conditions of *FRC I*, they do not explain why the domestic industry was unable to retain sales in the replacement market in *FRC II* when the industry had [ █████████████ ] and the total shipments to that market segment [ ████████████ ]. Views at 55; SR at Table G-12.

Furthermore, contrary to Plaintiffs' view, the Commission considered whether the increased consumption in the OEM market in 2022 explained the domestic industry's improved performance that year. It explained, and the evidence shows, that the increased consumption (in the OEM market) did not fully explain the domestic industry's improved performance, as the domestic industry's U.S shipments increased by far more than the increase in apparent U.S. consumption in 2022. Views at 54-55, n.280, & 58.

In sum, the Commission's affirmative *FRC II* determinations were not undermined by, nor inconsistent with, its *FRC I* determinations.

### C.   The Commission's Decision Not to Disqualify the Attorney and his Firm Is Supported by Substantial Evidence and Otherwise in Accordance with Law

#### 1.   Background

##### a)   *FRC I* Investigations

On September 28, 2021, the Attorney, on behalf of the Coalition, filed antidumping and countervailing duty petitions in *FRC I*, covering freight rail coupler systems and components from China.  The petitioning Coalition originally consisted of domestic producers M&T and Amsted.  *See FRC I* Views at 3 n.1.  Shortly after the *FRC I* petitions were filed, Amsted withdrew from the Coalition, and was replaced by United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union AFL-CIO, CLC ("USW"), an association representing unionized workers at Amsted.  *FRC I* Views at 3 n.1.

##### b)   *FRC II* Investigations

On September 28, 2022, the Attorney, again on behalf of the Coalition (specifically, M&T and USW), filed new petitions covering FRC imports from China and Mexico, commencing the underlying investigations, *FRC II*.[12]  PR1, CR1.  As noted in the Statement of Facts, *FRC II*'s scope of imported merchandise, covered subject countries, and period of investigation differed from that of *FRC I*.  Prelim. Views at 39-40 & n.167; *see also* Views at 58.

---

[12] As evidenced by the timeline, Amsted misstates that it "supervised and materially contributed to the Attorney's preparation for *FRC II*."  PlBr. at 4, 34.  Indeed, Amsted itself states that the Attorney represented Amsted only in the "filing of the {*FRC I*} petition on September 29, 2021, and in the initial days following the filing of the {*FRC I*} petition,"  PlBr. at 34, a year before the *FRC II* petition was even filed.

On October 14, 2022, almost two weeks into the Commission's forty-five day preliminary phase investigations, Amsted and its Mexican affiliate, ASF-K de Mexico S. de R.L. de C.V. ("ASF-K"), filed a request with the Commission to disqualify the Attorney and his Firm from any further participation in the *FRC II* investigations based on an alleged conflict of interest stemming from the Attorney's prior representation of Amsted in *FRC I* ("disqualification request"). PR36, CR31. According to Amsted and ASF-K, the Attorney violated Rule 1.9(a) of the American Bar Association's ("ABA") Model Rules of Professional Conduct and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. PR36, CR31.

On October 18, 2022, the Attorney responded to the disqualification. PR44, CR56. In the response, he maintained that no conflict existed, and that in any event, Amsted had expressly waived any conflict with respect to any subsequent trade investigations. PR44, CR56.

On October 21, 2022, the Commission responded to the disqualification request, stating that "there {wa}s not good cause under Rule 201.15(a), at this time, to disqualify {the Attorney and his Firm} from participation" in *FRC II* based on the ethical issues Amsted raised. PR53 at 2. The Commission explained that it "does not adjudicate alleged violations of the Rules of Professional Conduct of a state Bar, nor does it determine whether conduct has violated the Model Rules of Professional Conduct of the {ABA}, such as those described in {the} request." PR53 at 1-2. The Commission further explained that such determinations fell within the purview of the relevant state bar association and noted that no such determination had been made. PR53 at 2.

Notwithstanding that the Commission issued its response more than two years ago during the preliminary phase of the *FRC II* investigations, Amsted has still not submitted any evidence

of a final determination from the relevant Bar authority or even a filed Bar complaint regarding the alleged conflict of interest.

### 2. Good Cause Did Not Exist to Disqualify the Attorney from Representing the Coalition During the *FRC II* Investigations

The Commission's determination not to disqualify the Attorney and his Firm based upon an alleged conflict of interest is supported by substantial evidence and otherwise in accordance with law. The Commission's regulations provide that any attorney or agent practicing before the Commission may "be suspended or barred from practicing before the Commission, or have imposed on him such lesser sanctions as the Commission deems appropriate" but only for "good cause shown." 19 C.F.R. § 201.15(a). Here, it is undisputed that there was no conclusive determination of a conflict of interest on the record, and consequently, no good cause for the Commission to have disqualified the Attorney from participating in *FRC II*.

Amsted nevertheless insists that "the Commission improperly consigned Plaintiffs to a direct, ongoing, and nonconsensual conflict of interest" in the *FRC II* investigations that "demands redress." PlBr. at 35-44. Amsted cites *Makita Corp. v. United States*, 17 C.I.T. 240, 819 F. Supp. 1099 (1993), claiming that it supports the Attorney's disqualification in this case.[13] PlBr. at 43. Amsted's reliance on *Makita,* however*,* is misplaced. As an initial matter, prior decisions by this Court are not binding, *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989). Moreover, *Makita* is distinguishable in many ways. Importantly, it did not involve record review of an agency's determination (which in this case includes the decision not

---

[13] Amsted also claims that under *Loper Bright*, 603 U.S. at 412-13, "this Court must evaluate the Commission's obligations and authority under the Tariff Act without deference to the Commission's own interpretation." PlBr. at 44. Amsted, however, fails to identify any statutory language that is in dispute or which requires interpretation within the context of its conflict of interest claim.

to disqualify) under 28 U.S.C. 1581(c) and 19 U.S.C. § 1516a.  Rather, it involved judicial action outside of review of the agency's merits determination during which "Plaintiffs had furnished affidavits and live testimony that detailed the precise nature of the information that the potentially conflicted attorney had acquired," making it "abundantly clear that the attorney was aware of specific categories of information relevant to Makita's defense in the antidumping investigations and that those categories of information extended far beyond what Makita would have otherwise revealed under the APO."  *Amsted Rail Co.,* 600 F. Supp. 3d at 1327 (discussing *Makita*, 819 F. Supp. at 1102).  Unlike in Makita, Amsted's claim here is subject to record review, consisting only of information that was before the Commission during the course of its administrative proceeding.  19 U.S.C. § 1516a(b)(2).

Amsted's conflict of interest allegation is also factually different from the one at issue in *Makita*.  *Makita* involved an attorney that had represented plaintiff before the Commission in a proceeding under 19 U.S.C. § 1337 ("section 337"), and then its adversary in a subsequent antidumping investigation before Commerce.  17 C.I.T. 240, 819 F. Supp. at 1099.  Here, the Attorney represented the same client – a coalition consisting of domestic producer(s) and union workers – across the prior investigations, *FRC I*, and the current investigations, *FRC II*.  *Amsted*, 600 F. Supp. 3d at 1327.  To the extent that Amsted's interests became adverse to the Coalition, it resulted from Amsted's own decision that it no longer wanted to be part of the Coalition, a choice it made in *FRC I*, and not because the Attorney changed his representation.  The alleged conflict is further questionable given that the *FRC II* investigations involve a different scope, time period, and subject countries, and therefore may not even meet the strict definition of being "substantially related" to the *FRC I* investigations, a purported requirement in establishing a conflict of interest.  PlBr. at 39-40.  Amsted had also agreed to an advance conflicts waiver

covering future conflicts with the Attorney that could bar it from seeking disqualification under the relevant conflict rules.  PR44, CR56.  At bottom, and in the absence of any conclusive proof of a conflict of interest, let alone one that required disqualification, the Commission's decision that good cause did not exist to disqualify the Attorney "at this time" was eminently reasonable.

Amsted's other argument challenging the Commission's decision not to disqualify centers around its mistaken belief that the Commission was required by law to adjudicate Amsted's conflict of interest claim.  PlBr. at 34-48.  But no such requirement exists.  The Commission's statutory mandate is to determine whether the imported merchandise in question either materially injures or threatens to materially injure a domestic industry within its statutory deadlines. 19 U.S.C. §§ 1671d(b)(1) & 1673d(b)(1).  There is no statutory requirement within this complex Title VII scheme for the Commission to sit in the place of the relevant state Bar and adjudicate claims of violation of the Rules of Professional Responsibility and conduct an assessment as to whether the Attorney violated the Model Rules of Professional Conduct.  Nor is there a regulatory requirement.  Given the absence of any statutory or regulatory requirement, Amsted's contention that the agency "erred by refusing to consider the ethical charges" must fail. PlBr. at 45; *see also Shakeproof Indus. Prods. Div. of Ill. Toll Works, Inc. v. United States*, 104 F.3d 1309, 1313-14 (Fed. Cir. 1997) (finding no legal error in Commerce's refusal to apply the D.C. Rules of Professional Conduct to the question of whether a firm should have been disqualified based upon an alleged conflict of interest); *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1261 (Fed. Cir. 2023) (in the absence of a statutory requirement, the Commission was free in fashioning its "own rules of procedure and to pursue methods of inquiry capable of permitting {it} to discharge {its} multitudinous duties").

To argue otherwise, Amsted cites *Polyhdoroff v. ICC*, 773 F.2d 372, 375 (D.C. Cir. 1985), *Goldsmith v. U.S. Bd. of Tax Appeals*, 270 U.S. 117, 121 (1926), and *Herman v. Acheson*, 108 F. Supp. 723, 725 (D.D.C. 1952), which recognize the agency's "power to police the professionals who practice before it."  PlBr. at 46.  However, while these cases acknowledge agency authority to adopt procedures to make conflict of interest determinations, they do not stand for the proposition advocated by Amsted, that the Commission *must* adjudicate and render conflict of interest determinations.

Similarly unavailing is Amsted's reliance upon the Commission's procedures in investigations under section 337 as establishing agency practice of resolving disqualification requests upon the merits in Title VII investigations.  PlBr. at 47-48.  Section 337 cases are entirely different from Title VII proceedings.  Specifically, in section 337 cases, administrative law judges preside over formal adjudications conducted pursuant to section 554 of the Administrative Procedures Act, 5 U.S.C. § 554.  These proceedings bear similarity to trials in that they involve notice, cross-examination, presentation of evidence, objection, motion, argument, and other rights, and apply procedural rules that are similar in many respects to the Federal Rules of Civil Procedure.  In contrast, Title VII proceedings are investigatory in nature, without any involvement by ALJs, and do not have such procedural structures.  *See Budd Co. v. United States*, 1 CIT 67, 72, 507 F. Supp. 997, 1001 (1980) ("Congress has recognized that the administrative proceedings under Title VII of the Tariff Act of 1930 are investigatory, not adjudicatory.").  Amsted fails to demonstrate how the Commission's practice in 337 matters are in any way informative of, or binding on, its obligations in Title VII investigations, let alone that the Commission departed from any established practice in its Title VII investigations.

3.    **The Reasonableness of the Commission's Decision Not to Disqualify Does Not Depend on Amsted's Ability to Obtain a Remedy in the Face of Its Own Inaction**

Amsted complains that the Commission's decision "passing the buck to local bar authorities leaves {it} with no adequate remedy."  PlBr. at 48-49.  Amsted, however, fails to show how this concern has any bearing upon whether the Commission's decision not to disqualify for lack of good cause shown was supported by substantial evidence or otherwise in accordance with law, the relevant question here.  In any event, Amsted's concern is unwarranted because had it submitted evidence of "good cause" (*e.g.,* a proven conflict of interest which required disqualification), it would have had an available remedy in this action.  Amsted cannot now blame the Commission for its own inaction in failing to report its conflict of interest claim to the relevant Bar and obtaining a determination.

Indeed, upon a conclusive determination of a proven conflict of interest, Amsted could have provided it as evidence of "good cause" for possible disqualification of the Attorney from the Commission's *FRC II* proceedings.  The Commission explained this possibility in the preliminary phase of *FRC II*, stating in response to Amsted's disqualification request that "there {was} not good cause, . . . *at this time*, to disqualify" the Attorney.  PR53.  In deliberately using this specific language, the Commission left open the possibility that if the relevant authorities were to find a conflict, that it would account for that finding in determining whether the Attorney should "be suspended or barred from practicing before the Commission, or have imposed on him such lesser sanctions as the Commission deems appropriate" under 19 C.F.R. § 201.15(a).  PR53 at 1 n.1.  The Commission could have rectified the "taint," if any, caused by the Attorney's conduct.  *See*, *e.g.*, *Koyo Seiko Co., Ltd. v. United States*, 13 CIT 461, 464, 715 F. Supp. 1097, 1099 (1989) (discussing the Commission's statutory mandate of reconsideration that is "free of

the accretions of any private interests, expectations or equities" in considering an issue anew);

*Elkem Metals Co. v. United States*, 26 CIT 234, 240, 193 F. Supp. 2d 1314, 1321 & n.6 (2002)

(finding that the Commission had the inherent power to reconsider its final determinations to

account for fraudulent information with respect to pricing that had been provided during the

original investigations). But, as noted above, to this day, Amsted has still not submitted any

evidence of a final determination from the relevant Bar authority or even a filed Bar complaint

regarding the alleged conflict of interest.

Even so, Amsted may still have the option of seeking judicial relief in district court

against the Attorney and his Firm. *See, e.g.*, *Geo Specialty Chem., Inc. v. Husisian*, 951 F. Supp.

2d 32, 37 (D.D.C. 2013). In *Geo Specialty*, the U.S. District Court for the District of Columbia

found that it had jurisdiction to consider plaintiff's complaint seeking injunctive relief and

monetary damages from its former attorney, alleging a violation of a fiduciary obligation

stemming from the attorney's representation of plaintiff domestic producer of glycine in one

trade proceeding, but later representing adversarial Chinese exporters of glycine in another trade

proceeding before Commerce. Although it found jurisdiction, the court ultimately dismissed the

case, holding that the complaint failed to plead facts supporting a plausible right to relief because

"a factfinder could not possibly conclude that the . . . new shipper review is 'the same or [ ]

substantially related' to the proceedings in which {the former attorney} represented {the

plaintiff}." *Id.*

      **4.**    **The Court Should Not Entertain Amsted's Request for the Court to Address the Alleged Conflict of Interest**

Amsted's alternative argument that this Court must address the alleged conflict of interest

claim also lacks merit. PlBr. at 49.

As noted above, the Court's role in this appeal is to review the Commission's final determination to determine whether it is lawful and supported by substantial evidence in the record. 19 U.S.C. § 1516a(b); *see also N.M. Garlic Growers Coal. et al. v. United States*, 352 F. Supp. 3d 1281, 1307 & n.38 (Ct. Int'l Trade 2018) (finding that its task was to determine whether substantial evidence supported Commerce's decision and that it "need not resolve its ethical concerns with {the attorney's} conduct prior to rendering a decision"). In doing so, the Court considers the record evidence that was before the Commission in its administrative proceedings. 19 U.S.C. § 1516a(b)(2). In other words, the Court must determine whether the Commission's decision not to disqualify the Attorney was lawful and supported by substantial evidence in the record. As explained above, the Commission's determination on this issue meets this standard.

Amsted nevertheless claims that the Court should adjudicate its conflict of interest claim because it "has plenary power to remedy ethical violations." PlBr. at 49. Amsted, however, misapprehends that this plenary power applies to judicial proceedings before the Court and does not extend to the regulation of conduct of attorneys appearing before the Commission. Indeed, the Federal Circuit has recognized that just as the courts have the inherent authority to adopt procedures to manage their own affairs, "so do administrative agencies." *Cf. Royal Brush Mfg.*, 75 F.4th at 1261. Here, the Commission enacted and applied its rule requiring that "good cause" must exist for an Attorney to "be suspended or barred from practicing before the Commission, or have imposed on him such lesser sanctions as the Commission deems appropriate." 19 C.F.R. § 201.15(a). The Court should review the Commission's determination within the context of the agency's regulatory procedures, consistent with this Court's standard of review. *See Ass'n of Am. Sch. Paper Suppliers v. United States*, 34 CIT 31, 37, 683 F. Supp. 2d 1317, 1323 (2010) (citing

*Beker Indus. Corp. v. United States*, 7 CIT 313, 313-18 (1984)) (stating that judicial review must "be based solely upon the administrative record made during the particular review proceeding which resulted in the determination subject to judicial review").

### 5.    In Any Event, Amsted is Not Entitled to Its Requested Relief

As discussed above, Amsted's conflict of interest claim fails for several reasons.  All other inadequacies aside, Amsted does not and, in fact, cannot show that it is entitled to its requested relief for an order for the Commission "to dismiss the investigation entirely" or for the Commission to "enter a negative determination" based upon this claim.  PlBr. at 50.

The statute does not permit the Court to reverse a determination of the Commission, either directly or indirectly.  19 U.S.C. § 1516; S. Rep. No. 96-249 at 252 ("Section 516A {of the Trade Agreements Act of 1979} would make it clear that traditional administrative law principles are to be applied in reviewing antidumping and countervailing duty decisions where by law Congress has entrusted the decision-making authority in a specialized, complex economic situation to administrative agencies"); *INS v. Ventura*, 537 U.S. 12, 16 (2002) (emphasizing that a court reviewing agency action should, except in exceptional circumstances, remand improper determinations to the agency involved for additional investigation or explanation); *Altx, Inc. v. United States*, 370 F.3d 1108, 1111 n.2 (Fed. Cir. 2004) ("Section 1516a limits the Court of International Trade to affirmances and remand orders; an outright reversal without a remand does not appear to be contemplated by the statute.").

While there may well be exceptional situations where "the trade court may be faced with a Commission determination that is unsupported by substantial evidence, and for which a remand {for further consideration or explanation} would be futile," that is not the case here.  *Nippon Steel*, 458 F.3d at 1359 (quotation omitted); *see also NLRB v. Food Store Emps. Union*, *Local*

*347*, 417 U.S. 1, 8 (1974).  As noted above, if the Court were to find merit to Amsted's argument that the Attorney violated his ethical obligations and that the Commission was unreasonable in not disqualifying the Attorney in the underlying *FRC II* investigations, the Commission has the ability, and should be given the opportunity, to rectify any "taint" caused by the Attorney's conduct.  *See*, *e.g.*, *Koyo Seiko*, 13 CIT at 462-64, 715 F. Supp. at 1099; *Elkem Metals*, 26 CIT at 240, 193 F. Supp. 2d at 1321.[14]

## V.    Conclusion

For all the foregoing reasons, this Court should affirm the Commission's affirmative determination for FRCs from Mexico.  Because the Commission reasonably considered all the evidence and explained its findings, the Commission's determinations are supported by substantial evidence and in accordance with law.

---

[14] Even if the Court finds the Commission's actions regarding this issue to be unreasonable, the appropriate remedy for further consideration, rather than direct the Commission to enter a negative determination, as Amsted requests.  *See Amsted*, 600 F. Supp. 3d at 1324 ("{I}f the court finds the Commission's actions to be unreasonable, it may remand the matter for further investigation as appropriate.").

Respectfully submitted,

Dominic L. Bianchi
General Counsel

Andrea C. Casson
Assistant General Counsel for Litigation

*/s/      Garrett L. Peterson*
Garrett L. Peterson
Jane C. Dempsey
Michael K. Haldenstein
Attorney-Advisors
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3241
garrett.peterson@usitc.gov

*Attorneys for Defendant United States International Trade Commission*

Dated: February 6, 2025

48

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S**

**NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE**

**56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains <u>14,622</u> words,

according to the word-count function of the word processing system used to prepare this brief

(Microsoft Word 2010).


Dated: February 6, 2025                    */s/ Garrett L. Peterson*
                                           Garrett L. Peterson
                                           Attorney-Advisor
                                           Office of the General Counsel
                                           U.S. International Trade Commission
                                           500 E Street, SW
                                           Washington, DC 20436
                                           Telephone: (202) 205-3241
                                           Facsimile: (202) 205-3111
                                           garrett.peterson@usitc.gov